# EXHIBIT A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 10-K

(Mark One)

☒    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2020

OR

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number: **001-36296**

# Sesen Bio, Inc.
(Exact name of registrant as specified in its charter)

| **Delaware** | **26-2025616** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| **245 First Street, Suite 1800** **Cambridge, MA** | **02142** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code **(617) 444-8550**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.001 par value | SESN | The Nasdaq Global Market |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Smaller reporting company | ☒ |
| Accelerated filer | ☐ | Emerging growth company | ☐ |
| Non-accelerated filer | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of common stock held by non-affiliates of the registrant, computed by reference to the closing price of the common stock on the Nasdaq Global Market on June 30, 2020, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $84.0 million.

There were 167,578,637 shares of the registrant's common stock outstanding as of March 8, 2021.

Near the completion of this Phase 2 clinical trial in 2009, Valstar was re-launched in the United States for the treatment of BCG-refractory CIS bladder cancer in patients for whom immediate cystectomy would be associated with unacceptable morbidity or mortality. However, because physicians were not widely prescribing Valstar to their patients and it was not an approved therapy in Europe, this disrupted our originally designed clinical path of a head-to-head pivotal Phase 3 clinical trial of Vicineum against Valstar. Due to the uncertainty of the standard of care in this space, our efforts were put on hold until a clear clinical path was established. In May 2013, the FDA co-sponsored a public workshop where it evaluated potential trial designs for the development of therapies for NMIBC and specifically provided regulatory guidance supporting the idea that a single-arm clinical trial could provide sufficient evidence of benefit if the results were robust. The panel suggested it is acceptable to include high-risk papillary patients without CIS in a clinical trial with CIS patients because the clinical management and outcome if left untreated is considered to be the same. In September 2014, we conducted an end of Phase 2 meeting with the FDA and, consistent with our interactions with the FDA during this meeting, refocused our resources to commence an open-label, non-randomized Phase 3 clinical trial of Vicineum in BCG-unresponsive NMIBC.

*Safety data.* We believe that our safety data from 110 patients in our Phase 1 and Phase 2 clinical trials support further development of Vicineum for the treatment of NMIBC BCG failures. There were no Grade 4 or Grade 5 serious adverse events that were considered by the clinical investigators to be related to Vicineum during the Phase 1 and Phase 2 clinical trials of Vicineum for the treatment of NMIBC BCG failures. There was one Grade 5 serious adverse event, or death, which was determined by the clinical investigator to be unrelated to Vicineum. The most common reported treatment-related adverse events were an abnormally frequent passage of small amounts of urine, blood in the urine and painful urination, the majority of which were considered to be mild or moderate in severity. No patients discontinued treatment due to a Vicineum-related adverse event during the Phase 1 and Phase 2 clinical trials.

*Phase 3 Clinical Trial*

Based upon our September 2014 end of Phase 2 meeting with the FDA, we, through our subsidiary Viventia, commenced the Phase 3 VISTA Trial in patients with BCG-unresponsive NMIBC who have received adequate BCG and whose disease is now BCG-unresponsive, and for whom the then-current standard of care was the surgical removal of their bladder, or a radical cystectomy, in the third quarter of 2015 in the United States and Canada. Based on safety and efficacy data observed with the longer 12-week induction in our Phase 2 clinical trial, the FDA agreed to our plan to employ more frequent dosing in our Phase 3 clinical trial, in which the primary endpoints are CR and DoR in patients with CIS whose disease is BCG-unresponsive. In November 2016, the FDA issued draft guidance regarding appropriate clinical trial design for new drugs and biologics for BCG-unresponsive NMIBC, including the use of single-arm trials. The FDA finalized this guidance in February 2018 and retained many of the recommendations from the 2016 draft guidance regarding clinical trial design, including the use of single-arm trials. We believe that our VISTA Trial design was consistent with these aspects of the FDA's guidance.

As part of this trial, in July 2015, we submitted a Clinical Trial Application ("CTA") to Health Canada to include Canadian sites. In September 2015, we received a No Objection Letter from Health Canada, permitting us to proceed with our Phase 3 VISTA Trial in Canada.

The primary and secondary endpoints for the VISTA Trial are as follows:

| | |
|---|---|
| **Dose** | 30 mg of Vicineum (in 50 mL of saline) |
| **Total enrollment** | 133 patients, including 93 CIS patients whose disease is BCG-unresponsive |
| **Primary endpoints** | • CRR at 3 months in patients with CIS (with or without papillary disease) whose disease is BCG-unresponsive; and |
| | • Kaplan-Meier estimate of DoR for BCG-unresponsive CIS patients who experience a CR. |

Patients with CIS will be considered to have a CR if at the time of any disease status evaluation (per protocol every 13 weeks or any unscheduled evaluation) there is no evidence of high-grade disease (CIS, high-grade Ta or any grade T1 disease) or disease progression (e.g., to muscle invasive disease). Low-grade disease is not considered a treatment failure in these patients, and they may remain on study treatment following TURBT.

14

We have a demonstrated history of investing in our workforce through comprehensive and competitive compensation and benefits, and a focus on health and employee wellbeing. We have adopted the Company's 2014 Stock Incentive Plan ("2014 Plan") and Employee Stock Purchase Plan ("ESPP") to enable us and our subsidiaries to recruit and retain highly qualified employees, directors and consultants, provide those individuals with an incentive for productivity, and provide those individuals with an opportunity to share in our growth and value.

As of December 31, 2020, we had twenty-seven full-time employees and no part-time employees, eight hold Ph.D. degrees and one is a veterinary doctor. This number consists of eleven employees engaged in administration, five employees engaged in clinical and regulatory activities, five employees engaged in research and development, four employees engaged in operations (two in manufacturing and two in facility/engineering) and two employees engaged in quality and support. Three of our employees are located in our corporate headquarters in Boston, thirteen of our employees are located in our Winnipeg facility, and eleven of our employees are located in our Philadelphia office. We have no collective bargaining agreements with our employees and none are represented by labor unions. We have not experienced any work stoppages. We believe our relationship with our employees is satisfactory.

Since the beginning of the COVID-19 pandemic, approximately 30% of our employees have continued to work at our Winnipeg facility, where we have adopted health screening, implemented socially distancing and personal protective equipment requirements, enhanced cleaning and sanitation protocols, and modified workspaces to reduce the potential for transmission of the virus. All other employees who do not require access to our facility to perform their work have been working from home during the pandemic.

**Corporate Information and Access to SEC Reports**

Our principal executive offices are located at 245 First Street, Suite 1800, Cambridge, Massachusetts 02142, our telephone number is (617) 444-8550 and our website address is www.sesenbio.com. We make our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to those reports, available free of charge in the "Investors" section of our website as soon as reasonably practicable after we file these reports with the SEC. We routinely post these reports, recent news and announcements, financial results and other important information about our business on our website at www.sesenbio.com. Information contained on our website is not a part of this Annual Report on Form 10-K.

In addition, the United States Securities and Exchange Commission ("SEC") maintains an Internet website at www.sec.gov that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC.

43

*Fair Value of Contingent Consideration*

| | |
|---|---|
| *Description of the Matter* | As discussed in Notes 3 and 5 to the consolidated financial statements under the caption "Contingent Consideration," the Company uses a discounted cash flow model to estimate the fair value of the contingent consideration liability each reporting period, which represents the present value of projected future cash flows associated with regulatory approval milestones and royalties on net sales due to the selling shareholders of Viventia Bio Inc. Fluctuations in the fair value of the liability result in a charge to earnings (or loss) during the period. As of December 31, 2020, the Company estimated the fair value of the contingent consideration liability as $108.8 million and recorded the change in fair value of $11.2 million within operating (income) expense for the year ended December 31, 2020. |
| | Auditing the fair value of the contingent consideration liability required significant auditor judgment due to the high degree of subjectivity in evaluating certain assumptions used by management to estimate the fair value of the liability. In particular, the fair value measurement was sensitive to the significant assumptions underlying the projected commercial sales of Vicineum and probabilities of success and timing of certain milestone events and achievements. |
| *How We Addressed the Matter in Our Audit* | To test the estimated fair value of the contingent consideration liability, our audit procedures included, among others, assessing the terms of the arrangement, evaluating the methodology used and testing the key inputs and significant assumptions discussed above. We evaluated the significant assumptions in light of observable industry and economic trends and standards, external data sources, probability of success benchmarks, and regulatory factors. Our procedures included evaluating the data sources used by management in determining its significant assumptions and included an evaluation of available information that either corroborated or contradicted management's conclusions. In addition, we involved our valuation professionals to assess the methodology used to determine the fair value of the contingent consideration liability, which included performing corroborative fair value calculations. |

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2010.

Boston, Massachusetts
March 15, 2021

F-3