**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE SESEN BIO, INC. SECURITIES
LITIGATION

Case No.: 1:21-cv-07025-AKH

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

I.      Preliminary Statement.................................................................................................1

II.     Statement Of Facts......................................................................................................4

        A.      Sesen Bio Bets Its Future On Near-Term Regulatory Approval Of
                Vicineum........................................................................................................4

        B.      Defendants Tout Sesen Bio's Marketing Applications And VISTA Results
                Without Disclosing Material Risks To Vicineum's Approval...............................5

        C.      Defendants' Failure To Disclose The Material Risks To Vicineum's
                Approval Enable The Company To Raise $175 Million ........................................6

        D.      Defendants Failed To Disclose That The VISTA Trial Was Marred By
                Investigator Misconduct And Tainted Data...............................................6

        E.      Defendants Also Failed To Disclose That Trial Patients Were Harmed
                From Vicineum Leaking Out Of The Bladder Into Their Bodies........................8

        F.      Defendants Failed To Disclose That Regulators Warned Sesen Bio Of
                Serious Problems With Vicineum And The VISTA Trial....................................10

        G.      Even After The FDA Rejected Defendants' Application, The Company
                Still Failed To Disclose The Truth.......................................................11

        H.      Sesen Bio's Business Continues To Languish After The Class Period.................12

III.    Applicable Legal Standards Disfavor Defendants' Motion................................................13

IV.     Defendants Make Factual Arguments Which Should Not Be Considered On A
        Motion To Dismiss .................................................................................................14

V.      Defendants' Misleading Statements Selectively Disclosing Positive Information
        Created A Duty To Disclose The Omitted Material Adverse Facts ................................17

        A.      Defendants' VISTA Trial Was Compromised By Widespread Misconduct
                And Tainted Data.............................................................................19

        B.      Two Patients In Vicineum Clinical Trials Met The Criteria For Hy's Law,
                Indicating A Substantial Probability Of Liver Failure Or Death.........................21

        C.      The EMA Repeatedly Provided Defendants Strongly Negative Feedback
                On Vicineum...................................................................................23

VI.     Defendants' Misplaced Arguments Fail To Defeat Falsity .............................................26

        A.      Defendants' Misrepresentations Are Not Protected By The Safe Harbor ............26

1. Many Statements At Issue Are Not Forward-Looking Statements, But Statements Of Present Or Historical Facts ........................................26

2. The Safe Harbor Does Not Protect Material Omissions ...........................27

3. The Safe Harbor Does Not Protect Any Of Defendants' Misstatements From Liability ..................................................................28

B. Most Of Defendants' Misleading Statements Are Not Opinions .........................29

C. Defendants' Risk Factor Disclosures Were Materially Misleading .....................32

D. Defendants' Misleading Statements Were Material, And Thus Were Not Puffery........................................................................................................34

VII. The Complaint Pleads A Strong Inference Of Scienter .......................................34

A. Defendants Consciously And Recklessly Disregarded Known Adverse Information ........................................................................................................35

B. Defendants' Pattern Of Selective Partial Disclosures Adds To A Strong Inference Of Scienter .........................................................................................36

C. Defendants Held Themselves Out As Knowledgeable About Vicineum's Trials, Safety, And Regulatory Developments .......................................................38

D. Defendants Raised $175 Million From Investors While Concealing Material Adverse Facts .......................................................................................39

E. Defendants' Additional Motive Arguments Fail ...................................................41

VIII. The Complaint States A Claim For Control Person Liability...........................................43

IX. The Complaint Pleads Defendants' Fraud With Particularity .........................................44

X. Conclusion ........................................................................................................................45

# TABLE OF AUTHORITIES

<u>CASES</u>

*Abramson v. Newlink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020)............................................................................... 29, 31, 32

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................ 14

*City of Livonia Employees' Ret. Sys. v. Wyeth*,
  2010 WL 3910265 (S.D.N.Y. Sept. 29, 2010).................................................... 27, 35

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012).................................................................. 26

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)................................................................................ 21

*City of Providence v. Aeropostale, Inc.*,
  2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ..................................................... 27, 28

*Cohen v. Kitov Pharms. Holdings, Ltd.*,
  2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) ..................................................... *passim*

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
  433 F. Supp. 3d 515 (S.D.N.Y. 2020).................................................................. 44

*Credit Suisse First Bos. Corp. v. ARM Fin. Grp., Inc.*,
  2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ....................................................... 29

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)................................................................................ 14

*Exch. Comm'n v. Sabrdaran*,
  252 F. Supp. 3d 866 (N.D. Cal. 2017) ................................................................ 36

*Foman v. Davis*,
  371 U.S. 178 (1962)............................................................................................ 45

*Friedl v. City of New York*,
  210 F.3d 79 (2d Cir. 2000).................................................................................. 16

*In re Allergan PLC Sec. Litig.*,
  2019 WL 4686445 (S.D.N.Y. Sept. 20, 2019)..................................................... 17, 38

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) .................................................................................... 42

*In re Aratana Therapeutics Inc. Sec. Litig.*,
    315 F. Supp. 3d 737 (S.D.N.Y. 2018)..................................................................... 42

*In re Complete Mgmt. Inc. Sec. Litig.*,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001)...................................................................... 28

*In re Delcath Sys., Inc. Sec. Litig.*,
    36 F. Supp. 3d 320 (S.D.N.Y. 2014)................................................................... passim

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006)........................................................................ 28

*In re Facebook, Inc. IPO Securities and Derivative Litigation*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013)...................................................................... 33

*In re Intercept Pharms., Inc. Sec. Litig.*,
    2015 WL 915271 (S.D.N.Y. Mar. 4, 2015) ............................................... 35, 36, 37, 39

*In re Lihua Int'l, Inc. Sec. Litig.*,
    2016 WL 1312104 (S.D.N.Y. Mar. 31, 2016) ......................................................... 20

*In re MF Global Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)...................................................................... 26

*In re N. Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)...................................................................... 42

*In re OSI Pharms., Inc. Sec. Litig.*,
    2007 WL 9672541 (E.D.N.Y. Mar. 31, 2007).............................................. 16, 21, 25

*In re Oxford Health Plans Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................................ 27

*In re Pfizer Inc. Sec. Litig.*,
    584 F. Supp. 2d 621 (S.D.N.Y. 2008)...................................................................... 16

*In re Regeneron Pharm. Inc. Sec. Litig.*,
    2005 WL 225288 (S.D.N.Y. Feb. 1, 2005)........................................................ 26, 27, 29, 34

*In re Salix Pharms., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)........................................................... 27

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015)......................................................................... 27

*In re Sanofi-Aventis Sec. Litig.*,
  774 F. Supp. 2d 549 (S.D.N.Y. 2011)........................................................... 18, 26, 36

*In re Silvercorp Metals, Inc. Sec. Litig.*,
  26 F. Supp. 3d 266 (S.D.N.Y. 2014).......................................................................... 36

*In re Tenaris S.A. Sec. Litig.*,
  493 F. Supp. 3d 143 (E.D.N.Y. 2020) ....................................................................... 33

*In re Vivendi Universal, S.A.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003)........................................................................ 20

*In re XL Fleet Corp. Sec. Litig.*,
  2022 WL 493629 (S.D.N.Y. Feb. 17, 2022).......................................................... 21, 36

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016)......................................................................................... 41

*Irvine v. ImClone Sys., Inc.*,
  2003 WL 21297285 (S.D.N.Y. June 4, 2003) ........................................................... 28

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)....................................................................................... 42

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ..................................................................................... 16

*Kleinman v. Elan Corp., plc*,
  706 F.3d 145 (2d Cir. 2013)....................................................................................... 30

*Lopez v. Ctpartners Exec. Search Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016).......................................................................... 20

*Luce v. Edelstein*,
  802 F.2d 49 (2d Cir. 1986)......................................................................................... 45

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ..................................................................................... 39

*Mateo v. Bristow*,
  2013 WL 3863865 (S.D.N.Y. July 16, 2013) ............................................................ 14

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)...................................................................................... *passim*

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ............................................................... 38

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)........................................................... 20, 21, 35

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019)........................................................ 42

*Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc.*,
  2020 WL 3268531 (S.D.N.Y. June 17, 2020) ................................... 23, 24

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)............................................................. 29, 30, 31, 32

*Sec. & Exch. Comm'n v. Sabrdaran*,
  2015 WL 901352 (N.D. Cal. Mar. 2, 2015)............................................. 36

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
  348 F. Supp. 3d 313 (S.D.N.Y. 2018)................................................ *passim*

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 3268495 (S.D.N.Y. June 16, 2020) .................................... *passim*

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 4208442 (S.D.N.Y. July 21, 2020) ...................................... 39, 43

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)...................................................................... 28

*Tabak v. Canadian Solar Inc.*,
  549 F. App'x 24 (2d Cir. 2013) ................................................................ 43

*Takara Trust v. Molex Inc.*,
  429 F. Supp. 2d 960 (N.D. Ill. 2006) ....................................................... 28

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)........................................................................... 14, 43

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016).................................................................. 24, 25

STATUTES

15 U.S.C. §78u–4(b)(3)(B) ................................................................................ 16

15 U.S.C. §78u-5(c)(1) ..................................................................................... 26

15 U.S.C. §78u-5(c)(1)(A)................................................................................ 28

RULES

Fed. R. Civ. P. 8................................................................................................ 44

Fed. R. Civ. P. 12(b)(6).............................................................................. 14, 16

Fed. R. Civ. P 12(g) ......................................................................................... 14

Fed. R. Civ. P. 56............................................................................................. 16

Fed. R. Civ. P. 56(d)(2).................................................................................... 16

Plaintiffs respectfully submit their opposition to Defendants' Motion to Dismiss (Dkt No. 72) the Amended Class Action Complaint for Violations of the Federal Securities Law (Dkt No. 65) (the "AC").[1]

## I.      Preliminary Statement

Plaintiffs allege a straightforward claim of securities fraud: throughout the December 21, 2020 to August 17, 2021 Class Period, Defendants consciously and recklessly withheld highly material negative information from the public about their lead drug approval candidate, while raising vast sums of money from unsuspecting investors. Defendant Sesen Bio, Inc. ("Sesen Bio" or the "Company") is a small drug development company; none of its products have been approved by regulators. The Company's lead (indeed, only) product candidate at all relevant times has been Vicineum, a treatment for cases of non-muscle invasive bladder cancer that are unresponsive to the established first-line treatment of the bacillus Calmette–Guérin vaccine. Vicineum contains highly toxic material that is, according to Defendants, *supposed to* only interact with cancer cells while avoiding healthy cells. Vicineum is delivered via catheter into the bladder, where it is, according to Defendants, *supposed to* remain until being removed by urination within two hours.

At the start of the Class Period Sesen Bio announced that it had submitted an application to the Food and Drug Administration for approval to market Vicineum. Over the ensuing months Sesen Bio, its CEO Defendant Cannell, and its CFO Defendant Forbes, repeatedly promoted Vicineum's "VISTA" clinical trial as providing the key data supporting approval. They released trial data purporting to show that Vicineum had good tolerability and a favorable safety profile.

---

1 Citations to the AC are in the form "¶__." Terms not otherwise defined have the same meanings as in the AC. Unless otherwise noted, internal alterations, citations and quotations are omitted and emphasis is added throughout. "Motion" or "MTD" refers to Defendants' memorandum in support of their motion to dismiss (Dkt No. 73).

And they released a steady stream of press releases and other public statements hyping almost every communication from the FDA and the European Medicines Agency (to which Defendants had submitted a parallel application for marketing approval in Europe).

Based on these public statements, the trading price of Sesen Bio stock more than tripled. The Company promptly cashed in, selling approximately $175 million in stock. This was an enormous windfall for a small, fledgling company like Sesen Bio, which had admitted at the beginning of 2021 that it lacked funds to survive until the end of the year.

But unbeknownst to investors, Defendants' overwhelmingly positive public disclosures regarding Vicineum were cherry picked and failed to reveal key hard facts that severely undermined the prospects for Vicineum's near-term approval and the Company's commercial success. *First*, the pivotal VISTA study, which was the key to Vicineum's approval, was compromised by thousands of trial protocol violations. VISTA was also plagued by investigator misconduct, with the trial's independent monitor reporting three investigators to the FDA. One investigator had even been found to be back-dating data. Defendants submitted misconduct-tainted VISTA data to the FDA after explicitly being warned not to do so.

*Second*, Defendants' clinical trials indicated that highly toxic Vicineum leaked out into the body and interacted with healthy cells, causing serious health problems. Specifically, Defendants found that two patients in their trials met the criteria for "Hy's Law." Hy's Law is used by drug makers and drug safety regulators as a strong indicator that a given drug will cause fatal drug-induced liver injury in patients. Drug-induced liver injury is one of the most frequent causes of safety-related drug marketing withdrawals.

*Third*, the European Medicines Agency repeatedly gave Defendants sharply negative feedback regarding their application to market Vicineum in Europe. The EMA denied

2

Defendants' request for accelerated assessment of the application, in part because Vicineum was "not expected to . . . provide a therapeutic advantage compared to available treatments, survival benefit or other important benefit." The EMA later followed up in its Day 120 assessment report, noting that Vicineum "seems to pose significant renal toxicity" and that trial results indicated "systemic absorption from the urinary bladder or at least absorption to kidney and thereafter liver." The Day 120 report further observed that "[t]he credibility of the study conduct, validity of the database, and the clinical meaningfulness of the data are seriously questioned."

Defendants revealed none of this to the public, but the truth eventually came out, causing a prompt crash from which Sesen Bio's stock price has never recovered. On August 13, 2021 the Company announced that the FDA had rejected its application, and would require "additional clinical/statistical data and analyses," before Vicineum could be re-considered for approval. The Company's stock fell 57% that day. On August 16, 2021 Defendants held a public conference call to discuss the FDA rejection, in which they admitted that the FDA would require Sesen Bio to perform an additional clinical trial before resubmitting a Vicineum application. The Company's shares fell another 42%. Then on August 18, 2021, the leading healthcare industry news publication *STAT* published a detailed exposé revealing the trial misconduct and Hy's Law cases, based on "hundreds of pages of internal documents," including safety reports, raw data, and communications between employees, which documents were "confirmed by three people familiar with the matter." Sesen Bio stock fell another 13%. Over a period of five days, the Company's stock price had lost all of its artificial gains, and reverted to its pre-Class Period trading range of around $1.00 per share, roughly where it remains to this day.

Defendants have no real to defense to the allegations that they withheld these critical hard facts from the investing public—facts that created material risks to Vicineum's prospects for

near-term regulatory approval and to Sesen Bio's prospects for success. Their motion instead attempts to dispute Plaintiffs' well-pleaded factual allegations and to mischaracterize Plaintiffs' arguments, knocking down straw men in their place. For example, Defendants falsely claim "Plaintiffs' scienter theory" is that "Sesen Bio knew or should have known that its application was doomed from the outset." But the complaint does not allege that Defendants' statements were misleading because they failed to disclose that the application would *necessarily* fail. Rather, the complaint clearly alleges these statements were misleading because they failed to disclose *material risks* to approval. Defendants' other arguments fare no better, and are refuted in detail, *infra*.

Plaintiffs' simple theory of fraud, and the compelling facts alleged, should be allowed to proceed to be tested on their merits. Defendants' motion should be denied.

## II.    Statement Of Facts

Sesen Bio is a late-stage clinical company that purports to advance TFP[2] therapeutics for cancer treatments. Its lead product candidate is Vicineum (also known as Vysyneum, VB4-845, or Oportuzumab monatox), a locally administered TFP developed as a treatment of BCG[3]-unresponsive non-muscle invasive bladder cancer. ¶26.

### A.    Sesen Bio Bets Its Future On Near-Term Regulatory Approval Of Vicineum

Prior to the Class Period, Sesen Bio had failed to achieve regulatory approval anywhere for even a single product. ¶29. The Company had never received a single dollar in revenue from product sales and only minimal revenues from licensing and partnership agreements. *Id*. Because of this lack of revenue, Sesen Bio required continuous infusions of investor capital to continue as

---

[2] "TFP" refers to "targeted fusion protein".

[3] "BCG" refers to "Bacillus Calmette-Guérin." BCG vaccine is the standard of care for patients with bladder cancer.

a going concern and counteract its substantial operating losses. ¶¶30-31.

Sesen Bio needed to be able to demonstrate that its products were commercially viable to continue to be able to raise money to fund operations. Therefore, during the Class Period, the approval and commercialization of Vicineum was Sesen Bio's exclusive focus since none of its other product candidates was developed enough to have a prospect of obtaining regulatory approval or being commercialized in the near future. ¶¶32-34. Moreover, time was of the essence because if regulators determined that approval of Vicineum required additional supporting trials this would likely add years of delay and tens of millions of dollars of expense to Sesen Bio's plans. ¶35. Such additional funds would have to be acquired from investors, which was certainly not assured if its products were not approved. *Id.*

**B.     Defendants Tout Sesen Bio's Marketing Applications And VISTA Results Without Disclosing Material Risks To Vicineum's Approval**

Sesen Bio's ability to sell Vicineum depended on regulators accepting its clinical trials as thoroughly demonstrating both safety and efficacy. Drug regulators carefully scrutinize clinical trials in order to protect the public from dangerous or unproven medicines. ¶36.

Sesen Bio initiated a Phase 3 clinical trial of Vicineum, which Sesen Bio referred to as the "VISTA" trial, and which Sesen Bio intended to be its final clinical trial before submitting applications for regulatory approvals for Vicineum. ¶39. VISTA was a single-arm, non-randomized trial, meaning that all patients received Vicineum, and there was no comparison or control group that received placebo treatment or alternative treatments. VISTA completed enrollment in April 2018 and had a data cutoff date of May 29, 2019. ¶40. In August 2019 Sesen Bio reported preliminary efficacy data from VISTA. *Id.*

VISTA was the pivotal trial submitted by Sesen Bio in support of its Biologics License Application to the FDA by which it sought approval to market Vicineum in the United States,

and also in support of its application to the European Medicines Agency ("EMA") for authorization to market Vicineum in the European Union ("E.U."). *Id*.

C.    **Defendants' Failure To Disclose The Material Risks To Vicineum's Approval Enable The Company To Raise $175 Million**

At the start of the Class Period, December 21, 2020, the Company announced that it had submitted its Biologics License Application ("BLA") to the FDA for Vicineum. ¶98. The Company further promoted its VISTA results as supporting approval:

> The BLA is supported by the pivotal Phase 3 VISTA trial, which the Company believes demonstrates a strong benefit-risk profile. The BLA also includes positive chemistry, manufacturing and controls (CMC) data that the Company believes validates the analytical comparability between clinical and commercial supply.

¶99. In fact, Defendant Cannell, Sesen Bio's CEO, specifically stated that "[o]ur strong non-clinical and clinical data, in addition to our positive comparability data, give us confidence in the regulatory path forward." ¶100. Over the ensuing months Defendants would continue to hype Vicineum's prospects, while failing to disclose material risks to its approval.

The Company's stock began to greatly increase in value at the beginning of the Class Period, and over the following months, due to Defendants' misleading statements. This artificial price increase enabled the Company to engage in a series of stock sales netting approximately $175 million during the Class Period. ¶¶89-92. These sales were transformative for the Company that previously represented that it may be unable to continue as a going concern, and now had well over $100 million in cash on hand. ¶¶94-97.

D.    **Defendants Failed To Disclose That The VISTA Trial Was Marred By Investigator Misconduct And Tainted Data**

While the Company was able to profit greatly from the increase in Sesen Bio's stock price during the Class Period, the investors purchasing the stock were given a misleading picture of the VISTA trial and regulatory applications. To begin with, the Company failed to disclose

6

that investigators conducting the VISTA trial had engaged in extreme misconduct, which had tainted trial data that Defendants submitted to the FDA.

As was disclosed at the end of the Class Period in a detailed exposé by the healthcare industry publication *STAT*, the VISTA trial "had more than 2,000 violations of trial protocol, including 215 classified as 'major,' according to company documents." ¶52; *see also* AC, Ex. 1. According to the hundreds of pages of internal Sesen Bio documents reviewed by *STAT*, "[t]he study's independent monitors reported three investigators to the FDA for particularly egregious violations, calling them issues of 'serious noncompliance' that 'placed subjects at risk of harm'." *Id*. In fact, a company that Sesen had hired to monitor its trial had found that three doctors in the study were guilty of "'serious noncompliance,' 'continued noncompliance,' and actions that 'placed subjects at risk of harm'." ¶53.

Most egregiously, Sesen Bio's internal documents revealed that, "one investigator had his clinic closed in 2017 after his hospital's disciplinary committee concluded he had engaged in 'disgraceful, dishonorable, or unprofessional' behavior," and a second investigator "was found to be back-dating data." ¶54. In both of these cases of investigator misconduct Sesen Bio's own documents revealed that it was advised that "the data from these affected centers cannot be used in any data analysis" submitted to the FDA. *Id*. However, the internal documents revealed that Sesen Bio "included results from both sites in its application for Vicineum's approval." *Id*.[4]

---

[4] The EMA's Day 120 report similarly found egregious flaws in VISTA's design and conduct. For example, the Day 120 report notes that Sesen Bio made several substantial changes to the study's conduct while it was ongoing, with respect to statistical analysis and inclusion criteria, which changes were poorly documented, and that as such "uncertainties and concerns about the credibility of data should trigger a GCP [good clinical practice] inspection." ¶83; *see also* AC, Ex. 2. The report similarly stated "[t]he credibility of the study conduct, validity of the database, and the clinical meaningfulness of the data are seriously questioned." ¶80.

When providing comment for the *STAT* article, Sesen Bio did not deny the protocol violations or investigator misconduct, or that it submitted the tainted data to FDA. ¶55. In fact, Sesen Bio later confirmed certain facts in the article, including that:

> [A] study investigator did not comply with applicable statutory requirements and applicable regulations regarding conduct of clinical investigations. The study investigator operated a clinical site that was previously part of the VISTA trial, which was closed by the Company on May 26, 2017. The study investigator's medical license was temporarily suspended on May 29, 2017 due to inaccurate recordkeeping, which was unassociated with Sesen Bio and the patients in the VISTA trial.

¶56. In spite of the known investigator misconduct and tainted data, Defendants intentionally failed to disclose these facts to the investing public even though they clearly presented a material risk to the BLA application and potential approval for Vicineum.

### E.   Defendants Also Failed To Disclose That Trial Patients Were Harmed From Vicineum Leaking Out Of The Bladder Into Their Bodies

The *STAT* article at the August 18, 2021 end of the Class Period further explained that Sesen Bio's clinical trials for Vicineum had all along suffered from numerous problems including worrying signs of toxicity that Sesen Bio had not publicly disclosed. The article cited "hundreds of pages of internal documents obtained by STAT . . . confirmed by three people familiar with the matter," including safety reports, raw data, and communications between employees. ¶43.

Vicineum, which contains highly toxic material that kills cells, is administered directly into the bladder via catheter. ¶44. Further, the Company claims that Vicineum is supposed to only interact with cancer cells and remain exclusively in the bladder, with the Vicineum leaving the body by urination two hours after it enters the bladder. *Id*. However, this is apparently *not* what actually happened to some patients in the VISTA trial. Specifically, *STAT* cited Sesen Bio

8

internal documents revealing that "data from Sesen's clinical trials suggested Vicineum was leaking out into the body, leading to worrisome side effects." ¶46.[5]

A study using Vicineum on head and neck cancer, conducted prior to VISTA, had led to a patient matching the criteria for Hy's Law, which means "that a patient is at serious risk for fatal, drug-induced liver injury." ¶46. Hy's Law is used in drug development to assess a drug's potential to cause severe drug-induced liver injury ("DILI"). ¶47. The regulatory definition of Hy's Law as described in the FDA's and other agencies' guidance, has been used by most drug makers worldwide, and has had a dramatic effect on data analysis and liver safety assessment during drug development. *Id.* As stated in the FDA's "Guidance for Industry, Drug-Induced Liver Injury: Premarketing Clinical Evaluation," "[f]inding one Hy's law case in the clinical trial database is worrisome; finding two is considered highly predictive that the drug has the potential to cause severe DILI when given to a larger population." ¶47. In sum, regulators and drug makers view even a single instance of Hy's Law in a study subject as a major red flag when, as here, there has already been another instance of Hy's Law with the same drug.

This is precisely what happened in the VISTA trial. According to *STAT*'s review of Sesen Bio documents, in VISTA, "[o]ne patient met the criteria for Hy's Law, suggesting Vicineum led to serious liver toxicity," and "[a]nother patient was diagnosed with life-threatening, drug-induced liver failure, confirmed by biopsy." ¶48. According to *STAT*, Sesen Bio documents confirmed these cases of Hy's Law in Sesen Bio's trials, including "a clinical

---

[5] The EMA Day 120 report confirms that the high prevalence of adverse events in Sesen Bio's studies indicated the possibility that Vicineum was leaking into the body beyond its intended bladder target, stating "safety data suggest that there is a relation between oportuzumab systemic exposure and incidence of adverse events since there is a high percentage of events that are not expected from a medicinal product for vesical instillation." ¶75. The report further states "Systemic drug exposure is suspected." *Id.*

report concluding one patient 'met the criteria for Hy's Law'," and "internal communications about a second patient in which one employee wrote 'I agree this is a Hy's Law case'." ¶49.[6]

**F.      Defendants Failed To Disclose That Regulators Warned Sesen Bio Of Serious Problems With Vicineum And The VISTA Trial**

Sesen Bio interacted frequently with the FDA and the EMA regarding its applications to market Vicineum, but misleadingly only reported positive news about these interactions while failing to disclose the extent and seriousness of concerns expressed by regulators, including specific concerns repeatedly expressed by the EMA to the Company. ¶58.

For example, both before and after Sesen Bio's submission of the marketing authorization application ("MAA") for Vicineum to the EMA, the EMA repeatedly expressed serious concerns about Vicineum and its supporting trials, including in official "assessment reports," all of which Sesen Bio failed to disclose to investors. ¶61. Sesen Bio submitted its MAA to the EMA in March 2021. ¶59. Shortly after Sesen Bio announced on August 13, 2021 that the FDA had rejected its BLA for Vicineum, on August 20, 2021 Sesen Bio withdrew its MAA to the EMA. ¶62. On October 20, 2021 the EMA published a "Withdrawal assessment report" regarding Sesen Bio's withdrawal of the MAA. *Id.*; *see also* AC, Ex. 2.

The "withdrawal assessment report" contained a Day 120 assessment report that Sesen Bio should have received around its July 22, 2021 date. ¶64. The Day 120 report specifically explained that, "[b]ased on the review of the data on quality, safety, efficacy, the application for Oportuzumab monatox [the generic chemical name of Vicineum] . . . is not approvable since 'major objections' have been identified, which preclude a recommendation for marketing

---

[6] *STAT* news had an independent expert review the internal Sesen Bio documents that it obtained. Ben Davies, a urologist at the University of Pittsburgh Medical Center who treats bladder cancer is quoted as stating, "[i]f this is true, there are serious issues that need to be addressed before this drug can even be considered for approval," and that "[m]ost serious is this apparent liver toxicity." ¶51.

authorisation at the present time." ¶65. The report further noted that the "major objections precluding a recommendation of marketing authorisation" related to safety, efficacy, product quality, and the conduct of the VISTA trial and the reliability of its data. *Id*. It concludes that "[t]he B/R [benefit/risk] balance is currently negative due to several MOs [major objections]," and that "[t]he overall B/R of Oportuzumab monatox . . . is negative." *Id*.[7]

Moreover, the report further states that Sesen Bio requested that its MAA for Vicineum be reviewed under the EMA's accelerated assessment procedure, which the EMA denied. ¶67. The EMA's reasons for denying accelerated assessment included that "the product is not expected to . . . provide a therapeutic advantage compared to available treatments, survival benefit or other important benefit," that "[t]he single arm study is not considered strong evidence in this setting," and that "[t]he clinical relevance of the 3-month timepoint for complete response compared to 6 months is not clearly justified." *Id*. The EMA made its decision to deny accelerated assessment at its meeting held on January 25-29, 2021. Consistent with the EMA's generally applicable procedures for the processing of MAAs, the EMA would have communicated its denial of accelerated assessment, and the reasons for this denial, to Sesen Bio shortly thereafter. ¶68. Yet, Defendants chose not to disclose these adverse facts.[8]

### G.    Even After The FDA Rejected Defendants' Application, The Company Still Failed To Disclose The Truth

On August 13, 2021, Sesen Bio announced that the FDA declined to approve its BLA for

---

[7] The Day 120 report also notes that the EMA advised Sesen Bio in 2009 to conduct its pivotal study as a controlled randomized trial, but Sesen Bio simply ignored this advice and conducted a single-arm study instead. ¶66.

[8] In addition to the severely negative findings communicated by the EMA to Sesen Bio in the Day 120 report, and its denial of accelerated assessment, the EMA's MAA evaluation process also involves the issuance of a "Day 80" assessment report. ¶69. Consistent with the EMA's generally applicable procedures for the processing of MAAs, the EMA would have provided the Day 80 report to Sesen Bio on or about June 13, 2021, and this report would have contained findings consistent with those in the Day 120 report. *Id*.

11

Vicineum, through the issuance of a Complete Response Letter ("CRL"). ¶215. The Company admitted that FDA had issued recommendations related to "additional clinical/statistical data and analyses in addition to Chemistry, Manufacturing and Controls (CMC) issues pertaining to a recent pre-approval inspection and product quality." *Id*. On this news, the Company's share price fell $2.80, or 57%, on unusually heavy trading volume. ¶216. When announcing this news, Defendants failed to provide to the investing public the CRL itself and only provided purported summaries of what it said. ¶218. In fact, Defendants have never disclosed the CRL. *See id.*

On August 16, 2021, the Company held a conference call to discuss the FDA's complete response letter. ¶222. On the call, Defendant Cannell further admitted that "[i]t appears that we will need to do a clinical trial to provide the additional efficacy and safety data necessary for the FDA to assess the benefit-risk profile." ¶223. Following the call, the Company's share price fell $0.89, or 42%, again on unusually heavy trading volume. ¶227.

On August 18, 2021, the truth finally came to light when *STAT* published an article entitled "Sesen Bio trial of cancer drug marked by misconduct and worrisome side effects, documents show." ¶232; *see also* AC, Ex. 1. The article cited "hundreds of pages of internal documents obtained by STAT . . . confirmed by three people familiar with the matter," such as internal safety reports, raw data, and communications between employees. ¶233. The article detailed that Sesen Bio's clinical trials for Vicineum had long suffered from numerous serious problems including undisclosed signs of toxicity, hundreds of major trial protocol violations, and reliance on tainted data. ¶234. On this news, the Company's share price fell $0.20, or 13%. ¶235.

### H.   Sesen Bio's Business Continues To Languish After The Class Period

Today, nearly eight months after Defendants received the FDA's complete response letter, they have still not been able to agree with the FDA on the design of a follow-up trial for Vicineum. Sesen Bio will not even definitively commit to submitting a new application. *See*

Houston Decl. Ex. A, Sesen Bio, SEC Form 8-K filed Mar. 30, 2022 (referring to a "*potential resubmission of a Biologics License Application for Vicineum*"). The Company has signaled that any possible agreement with the FDA is still months away. *Id.* ("The Company plans to further engage the FDA in the coming months to align on the remaining outstanding items.").

Sesen Bio's board of directors ordered an internal investigation into the facts at issue here. *See* Houston Decl. Ex. B, Sesen Bio, SEC Form 8-K filed Feb. 25, 2022. The investigation involved "a review of more than 600,000 documents, and 39 interviews of current and former employees and consultants." *Id.* The Company, attempting to put the best possible spin on the investigation's results, provided zero description of the facts it uncovered. *Id.* Defendants only mustered the exceptionally weak conclusion that the board (which includes Defendant Cannell):

> continues to fully support the Company's current management team [which includes Defendant Cannell] and believes no changes or amendments relating to the Company's prior disclosures to the Securities and Exchange Commission ("SEC") or the Food and Drug Administration ("FDA") relating to Vicineum™, the Phase 3 VISTA trial for Vicineum for the treatment of BCG-unresponsive NMIBC, or the Company's Biologics License Application ("BLA") for Vicineum are warranted.

*Id.* This self-serving conclusion should not be taken at face value and has no bearing on the validity of Plaintiffs' claims. Even if this vague and carefully worded statement were credited (it should not be), it fails to address (perhaps intentionally) Sesen Bio's MAA to the EMA, trials other than VISTA, or whether Defendants' statements were knowingly misleading when made.

Unsurprisingly, Sesen Bio's stock has continued to languish, trading at less than $1 for almost the entire time since the end of the Class Period, well below its artificially inflated highs over $4 per share. *See* Houston Decl. Ex. C, Yahoo! Finance chart. As of the close of stock market trading yesterday, the Company's share price was approximately $0.62. *Id.*

## III.   Applicable Legal Standards Disfavor Defendants' Motion

To avoid dismissal, a complaint need only "contain sufficient factual matter . . . to state a

claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs need only plead facts "that allow[] the court to draw the reasonable inference that the defendant is liable." *Id.* at 678. The Court "must consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007). Even in cases subject to the PSLRA, on a motion to dismiss a court must "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015). While the pleading of scienter is subject to a strong inference standard, every other element of a securities fraud claim is subject to a plausibility standard. *See id.* at 304, 307 (applying plausibility standard to falsity).

To state a claim under Exchange Act §10(b) and SEC Rule 10b-5(b), a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Defendants contest only material falsity and scienter.[9] The AC sufficiently alleges each element of its claims.

## IV.   Defendants Make Factual Arguments Which Should Not Be Considered On A Motion To Dismiss

Defendants' motion, while presented as a Rule 12(b)(6) motion to dismiss, more closely resembles a motion for summary judgment. It contains a lengthy "Statement Of Facts" (Defendants' "Argument" section does not begin until page 20 of their brief), which draws on 35 exhibits spanning over 250 pages. The ostensible recitation of "facts" is heavily argumentative. It

---

[9] Defendants waived their right to challenge any element other than those addressed in their opening papers, and these non-contested elements are not addressed herein. *See* Fed. R. Civ. P 12(g); *Mateo v. Bristow*, 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013) ("a court should not consider arguments that are raised for the first time in a reply brief").

makes factual assertions without any support, purporting to contradict the AC's allegations.[10] It repeatedly asks the Court to draw unwarranted inferences in Defendants' favor at the pleading stage.[11] It relies on Defendants' own disputed statements made in SEC filings for the truth of the matters asserted.[12] It cites to materials outside the AC and not subject to judicial notice or incorporation by reference.[13] It mischaracterizes the contents of Defendants' exhibits and numerous internet citations.[14] It misrepresents Plaintiffs' allegations and presents straw men in their place.[15] These tactics are improper on a motion to dismiss.

---

[10] *E.g.*, MTD at 17 ("Contrary to Plaintiffs' allegations, the EMA never provided any conclusions or final rulings on Sesen Bio's MAA."). Defendants attempt to contradict a straw man version of Plaintiffs' allegations. It is irrelevant whether the EMA provided a "final ruling." Plaintiffs allege that "the EMA repeatedly expressed serious concerns about Vicineum and its supporting trials, including in official 'assessment reports'." ¶61.

[11] *E.g.*, MTD at 14 ("the FDA informed Sesen Bio that the FDA was no longer planning to hold an AdCom meeting on Vicineum, suggesting that the FDA did not see any unusual or difficult problems with the trial data."). The lack of a meeting says nothing about the FDA's views.

[12] *E.g.*, MTD at 7 ("in Sesen Bio's view, Vicineum benefited NMIBC patients with an appropriate safety profile"). Defendants certainly publicly claimed as much, but the concealed poor safety results of their trials (¶¶43-51, 70-78) severely undermine the claim.

[13] *E.g.*, MTD at 10 n.11 (citing a document from the website https://pharmaintelligence.informa.com). Defendants fail to inform the Court that the approval probability statistics they cite from this document include resubmissions, *i.e.*, they are inflated by instances where an initial application is rejected, and then a later submission is approved.

[14] *E.g.*, MTD at 8 ("The VISTA Trial adopted the FDA's recommended primary endpoints," including "CRR at three months"). The document Defendants cite says nothing about the FDA purportedly recommending a three month period. *See* Dkt No. 74-1 at 14. On the contrary, this appears to have been a choice by Sesen Bio to try to obtain results that may seem more favorable than they actually are. *See* AC, Ex. 2 at 68 ("[T]he applicant has chosen to evaluate the CR at 3 months as primary outcome. The choice of CR at Month 3 as primary endpoint has several drawbacks. The timepoint is considered not sufficient to evaluate response.").

[15] *E.g.*, MTD at 19 n.33 (falsely identifying "Plaintiffs' scienter theory" as "Sesen Bio knew or should have known that its application was doomed from the outset"). Whether Defendants believed the application might be approved is irrelevant. Plaintiffs' clearly alleged theory of scienter is that Defendants knew, but withheld from investors, negative information that created material risks to Vicineum's approval. *E.g.*, ¶6 ("Defendants materially misled the public by failing to disclose material risks to Vicineum's approval").

The Court should not entertain Defendants' attempts to rely on their own misleading SEC filings and extraneous documents in order to contradict well-pled allegations and spin their own disputed version of the "facts." *See Cohen v. Kitov Pharms. Holdings, Ltd.*, 2018 WL 1406619, at *6 (S.D.N.Y. Mar. 20, 2018) (rejecting Defendants' efforts to quote from their own SEC filings to prove they did not tamper with clinical trial data); *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 634 (S.D.N.Y. 2008) ("The Court declines to take judicial notice of the meaning of . . . the data interpretations proffered by Defendants"), *abrogated on other grounds by Dekalb Cty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393 (2d Cir. 2016); *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (recognizing a "concerning pattern in securities cases" where defendants attempt to exploit judicial notice and incorporation by reference "improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage.").

The Court's "function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *In re OSI Pharms., Inc. Sec. Litig.*, 2007 WL 9672541, at *4 (E.D.N.Y. Mar. 31, 2007). As such, "it is error to consider factual allegations contained in legal briefs or memoranda without converting the motion to one for summary judgment." *Id.* Because "Defendants have much greater access to information and documents . . . Plaintiffs would be better able to counter Defendants' evidence after a reasonable period for discovery." *Id.*[16] Therefore, to the extent that

---

[16] *See also* Fed. R. Civ. P. 56(d)(2); *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) ("When matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material"); 15 U.S.C. § 78u–4(b)(3)(B) (even during pendency of a motion to dismiss in a securities action the court may allow particularized discovery necessary to prevent undue prejudice).

the Court is inclined to consider Defendants' fact arguments (it should not), their Motion should be converted to one for summary judgment, and Plaintiffs should be granted reasonable discovery to test Defendants' factual assertions. *See, e.g.*, MTD at 17 (factually disputing, without offering any citation or support, what information the EMA provided to Defendants regarding the Sesen Bio application). At a minimum, this discovery should include: (i) the EMA's explanation of its reasons for denying accelerated assessment, (ii) the EMA's Day 80 report, (iii) the EMA's Day 120 report, and (iv) the FDA's complete response letter.

## V.   Defendants' Misleading Statements Selectively Disclosing Positive Information Created A Duty To Disclose The Omitted Material Adverse Facts

Throughout the Class Period, Defendants selectively disclosed positive information about the VISTA trial, Vicineum's safety profile, and feedback from the FDA and EMA, while failing to disclose material adverse facts on these very same topics. Defendants failed to disclose 215 major violations of the VISTA trial protocol, serious trial investigator misconduct including backdating data, and that Sesen Bio submitted misconduct-tainted data to the FDA. ¶¶52-57. Defendants failed to disclose that two trial patients met the criteria for Hy's Law, which the FDA considers highly predictive of potential to cause severe drug-induced liver injury in a larger population. ¶¶46-49. Defendants failed to disclose multiple instances of strongly negative feedback from the EMA. ¶¶58-88. All of these facts created material risks to Vicineum's prospects for regulatory approval, about which Defendants kept investors in the dark.

"Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *In re Allergan PLC Sec. Litig.*, 2019 WL 4686445, at *23 (S.D.N.Y. Sept. 20, 2019); *see also Kitov Pharms.*, 2018 WL 1406619, at *4. This is because, "even a statement that is literally true when viewed in isolation can be misleading in context if it leaves investors with a false impression." *Allergan*,

2019 WL 4686445, at \*23; *see also In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 332 (S.D.N.Y. 2014). Therefore, "when a pharmaceutical company makes statements about its product, the company is required to disclose information that would render those statements not misleading." *Delcath Sys.*, 36 F. Supp. 3d at 332; *see also In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 563 (S.D.N.Y. 2011) (where defendants were "regularly commenting about a pending drug application," they had "an unwaivable duty to be both accurate and complete when [they] spoke to investors.").

Once defendants choose to speak on a given topic, whether disclosure of related adverse facts is required turns on an assessment of those facts' materiality. *Sanofi-Aventis*, 774 F. Supp. 2d at 564 ("[W]here the duty to disclose arises from a need to avoid false or misleading statements the inquiries as to duty and materiality coalesce."). "A plaintiff need only demonstrate the materiality of the omitted facts because if a reasonable investor would so regard the omitted fact as material, it is difficult to imagine a circumstance where the prior statement would not be rendered misleading in the absence of the disclosure." *Id.* (cleaned up).

Materiality "is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives*, 563 U.S. at 38. This is "an inherently fact-specific" inquiry. *Id.* at 39. As such, "[w]hether the omitted fact constitutes material information, and whether nondisclosure of the omitted fact renders the original disclosure misleading, remain questions for the trier of fact." *Sanofi-Aventis*, 774 F. Supp. 2d at 564 (cleaned up); *see also Kitov Pharms.*, 2018 WL 1406619, at \*4 (S.D.N.Y. Mar. 20, 2018) ("Because materiality is a mixed question of law and fact, a claim may not be dismissed on this

18

ground unless the misstatements or omissions are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.").

Here, the negative facts Defendants withheld from investors are plainly material as they would have impacted investors' decisions whether to purchase Sesen Bio's stock, and as such, Defendants had a duty to disclose these facts due to their misleadingly incomplete statements cherry picking information on the very same topics.

### A. Defendants' VISTA Trial Was Compromised By Widespread Misconduct And Tainted Data

Defendants put the integrity of the VISTA trial at issue by repeatedly touting the VISTA trial and its central role in Sesen Bio's applications for FDA and EMA approval (*e.g.*, ¶¶99, 133), asserting that Sesen Bio's clinical trials were aligned with FDA guidance (*e.g.*, ¶105), and presenting as mere hypothetical risks that Sesen Bio might fail to comply with Good Clinical Practices and might generate unreliable trial data (*e.g.*, ¶149). These statements were rendered materially misleading by Defendants' failure to disclose the shocking extent of misconduct in the VISTA trial, and Defendants' use of misconduct-tainted data from that trial that they had been warned not to rely on. ¶¶52-57. *See Kitov Pharms.*, 2018 WL 1406619, at *5 ("The Complaint adequately pleads that Defendants made material omissions when they made statements about the results of the Study . . . but failed to disclose that the results had been falsified.").

The VISTA trial was compromised by over 2,000 protocol violations, including 215 major violations. ¶52. The trial's independent monitors reported three VISTA investigators to the FDA for "serios noncompliance" that "placed subjects at risk of harm." ¶¶52-53. One investigator had his clinic closed after his hospital's disciplinary committee concluded he had engaged in "disgraceful, dishonorable, or unprofessional" behavior. ¶54. Another was found to be back-dating data. *Id.* Sesen Bio was warned that "the data from these affected centers cannot

19

be used in any data analysis" submitted to the FDA, but the Company included the results in its Vicineum application anyway. *Id.* Defendants have even admitted to using data from five VISTA patients (VISTA enrolled only 133 patients, *see* ¶39), although the investigator running their clinical site had his medical license suspended due to "inaccurate recordkeeping." ¶56.

This shocking degree of misconduct in the VISTA trial, and Sesen Bio's admitted, knowing submission of tainted data to the FDA, would be highly material to a reasonable investor trying to assess the prospects for approval of Vicineum, which critically depended on regulators accepting the results of the VISTA trial. Defendants were required to disclose this information to correct the misleading impression created by their selective, positive statements.

Defendants ask the Court to ignore the VISTA trial misconduct, arguing that the sources relied on by the *STAT* article are insufficiently described under *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000). But Defendants cite no authority holding that *Novak's* criteria for confidential witness allegations apply to credible journalistic sources. *See In re Lihua Int'l, Inc. Sec. Litig.*, 2016 WL 1312104, at \*12 n.8 (S.D.N.Y. Mar. 31, 2016) ("nothing in *Novak* suggests that its standard applies to confidential sources quoted in publically available news articles"). This is unsurprising since courts routinely credit allegations derived from similar articles. *E.g.*, *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 31 (S.D.N.Y. 2016) ("a plaintiff is permitted to rely on newspaper articles, provided that the reports themselves indicate particularized facts . . . in order to support Plaintiffs' claims."); *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 181 (S.D.N.Y. 2003) ("Defendants provide nothing to impugn the veracity of these post-dated news articles.").

Furthermore, Defendants' argument ignores *Novak's* holding that even confidential sources need not be described with particularity where they are corroborated by allegations that

20

"provide an adequate basis for believing that the defendants' statements were false." *Novak*, 216 F.3d at 314. The *STAT* article was based on "hundreds of pages of internal documents obtained by STAT . . . confirmed by three people familiar with the matter." ¶43. Sesen Bio itself effectively corroborated the *STAT* article by commenting for the article without denying its key claims. ¶55; *see In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *5 (S.D.N.Y. Feb. 17, 2022) (confidential witness statements were corroborated by company's response to short-seller report, in which the company failed to deny the report's key claims).[17]

**B.      Two Patients In Vicineum Clinical Trials Met The Criteria For Hy's Law, Indicating A Substantial Probability Of Liver Failure Or Death**

Defendants put Vicineum's safety data at issue by repeatedly issuing incomplete safety results (*e.g.*, ¶¶104, 111, 141, 146), touting its purported ability to avoid harming healthy cells (*e.g.*, ¶¶109, 144, 145, 182), extolling its purportedly favorable safety profile while downplaying the significance of adverse events (*e.g.*, ¶110), and presenting its harmful side effects as mere hypothetical risks (*e.g.*, ¶148). These statements were materially misleading due to Defendants' failure to disclose known facts showing that highly toxic Vicineum was leaking into patients' bodies and harming their vital organs. *See OSI Pharms.*, 2007 WL 9672541, at *8 (omission of "adverse facts discovered during clinical trials" made statements misleading that did not "adequately convey to the public the limitations of [the drug] that were discovered during the Clinical Study."); *Delcath Sys.*, 36 F. Supp. 3d at 332 (disclosing serius adverse events in drug treatment group, while omitting lower incidence in control group, was materially misleading).

---

[17] For the same reasons, Defendants' argument that the *STAT* article's revelations are merely allegations of "unadjudicated wrongdoing" also fails. The *STAT* article detailed the contents of Sesen Bio's own internal documents and the communications of Sesen Bio employees, which the Company itself has essentially corroborated. In contrast, the case relied on by Defendants involved merely ongoing investigations and allegations in third-party complaints. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).

Specifically, Defendants failed to disclose that two patients in Vicineum clinical trials met the criteria for Hy's Law, which the FDA considers highly predictive of potential to cause severe drug-induced liver injury. ¶¶46-49. Hy's Law states that where patients match certain criteria, this indicates a significant probability of drug induced liver injury ("DILI") resulting in death or liver transplantation. ¶46. Hy's Law is commonly used by regulators and drug makers in connection with new drug development. *Id.* According to published FDA guidance, "[f]inding one Hy's Law case in the clinical trial database is worrisome; finding two is considered highly predictive that the drug has the potential to cause severe DILI when given to a larger population." *Id.*

Defendants found two Hy's Law cases in their Vicineum trials. Their own internal documents admit this. *See* AC, Ex. 2 at 6 (STAT cited "company documents, including a clinical report concluding one patient 'met the criteria for Hy's Law' and internal communications about a second patient in which one employee wrote 'I agree this is a Hy's Law case'."); ¶49. Because of the FDA's publicized concern for the extreme safety risk presented by Hy's Law, the existence of these two cases in Defendants' trials was a highly material fact, which they were required to disclose to correct their misleading safety-related statements.[18]

The materiality of this information is further confirmed by the fact that the EMA specifically inquired about Hy's Law cases in the Day 120 report. *See* AC, Ex. 2 at 117 ("The

---

[18] The Vicineum bladder trials enrolled a combined total of only 243 patients (¶¶37-39), and Vicineum's head and neck cancer trials enrolled similarly small numbers. As such, finding even two Hy's Law cases in this small data set indicates the potential for large numbers of severe drug induced liver injury cases if Vicineum were to be made available for wider use. While Defendants may argue that the existence of two Hy's Law cases in their clinical trials is numerically insufficient to be material, the Supreme Court has expressly rejected bright-line rules regarding the statistical significance of drug safety information in favor of a "fact-specific" inquiry." *Matrixx Initiatives*, 563 U.S. at 43 ("Given that medical professionals and regulators act on the basis of evidence of causation that is not statistically significant, it stands to reason that in certain cases reasonable investors would as well.").

applicant is asked to clarify, how many patients fulfilled Hy's law and whether there were any cases of DILI."). Furthermore, an independent expert urologist at the University of Pittsburgh Medical Center told *STAT* regarding the undisclosed safety data, "[i]f this is true, there are serious issues that need to be addressed before this drug can even be considered for approval," and that "[m]ost serious is this apparent liver toxicity." ¶51. The undisclosed Hy's Law cases would be highly material information to reasonable investors.

### C. The EMA Repeatedly Provided Defendants Strongly Negative Feedback On Vicineum

Defendants put the feedback they received from the EMA at issue by misleadingly touting selective interactions with and communications from the EMA and the FDA (*e.g.*, ¶¶118-20, 123-28, 132-34, 139, 142-43, 152, 159, 164, 169-70, 174, 187-90, 198-200, 203, 205), and by presenting as a mere hypothetical risk that regulators might not be satisfied by Defendants' trial results (*e.g.*, ¶147). These statements were rendered materially misleading by Defendants' failure to disclose that the EMA repeatedly gave Sesen Bio strongly negative feedback on its Vicineum application. ¶¶58-88. *See Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, at \*17 (S.D.N.Y. June 17, 2020) ("While Defendants may not have had an affirmative obligation to disclose all material, nonpublic information about the various FDA inspections and 483 letter observations it received, once [the CEO] chose to speak regarding the Company's lack of 483 letters, he had a duty to be both accurate and complete.") (cleaned up).

The EMA denied accelerated assessment for reasons including that Vicineum "is not expected to . . . provide a therapeutic advantage compared to available treatments, survival benefit or other important benefit." ¶¶67-68. The Day 120 report contained numerous highly negative observations and requests for additional information. These included, *inter alia*, that Vicineum "seems to pose significant renal toxicity" and that trial results indicated "systemic

absorption from the urinary bladder or at least absorption to kidney and thereafter liver." ¶¶70, 72. The EMA noted that Vicineum "showed a lack of clinically relevant treatment effect with a poor complete response rate." ¶79. The EMA further observed that "[t]he credibility of the study conduct, validity of the database, and the clinical meaningfulness of the data are seriously questioned." ¶80. A reasonable investor would view such overwhelmingly negative feedback from the EMA as significantly altering the total mix of information available, and so Defendants were required to disclose this information in order to correct the misleading impression of strongly positive regulatory reactions they created through their incomplete statements.

Defendants argue that they had no duty to disclose "interim" or non-"final" communications from the EMA. While Defendants may not have been under an independent obligation to disclose these communications, they assumed that duty by their misleading selective disclosures. *See Teligent, Inc.*, 2020 WL 3268531, at \*14-15 (failure to disclose letter from FDA listing manufacturing process violations was misleading, even though the letter "is not a definitive finding by the FDA" but merely "represents a *risk* that the FDA may take corrective action").

Defendants rely heavily on *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016), but that case is readily distinguishable. In *Tongue*, Defendants had no obligation to disclose communications from the FDA regarding its preference for double-blind versus single-blind trials where this preference was publicly known, there was every indication that the concerns could be overcome by the drug's large treatment effect, the drug had already been approved by 30 countries, and the drug was later approved by the FDA without additional trials. *See id.* at 211-14. Here, in contrast, no regulator has ever approved Vicineum, and the EMA's strongly negative communications to Sesen Bio were not publicly known and were in direct conflict with the

regulatory developments selectively disclosed by Defendants. *Tongue* does not stand for the proposition that there is never a duty to disclose non-"final" regulatory communications. It merely found that there was no conflict between the defendants' positive statements and the particular FDA communications at issue in that case. *See id.* at 212.

Defendants vaguely raise factual disputes regarding the precise content of the Day 120 report they received, but do not dispute receiving negative feedback from the EMA in its denial of accelerated assessment, Day 80 report, and Day 120 report. Defendants' argument is unsupported by any facts presently before the Court, is contradicted by Plaintiffs' allegations regarding the EMA application process (¶¶62-69), and fails to address the "22 July 2021" date on the cover of the Day 120 report. Defendants' argument is even contradicted by their own admissions contained in a Sesen Bio SEC filing, stating that the EMA's withdrawal assessment report (reproduced in Exhibit 2 to the AC):

> reflects the initial assessment and corresponding questions from the EMA and identifies major objections in the areas of Quality, Good Clinical Practice, Efficacy and Safety. The Day 120 questions to which Sesen Bio was in the process of responding when it withdrew its MAA for Vysyneum covered these objections.

*See* Houston Decl. Ex D, Sesen Bio, SEC Form 8-K filed Oct. 20, 2021.[19]

In sum, by cherry picking certain positive details to disclose to investors regarding Vicineum's clinical trials, safety, and regulatory process, Defendants assumed the duty to speak on these subjects completely and accurately. They consistently failed to do so, and on the whole,

---

[19] In any event, Defendants' factual argument regarding the disputed content of the Day 120 report is premature prior to discovery. *See Kitov Pharms.*, 2018 WL 1406619, at *6 ("Defendants argue that the failure to disclose falsified data is not an actionable omission in any instance because the results were not falsified. That argument is premature on a motion to dismiss, as long as the allegation of falsehood is sufficiently detailed"); *OSI Pharms.*, 2007 WL 9672541, at *7 (E.D.N.Y. Mar. 31, 2007) ("the veracity of the statements is a disputed issue of fact that may not be appropriately decided in favor of Defendants at this stage of the proceedings.").

"insufficient facts were disclosed to allow a reasonable investor to make an accurate assessment of the disclosures that were made." *Delcath Sys.*, 36 F. Supp. 3d at 332.

## VI.    Defendants' Misplaced Arguments Fail To Defeat Falsity

### A.    Defendants' Misrepresentations Are Not Protected By The Safe Harbor

Defendants argue that certain misrepresentations are forward-looking statements and that as such they should be dismissed under the PSLRA's safe harbor. The safe harbor, however, does not protect statements of present or historical fact, and it does not protect material omissions. Many of the statements challenged in the AC are not forward-looking, and *all* of the statements are being challenged for being misleading due to material omissions.

#### 1.    Many Statements At Issue Are Not Forward-Looking Statements, But Statements Of Present Or Historical Facts

The PSLRA Safe Harbor applies only to statements that are "forward-looking." 15 U.S.C. § 78u-5(c)(1). "Representations of historical or current fact do not qualify for the PSLRA's safe harbor." *In re Regeneron Pharm. Inc. Sec. Litig.*, 2005 WL 225288, at *13 (S.D.N.Y. Feb. 1, 2005).[20] Moreover, the safe harbor does not apply where a "statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact." *Sanofi-Aventis*, 774 F. Supp. 2d at 566; *Regeneron Pharms.*, 2005 WL 225288, at *13 ("Statements that might arguably have some forward-looking aspect are unprotected by the PSLRA safe harbor provision to the extent that they are premised on representations of present fact.").

Because clinical trial results relate to historical facts, statements "pertaining to the purported actual results of the [clinical trial], . . . by definition are not forward-looking." *Kitov Pharms.*, 2018 WL 1406619, at *6. Therefore, the alleged forward looking statements regarding

---

[20] *Accord City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 365-66 (S.D.N.Y. 2012); *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013).

the VISTA trial that omitted to disclose its widespread misconduct and Sesen Bio's incorporation of tainted data do not qualify for the safe harbor. Likewise, Defendants' misleading safety-related statements omitting the existence of two Hy's Law cases in their clinical trials are not forward-looking, and not protected under the safe harbor. *See City of Livonia Employees' Ret. Sys. v. Wyeth*, 2010 WL 3910265, at *5 (S.D.N.Y. Sept. 29, 2010) (statements regarding safety results from drug's clinical trials were not forward-looking); *Regeneron Pharms.*, 2005 WL 225288, at *13 (Statements regarding a drug's safety and tolerability are not forward-looking, but rather "involve representations of present or historical facts.").[21] Additionally, Defendants' statements selectively touting positive interactions with regulators, while failing to reveal severely negative prior feedback from the EMA, fail to qualify for the safe harbor for the same reasons.

### 2. The Safe Harbor Does Not Protect Material Omissions

"The safe harbor also does not protect material omissions." *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016). This is true, "regardless of whether the statements thereby rendered misleading were forward-looking." *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013); *see also In re Oxford Health Plans Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) ("[P]laintiffs . . . are not relying on the falsity of Oxford's financial projections . . . but rather the defendants' failure to disclose historical and existing material facts . . . . The safe harbor and bespeaks caution doctrines do not

---

[21] Notably, Defendants' own primary authority regarding application of the safe harbor, while finding the safe harbor applicable to certain challenged forward-looking statements, did not find that it applied to alleged misstatements regarding "the results of the ongoing clinical trials," or the drug's "adverse effects on patients." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 530-31 (S.D.N.Y. 2015*), aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).

apply to these omissions.").[22] In this case, the principal allegations of falsity are based on failures to disclose. Defendants' challenged statements were rendered misleading by their failure to disclose the investigator misconduct and tainted data of the VISTA trial, that Defendants found two Hy's Law cases in Vicineum's clinical trials, and that the EMA had already identified serious problems with Vicineum and its trials. Because the AC's falsity allegations are based on Defendants' material omissions, the PSLRA's safe harbor provision is inapplicable.

### 3.    The Safe Harbor Does Not Protect Any Of Defendants' Misstatements From Liability

Even if the safe harbor *potentially* applied to certain statements at issue, it still would not protect Defendants from liability. In order to be protected under the safe harbor, forward-looking statements must be accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the . . . statement." 15 U.S.C. §78u-5(c)(1)(A). Defendants have the burden to show that the "cautionary language was not boilerplate and conveyed substantive information." *Slayton v. Am. Express Co.*, 604 F.3d 758,772 (2d Cir. 2010). "To be meaningful, cautionary language must precisely address the substance of the specific statement or omission that is challenged." *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006); *see also Aeropostale*, 2013 WL 1197755, at *12.

Therefore, boilerplate regarding generic risks of the drug approval process "is not sufficient to place these statements under the 'safe harbor' provisions of the PSLRA." *Irvine v. ImClone Sys., Inc.*, 2003 WL 21297285, at *1 (S.D.N.Y. June 4, 2003). And protection is

---

[22] *Accord In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001) ("[t]he 'bespeaks caution' doctrine, and the related statutory 'safe harbor' of the PSLRA . . . . apply to forward-looking statements *only*, and not to material omissions") (emphasis in original); *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 974 (N.D. Ill. 2006) ("it is axiomatic that the failure to make a statement cannot be forward-looking").

likewise not available where defendants "fail to disclose hard facts critical to appreciating the magnitude of the risks described," or fail to disclose "problems that already have materialized." *Credit Suisse First Bos. Corp. v. ARM Fin. Grp., Inc.*, 2001 WL 300733, at \*8 (S.D.N.Y. Mar. 28, 2001); *Regeneron Pharms.*, 2005 WL 225288, at \*19.

Here, the purportedly "cautionary" statements supplied by Defendants were so vague as to apply equally to any new drug under development, and ignored the "hard facts" of widespread VISTA trial misconduct and tainted data, two Hy's Law cases, and strongly negative feedback from the EMA.[23] As such, Defendants cannot claim protection under the "meaningful cautionary language" prong of the safe harbor. And as discussed *infra* at Part VII, Defendants had actual knowledge of the undisclosed adverse facts, further rendering the safe harbor inapplicable.

### B.    Most Of Defendants' Misleading Statements Are Not Opinions

Defendants argue that their misleading statements are merely expressions of opinion, which they claim are subject to strict pleading requirements under the Supreme Court's *Omnicare* decision, in contrast to the more lenient standards applicable to factual statements.[24] But Defendants' misleading statements regarding the VISTA trial, Vicineum's safety, and feedback from regulators all relate to historical facts, and so are not opinion statements.

---

[23] *E.g.*, MTD at 26 ("Clinical testing is . . . uncertain as to outcome"); *id.* (Sesen Bio "may not actually achieve the plans, intentions or expectations disclosed"); *id.* ("Actual results may differ materially from those indicated"); *id.* at 25 (warning of potential "costs and delays," "[i]f clinical trials of Vicineum for the treatment of BCG-unresponsive NMIBC fail to demonstrate safety and efficacy to the satisfaction of the FDA or other foreign regulatory authorities).

[24] *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015). As the Second Circuit recently clarified, *Omnicare* in fact lessened the importance of this distinction by making it easier to plead misleading opinions. *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 176 (2d Cir. 2020) ("By increasing the ability of plaintiffs to plead material omissions with respect to statements of opinion as described above, *Omnicare* reduced the significance of district courts' classification of statements as those of fact or opinion.").

29

Defendants rely on *Kleinman v. Elan Corp., plc*, 706 F.3d 145 (2d Cir. 2013) and its progeny to argue that their statements regarding these historical factual matters nonetheless constitute opinions regarding the appropriate methodology or interpretation to be used in connection with their clinical trials. But, unlike the *Kleinman* plaintiff who proposed a factually-disputed, "competing analysis" of trial data,[25] "[t]he allegations here do not involve differing interpretations of disclosed data, but rather data that was not disclosed." *Delcath Sys.*, 36 F. Supp. 3d at 333; *cf. Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 324–25 (S.D.N.Y. 2018) ("At issue here are not Defendants' opinions about the NDA's prospects before the FDA, but Defendants' allegedly false descriptions of the contents of the NDA itself."). Unlike in *Kleinman*, Plaintiffs here rely not on an alternative "interpretation" of trial data, but on hard facts known directly to Sesen Bio. *See, e.g.*, ¶49 (the *STAT* article cited internal Company documents including "a clinical report concluding one patient 'met the criteria for Hy's Law'," and "internal communications about a second patient in which one employee wrote 'I agree this is a Hy's Law case'."); ¶56 (Sesen Bio itself reported a trial investigator to the FDA in 2017, who failed to comply with "applicable regulations regarding conduct of clinical investigations," and engaged in "inaccurate recordkeeping"); ¶54 (Sesen Bio submitted misconduct-tainted data to the FDA despite being warned not to do so). As such, "Defendants' alleged omissions more closely resemble the failure to disclose adverse events in *Matrixx*, than the failure to disclose differences in methodology and interpretation in *Kleinman*," and therefore Defendants' misstatements are factual in nature. *Delcath Sys.*, 36 F. Supp. 3d at 333.

Even if some of Defendants' statements were considered to be opinions, they would remain actionably misleading. In *Omnicare*, the Supreme Court held that "opinion statements are

---

[25] *See Kleinman*, 706 F.3d at 154.

not wholly immune from liability" and may be material misstatements under several circumstances. 575 U.S. at 176. For example, a statement of opinion violates securities laws if "plaintiffs can allege that a statement of opinion, without providing critical context, implied facts that can be proven false." *Newlink Genetics*, 965 F.3d at 175.[26] Under *Omnicare* there is no requirement for "plaintiffs to show that the speaker subjectively disbelieved the statement." *Id*. This is because "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about . . . speaker's basis for holding that view." *Omnicare*, 575 U.S. at 188; *see also id.* at 188-89 ("the investor . . . expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time").

Defendants knew material adverse facts regarding the VISTA trial, Vicineum's safety, and feedback from regulators, and these facts did not "fairly align" with Defendants' misleading public statements. Defendants' selective disclosures strongly implied to reasonable investors that the VISTA trial was not plagued by rampant investigator misconduct and tainted data, that Defendants were not aware of trial data presenting serious undisclosed health risks, and that regulators had not notified Defendants of material deficiencies regarding Vicineum or its trials. Any other conclusion from Defendants' near-constant stream of positive statements on these very topics would be illogical. And Defendants' statements were all the more misleading to reasonable investors, because they were made in Sesen Bio's SEC filings, and investors do not expect statements in such formal documents "to reflect baseless, off-the-cuff judgments." *Id.* at 190. As such, in order to avoid misleading investors, Defendants were required to disclose the

---

[26] *See also id.* at 178 ("A jury could conclude that the sheer volume of competing facts required [defendant] either to speak less confidently" or to disclose the adverse facts).

hard facts that severely undermined their purported opinions. *See id.* at 188 ("And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience.").

And these omission were not merely some trivial facts merely "cutting the other way," from the weight of the available evidence. *See Omnicare*, 575 U.S. at 189.[27] Here, such minor discrepancies would exist if Defendants knew of a handful of minor trial protocol violations, observed insignificant side effects that did not present substantial risks of death, or had received a few quibbles from regulators. But it would be absurd to dismiss as just some facts "cutting the other way" hundreds of major trial protocol violations, the submission of tainted data to the FDA, the presence of two Hy's Law cases in Defendants' trials, or the severely negative EMA 120 Day report. Defendants withheld from investors profoundly adverse facts and thus their purported opinions are actionable for failure to provide the necessary context. *Newlink Genetics*, 965 F.3d at 174 (Rule 10b-5 "renders both statements of fact *and* those of opinion actionable when such statements would be misleading without the contextualization of material facts.").

C.   **Defendants' Risk Factor Disclosures Were Materially Misleading**

Defendants claim their "risk factor" disclosures could not have misled because the adverse events they portrayed in hypothetical terms had purportedly not yet materialized. Defendants attempt to frame the relevant adverse information as the final decision by the FDA to reject their Vicineum application. This argument mischaracterizes Plaintiffs' allegations, and ignores the law regarding when risk factor disclosures may mislead investors. Defendants' disclosures in the form of "if $x$ happens, then $y$ may happen" were materially misleading for

---

[27] *Omnicare* explained that minor contradictory facts need not be disclosed in connection with opinion statements if they are substantially outweighed by supportive information, for example: "in stating an opinion about legal compliance, the issuer did not disclose that a single junior attorney expressed doubts about a practice's legality, when six of his more senior colleagues gave a stamp of approval." 575 U.S. at 190.

indicating to investors that *x* had not yet happened, when it already had. *See, e.g., In re Facebook, Inc. IPO Securities and Derivative Litigation*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("The Company's purported risk warnings misleadingly . . . only warned what might occur if certain contingencies were met; the disclosures did not make clear that such contingencies had, in fact, already occurred"); *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143 (E.D.N.Y. 2020) ("The risk factor disclosures may mislead a reasonable investor because they use the hypothetical qualifier 'if' to warn that a Tenaris employee could fail to comply with the law, when, according to the Amended Complaint, Rocca had already broken the law").

For example, whereas Defendants stated, "*[i]f* we or any of our CROs [contract research organizations] fail to comply with applicable GCP [Good Clinical Practices], the clinical data generated in our clinical trials *may* be deemed unreliable," they failed to disclose that the VISTA trial ***had already failed*** to comply with GCP because it experienced 215 major protocol violations and included misconduct-tainted data. ¶149; ¶¶52-57. Whereas Defendants stated, "Vicineum for the treatment of BCG-unresponsive NMIBC *may* cause undesirable side effects, serious adverse events or have other properties that *could* . . . delay or prevent its regulatory approval," they failed to disclose that ***they had already identified*** two cases of Hy's Law in Vicineum's clinical trials. ¶148; ¶¶46-49. And whereas Defendants stated, "*[i]f* clinical trials of Vicineum . . . fail to demonstrate safety and efficacy to the satisfaction of the FDA or other foreign regulatory authorities . . .we *may* incur additional costs or experience delays in completing . . . the development and commercialization of Vicineum," they failed to disclose that the EMA ***had already provided*** strongly negative feedback regarding Vicineum's safety and efficacy. ¶147; ¶¶58-88. These disclosures were materially misleading.

D.    **Defendants' Misleading Statements Were Material, And Thus Were Not Puffery**

Defendants' misleading statements at issue are factual, specific, and important to reasonable investors, contrary to Defendants' argument that their statements were mere "puffery" or generic corporate optimism. Statements regarding clinical trial results "are not statements of corporate optimism or puffery, but instead are statements of historical fact." *Kitov Pharms.*, 2018 WL 1406619, at *6; *see also Regeneron Pharms.*, 2005 WL 225288, at *21 ("In the context of a drug development program, courts have noted that [s]tatements regarding the overall efficacy of the drug . . . cannot be simply dismissed as immaterial"). Therefore Defendants' misleading statements regarding Vicineum's safety results and the VISTA trial are not puffery. Similarly, Defendants' frequent updates selectively disclosing certain regulatory developments conveyed material factual information bearing on Vicineum's prospects for approval by those regulators.

In any event, puffery is an argument about the materiality of the alleged misleading statement. A court may not dismiss a securities fraud claim on the grounds of materiality unless the omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Kitov Pharms.*, 2018 WL 1406619, at *4. And while Defendants' omissions were clearly qualitatively material for the reasons discussed *supra*, the dramatic decline of Sesen Bio's stock price in response to the emergence of the truth is yet further proof of the materiality. *See Regeneron Pharms.*, 2005 WL 225288, at *21 ("The materiality of the statements at issue is underscored by the fact that the price of Regeneron's common stock plummeted almost 57% the day the negative news was released."); ¶216 (Sesen Bio shares fell 57%); ¶227 (additional 42% loss); ¶235 (additional 13% loss).

VII.    **The Complaint Pleads A Strong Inference Of Scienter**

Scienter is adequately pled "if a reasonable person would deem the inference of scienter

cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Matrixx Initiatives*, 563 U.S. at 48. "[T]he court must review all the allegations holistically." *Id.* Scienter may be pled "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307. Here, Plaintiffs' mutually reinforcing allegations of motive and conscious recklessness create a strong inference of Defendants' scienter. *See Intellipharmaceutics*, 348 F. Supp. 3d at 326.

A.      **Defendants Consciously And Recklessly Disregarded Known Adverse Information**

Actionable recklessness is alleged where the defendants "knew facts or had access to information suggesting that their public statements were not accurate [or] failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 311. A strong inference of scienter is pled where the allegations, "suggest that [defendant] consciously chose not to disclose the [adverse] information, which it knew or should have known to be a significant negative finding." *In re Intercept Pharms., Inc. Sec. Litig.*, 2015 WL 915271, at *11 (S.D.N.Y. Mar. 4, 2015).

Defendants' own internal documents revealed widespread misconduct in the VISTA trial, and two patients meeting Hy's Law criteria in Vicineum's clinical trials. ¶¶43, 46, 49-51. This supports a strong inference of scienter. *See Wyeth*, 2010 WL 3910265, at *6-7 (conscious recklessness pled where defendants omitted disclosure of negative clinical trial results including cases of serious liver damage).[28] In addition, Defendants have failed to deny the *STAT* article's key claims despite providing comment for the article, which serves as a tacit admission that these

---

[28] Known drug safety risks need not be statistically significant, or meet any other arbitrary bright-line rule, in order to give rise to a strong inference of scienter. *See Matrixx Initiatives*, 563 U.S. at 49. Rather, as is true for determining when such risks are sufficiently material so as to trigger a duty to disclose, the inquiry is fact-specific and context dependent. *Id.*

35

claims are true. Defendants later even expressly *admitted* certain of the claims. ¶¶55-56. These facts further support a strong inference of Defendants' scienter. *See In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 276 (S.D.N.Y. 2014) (defendant's "non-denial" of allegations raised in public reporting about the defendant's and company's conduct "provide a strong inference of scienter"); *cf. XL Fleet*, 2022 WL 493629, at *5 (non-denial of short-seller allegations confirmed reliability of confidential witness statements).

Defendants' receipt of strongly negative feedback from the EMA also bolsters a strong inference of their scienter. ¶¶58-88; *see Sanofi-Aventis*, 774 F. Supp. 2d at 571 (S.D.N.Y. 2011) (scienter adequately alleged where FDA sent defendant company a letter expressing concern over drug's health risks); *Delcath Sys.*, 36 F. Supp. 3d at 335–36 ("the extreme negativity of the FDA and ODAC statements regarding the Phase III trial results supports, along with other allegations, that Defendants were reckless.").[29] The most compelling inference from Defendants' failure to disclose such plainly material information is an intent to mislead investors.

### B. Defendants' Pattern Of Selective Partial Disclosures Adds To A Strong Inference Of Scienter

Defendants' scienter is further supported by their repeated decisions to disclose only certain regulatory feedback, while concealing negative communications from the EMA received mere days or weeks earlier. *See Intercept Pharms.*, 2015 WL 915271, at *7 (scienter alleged where defendant "chose . . . only to report the positive development, engaging in the sort of selective disclosure that creates a real possibility of misleading investors.").

---

[29] Notably, the SEC has alleged knowledge based on a defendant's access to EMA Day 80 and Day 120 reports. *See Sec. & Exch. Comm'n v. Sabrdaran*, 2015 WL 901352, at *3 (N.D. Cal. Mar. 2, 2015) (SEC brought insider trading charges against drug company insider who tipped a friend regarding material non-public information including "positive news from the Day 80 and Day 120 reports"); *see also Sec. & Exch. Comm'n v. Sabrdaran*, 252 F. Supp. 3d 866, 911 (N.D. Cal. 2017) (upholding jury verdict for the SEC).

For example, the EMA denied Vicineum accelerated assessment in late January 2021 for reasons including that it "is not expected to . . . provide a therapeutic advantage compared to available treatments, survival benefit or other important benefit." ¶¶67-68. Then, on February 16, 2021 Defendant Cannell touted the FDA's grant of priority review for Vicineum, stating:

> priority review is awarded to products that, if approved, represent a significant improvement in safety or efficacy when compared to standard treatment. So the FDA awarding us priority rather than standard review is meaningful.

¶126. But Defendants never disclosed that the EMA had reached the opposite conclusion only two weeks earlier. Worse yet, on the very same February 16 call Defendant Cannell stated:

> You can expect us to continue to be transparent and communicative. For Investor Relations, we follow a very simple formula. We tell you what we're going to do, we execute those plans, and then we tell you what we did.

¶129. Defendants' receipt of the EMA 120 Day report was likewise followed in short order by similarly misleading statements.

Defendants issued a press release on August 9, 2021 enthusing in great detail about recent communications from the FDA, while failing to provide any relevant details of the EMA's recent, overwhelmingly negative feedback in the Day 120 report dated July 22, 2021. ¶201 Instead, Defendants merely stated:

> In Europe, the Company believes it remains on track for potential approval of Vysyneum™ in 2022. The Company has received the Day 80 and Day 120 questions from the European Medicines Agency (EMA) and is responding to inquiries and providing supporting information as part of the official review process.

*Id*. This clear pattern of selective disclosure raises a strong inference of Defendants' intent to conceal negative information while misleadingly touting closely related positive news.

C.     **Defendants Held Themselves Out As Knowledgeable About Vicineum's Trials, Safety, And Regulatory Developments**

A defendant company may be presumed to have knowledge of matters relating to a drug that the company describes as "central to its business and as the primary focus of its research and development." *Intellipharmaceutics*, 348 F. Supp. 3d at 325. Sesen Bio stated that "we are focused exclusively on the clinical development of Vicineum." ¶33. Similarly, where individual defendants hold themselves out as knowledgeable, this contributes to a strong inference of their scienter. *See id.* at 326 (where individual defendants regularly spoke on company's behalf about drug application, and were actively involved in its development, "they also can be presumed to have known the contents" of the application).[30] Defendants Cannell and Forbes repeatedly demonstrated their own in-depth involvement in matters relating to Vicineum. *See, e.g.*, ¶¶154-55 (Cannell responding to analyst questions regarding regulatory developments); ¶151 (Forbes discussing recent FDA decisions on investor call).

The strong inference of Defendants' scienter is still further reinforced by the fact that obtaining approval for and commercializing Vicineum was Defendants' sole focus during the Class Period. ¶¶32-35; *see New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) (finding support for the theory that "allegations of a company's core operations . . . can provide supplemental support for allegations of scienter"); *Delcath Sys.*, 36 F. Supp. 3d at 335 (conscious recklessness pled where, *inter alia*, the defendant company was a small organization with one drug under development).

---

[30] *See also Allergan*, 2019 WL 4686445, at *27 ("the Company and its senior executives were well aware of the growing body of evidence suggesting that Allergan's implants were more closely associated with ALCL than others—indeed, they furnished various statements about the issue during the Class Period").

38

**D.      Defendants Raised $175 Million From Investors While Concealing Material Adverse Facts**

Defendants wrongly assert that Plaintiffs' theory of scienter is that they knowingly concealed that their Vicineum applications were doomed to failure. That is false. Plaintiff's theory of scienter is that Defendants failed to disclose known adverse information that presented material risks to their Vicineum applications. "In short, [plaintiffs] allege[] that Defendants gambled and lost. [Plaintiffs are] not arguing—no matter how many times Defendants say the opposite . . .—that Defendants knew that the FDA would not approve [their drug]." *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 4208442, at *8 (S.D.N.Y. July 21, 2020) ("*Acer Therapeutics II*").[31] To establish scienter, Plaintiffs need not allege that Defendants knew to a certainty that their drug would be rejected, merely that the undisclosed adverse facts, "*could* cause problems for the drug's approval and commercial success." *Intercept Pharms.*, 2015 WL 915271, at *9.

Defendants' advance their straw man version of Plaintiffs' argument in order to claim that they could not possibly have a motive to conceal the imminent rejection of their Vicineum applications.[32] But this ignores Plaintiffs' actual motive theory. Plaintiffs allege that Defendants concealed adverse information, and used the resulting surge in Sesen Bio's share price to sell $175 million of artificially inflated stock. ¶¶89-97. Although Defendants no doubt hoped for

---

[31] *Acer Therapeutics II* denied defendants' motion for reconsideration of *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495 (S.D.N.Y. June 16, 2020) ("*Acer Therapeutics I*").

[32] In *Acer Therapeutics*, the defendants similarly argued that the plaintiffs could not allege motive because investors would inevitably uncover their alleged misrepresentations upon the FDA's rejection of a drug application. Judge Woods rejected that argument, finding that the plaintiffs' allegations "support the inference that Defendants rationally (though recklessly) gambled that the FDA would ultimately approve [the drug]," while concealing information from investors that created material risks to approval. *Acer Therapeutics I*, 2020 WL 3268495, at *11. *See also Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.").

near-term approval, they also obtained investor funds to safeguard Sesen Bio's finances in the event regulators decided to reject the pending Vicineum applications. *See* ¶35 ("If regulators determined that approval of Vicineum required additional supporting trials this would likely add years of delay and tens of millions of dollars of expense to Sesen Bio's plans.").

Sesen Bio's highly atypical Class Period stock sales, combined with its need for investor funds in order to continue as a going concern, add to the strong inference of Defendants' scienter. *See* ¶92 (Sesen Bio sold $175 million of stock in the first three quarters of 2021, versus only $18 million in the entire year from the fourth quarter of 2019 through the third quarter of 2020); ¶31 (at year-end 2020, the Company lacked sufficient cash to survive until 2021). "[C]ourts have found allegations of motive adequate where the company[] needed to fundraise to survive." *Acer Therapeutics I*, 2020 WL 3268495, at *11; *see also Intellipharmaceutics*, 348 F. Supp. 3d at 326 (defendant's motive to misrepresent facts relating to drug application sufficiently alleged where the complaint "describes [the company's] dependence on sales of its stock to cover its operating losses, as well as the correlation between [the drug's] expedited development and [the company's] increased stock prices.").

Additional facts surrounding Sesen Bio's highly unusual Class Period stock sales further bolster the strong inference of scienter. On April 5, 2021 the Company announced that it had $110 million cash on hand, and that as a result it was "well positioned" to launch Vicineum, and would cease stock sales for at least April and May. ¶94. Defendant Forbes stated on a May 10, 2021 conference call that "we do expect the $110 million to be sufficient to fund operations through the fourth quarter of this year." ¶95. On the same call, Defendant Cannell strongly implied that he expected Sesen Bio's stock price would be "much higher" once Vicineum gained approval. ¶96. Yet, despite having sufficient cash to fund operations for the year, and expecting a

substantially increased stock price post-approval, Sesen Bio sold an additional $38 million in stock from June 2021 through the end of the Class Period. ¶97. On these facts, the only logical reason to do so would have been that Defendants knew of material risks to approval, and sought to obtain the investor funds necessary to keep Sesen Bio afloat in the event of rejection. *See Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016) (finding it "at least as compelling as any opposing inference of nonfraudulent intent," that defendants decided to conceal material adverse facts where the expected "benefits of concealment might have exceeded the costs.") (cleaned up).

### E.      Defendants' Additional Motive Arguments Fail

Defendants point to certain facts they claim disprove any possible intent to deceive investors, but those facts are perfectly consistent with Plaintiffs' theory that Defendants hoped for near-term approval while concealing material risks. First, Defendants claim that Sesen Bio "invest[ed] hundreds of millions of dollars into the VISTA Trial in 2021." MTD at 42. Second, Defendants point to their hiring of certain sales employees and contractors in 2021. But spending money on VISTA and hiring sales personnel is entirely consistent with hoping for near-term approval, while knowing of material undisclosed risks.[33]

Defendants further argue that some securities fraud actions rely on confidential witnesses or suspicious stock sales by individual defendants, seeking to imply that these are required to

---

[33] Furthermore, Defendants' factual arguments do not withstand closer inspection. The Company's own SEC filings show that it spent only $25 million in total on research and development in 2021, and so did not spend "hundreds of millions" on VISTA that year. *See* Houston Decl. Ex. E, Sesen Bio, SEC Form 10-K filed Feb. 28, 2022. And the Company's SEC filings likewise show that it incurred only $5.5 million in "restructuring" (*i.e.*, severance) expenses in 2021, in connection with its decision to fire 18 employees after receiving the FDA's CRL. *See id.* Against the backdrop of Defendants' $175 million in Class Period stock sales, this modest cost pales into insignificance.

establish a strong inference of scienter. Defendants identify no authority so holding,[34] and courts have rejected these arguments. *E.g.*, *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 707 (9th Cir. 2021) ("Allegations of suspicious stock sales or information from confidential witnesses are not needed where, as here, other allegations in the complaint raise a strong inference of scienter."); *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019) ("this Court is aware of no authority requiring confidential witness allegations"). In fact, the Supreme Court in *Matrixx Initiatives* found a strong inference of scienter, without any mention of confidential witnesses or insider stock sales, based on the defendants' knowledge of undisclosed data regarding drug safety risks. *See* 563 U.S. at 48-49; *cf. id.* at 48 (even "[t]he absence of a motive allegation, though relevant, is not dispositive").

Defendants cite *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) to argue that motives possessed by all executives, such as the desire to obtain funds from investors, are insufficient to create a strong inference of scienter. But Plaintiffs do not allege generic corporate motives here. Plaintiffs allege that Defendants were motivated to obtain $175 million in investor funds so that Sesen Bio would be able to survive the possible rejection of its pending Vicineum applications. This plainly is not a motive shared by all corporate executives, not least because "[a]n executive at a company that will go belly up if it fails to fundraise has different incentives from a generic corporate insider." *Acer Therapeutics I*, 2020 WL 3268495, at *11. "One salient difference is that the former executive has a stronger incentive to bet the farm in a reckless gamble." *Id*.

---

[34] The cases Defendants do cite are easily distinguished on their facts, which lacked the detailed scienter allegations pled here. *See e.g.*, *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 765 (S.D.N.Y. 2018) (plaintiffs alleged no "concrete allegations whatsoever regarding defendants' knowledge, apart from the information defendants themselves disclosed"); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) ("The company itself derived no benefit from the statements at issue. During the class period, Nortel did not sell shares of its stock"). Moreover these cases do not purport to *require* insider selling or confidential witness allegations in order to plead scienter.

Regardless of whether Defendants' motives independently establish scienter, they add to the strong inference holistically created by the AC's mutually reinforcing allegations. Here, as in *Acer Therapeutics*, "[n]one of the cases cited by Defendants, including *Kalnit*, stand for the proposition that a court cannot consider [a] company's financial position as one factor, among others, supporting an inference of scienter." *Acer Therapeutics II*, 2020 WL 4208442, at *5.[35] "To the contrary, the argument that a company's financial position is irrelevant to the scienter inquiry deviates from *Tellabs*, which held that a court must consider 'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter'." *Id.* (quoting *Tellabs*, 551 U.S. at 310).

Here, Plaintiffs' mutually reinforcing scienter allegations are supported by, *inter alia*, the *STAT* article (which itself was based on "hundreds of pages of internal documents obtained by STAT . . . confirmed by three people familiar with the matter"), Defendants' non-denial implicitly corroborating the *STAT* article, the EMA Day 120 report, and Defendants' motive to obtain the funds necessary to continue operations in the event they did not receive near-term approval for Vicineum. The most compelling inference from these facts is that Defendants consciously and recklessly withheld the material adverse information from investors.

## VIII.   **The Complaint States A Claim For Control Person Liability**

Defendants' main argument against control person liability is that Plaintiffs purportedly have not pled a primary violation of §10(b). As Plaintiffs adequately plead a primary violation, they state a §20 control person claim against Defendants Cannell (Sesen Bio's CEO) and Forbes

---

[35] Defendants quote what is arguably dicta from the non-precedential summary order of *Tabak v. Canadian Solar Inc.*, 549 F. App'x 24, 28 (2d Cir. 2013) stating that a desire to increase a company's stock price to avoid bankruptcy is insufficient *on its own* to allege motive. Even this quoted language does not purport to exclude such allegations from consideration as part of a holistic scienter inquiry.

(Sesen Bio's CFO). *See Acer Therapeutics*, 2020 WL 3268495, at *12 n.4. Because Cannell and Forbes were Sesen Bio's senior officers and knowingly made misleading statements at issue they are "culpable participants" in the fraud. *See Intellipharmaceutics*, 348 F. Supp. 3d at 329.

## IX.    The Complaint Pleads Defendants' Fraud With Particularity

Defendants assert that the AC is a "puzzle pleading." This argument is belied by Defendants' own brief, which apparently had no difficulty identifying Plaintiffs' falsity arguments. Defendants' argument is merely an effort to distract from the merits of the case. Defendants cite to this Court's opinion in *In re Pareteum Sec. Litig.*, but do not even attempt to compare the complaints at issue there to the AC. 2020 WL 3448526, (S.D.N.Y. June 23, 2020) (Hellerstein, J.). The class action complaint in *Pareteum* was more than twice as long as the AC, and replete with unexplained block quotes, incoherent emphasis, and a maze of cross-references. *Id.* at *1-2. Here, in contrast, the AC sufficiently "identifies statements and omissions, describes relevant predicate events, and alleges how those events make the statements and omissions false or misleading." *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020). Moreover, this case is about Defendants' misleading *omissions*, regarding the VISTA trial for Vicineum, Vicineum's safety risks, and Defendants' communications with the EMA regarding Vicineum. As such, it stands to reason that Defendants' incomplete Class Period statements on these topics are misleading for the same reasons, *i.e.*, all of these statements failed to disclose the related adverse facts known to Defendants at the time. A belabored repetition of all the evidence in connection with each of Defendants' numerous misleadingly incomplete statements would hardly comport with the requirement to provide "a short and plain statement of the claim." Fed. R. Civ. P. 8. The AC pleads fraud with the requisite particularity, and Defendants' puzzle pleading argument should not be allowed to distract from the compelling merits of this action.

44

## X.    Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

motion in its entirety. If the Court grants any part of Defendants' motion, Plaintiffs request leave

to amend. *Foman v. Davis*, 371 U.S. 178, 182 (1962).[36]


DATED: April 6, 2022                                    **GLANCY PRONGAY & MURRAY LLP**


By: *Matthew M. Houston*

Matthew M. Houston (MMH-2218)
745 Fifth Avenue, 5th Floor
New York, New York 10151
Telephone: (212) 935-7400
Facsimile: (212) 756-0346
mhouston@glancylaw.com

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

*Attorneys for Lead Plaintiffs and the Class*

---

[36]*See also Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (finding that cases dismissed under Rule 9(b) are "almost always dismissed with leave to amend," especially where plaintiffs have not yet had a chance to re-plead fraud with greater specificity).

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On April 6, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 6, 2022.

*s/ Matthew M. Houston*
Matthew M. Houston