# EXHIBIT 37

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 10-K

(Mark One)

☒  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2021

OR

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number: **001-36296**

# Sesen Bio, Inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **26-2025616** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **245 First Street, Suite 1800** **Cambridge, MA** | **02142** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code **(617) 444-8550**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.001 par value | SESN | The Nasdaq Global Market |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Smaller reporting company | ☐ |
| Accelerated filer | ☐ | Emerging growth company | ☐ |
| Non-accelerated filer | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of common stock held by non-affiliates of the registrant, computed by reference to the closing price of the common stock on the Nasdaq Global Market on June 30, 2021, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $870.7 million.

There were 199,463,645 shares of the registrant's common stock outstanding as of February 21, 2022.

**Documents Incorporated by Reference**

Portions of the registrant's Definitive Proxy Statement relating to the 2022 Annual Meeting of Stockholders ("2022 Proxy Statement"), which will be filed with the Securities and Exchange Commission within 120 days after the end of the registrant's fiscal year ended December 31, 2021, are incorporated by reference into Part III of this Annual Report on Form 10-K.

**SESEN BIO, INC.**

**Annual Report on Form 10-K for the Fiscal Year ended December 31, 2021**

**Table of Contents**

| | | Page |
|---|---|---|
| Forward-looking Statements | | ii |
| Risk Factors Summary | | v |
| **PART I** | | |
| Item 1. | Business. | 1 |
| Item 1A. | Risk Factors. | 40 |
| Item 1B. | Unresolved Staff Comments. | 67 |
| Item 2. | Properties. | 67 |
| Item 3. | Legal Proceedings. | 67 |
| Item 4. | Mine Safety Disclosures. | 67 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities. | 69 |
| Item 6. | [Reserved.] | 68 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations. | 69 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk. | 84 |
| Item 8. | Financial Statements and Supplementary Data. | 84 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure. | 84 |
| Item 9A. | Controls and Procedures. | 85 |
| Item 9B. | Other Information. | 88 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections. | 88 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance. | 88 |
| Item 11. | Executive Compensation. | 88 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters. | 88 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence. | 85 |
| Item 14. | Principal Accountant Fees and Services. | 85 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules. | 89 |
| Item 16. | Form 10-K Summary. | 92 |

**SIGNATURES**

Unless the context otherwise requires, all references in this Annual Report on Form 10-K to "Sesen," the "Company," "we," "us," and "our" include Sesen Bio, Inc. and its subsidiaries.

of first dose of study treatment to the first occurrence of disease recurrence, progression or death on or prior to treatment discontinuation.

•*Overall Survival ("OS"):* 96% of all 133 patients treated with Vicineum in the VISTA Trial are estimated to have an overall survival of 2 years or greater, using the Kaplan-Meier method. OS is defined as the time from the date of first dose of study treatment to death from any cause.

Data is as of the May 29, 2019 data cut from the Phase III VISTA trial. The clinical data shown are based on the data submitted in the BLA on December 18, 2020. Final numbers are pending. On August 13, 2021, the FDA issued a CRL for the BLA that included requests for additional clinical and statistical data.

*Safety Results*

As of the May 29, 2019 data cutoff date, in patients across all cohorts (n=133) of our Phase 3 VISTA Trial of Vicineum for the treatment of BCG-unresponsive NMIBC, 88% experienced at least one adverse event, with 95% of adverse events being Grade 1 or 2. The most commonly reported treatment-related adverse events were dysuria (14%), hematuria (13%) and urinary tract infection (12%), all of which are consistent with the profile of bladder cancer patients and the use of catheterization for treatment delivery. These adverse events were determined by the clinical investigators to be manageable and reversible, and only four patients (3%) discontinued treatment due to an adverse event. Serious adverse events, regardless of treatment attribution, were reported in 14% of patients. There were four treatment-related serious adverse events reported in three patients including acute kidney injury (Grade 3), pyrexia (Grade 2), cholestatic hepatitis (Grade 4) and renal failure (Grade 5 or death). There were no age-related increases in adverse events observed in the VISTA Trial.

*Phase 1 and 2 Clinical Trials*

*Phase 1 Clinical Trial.* We initiated an open-label, dose-escalating Phase 1 clinical trial of Vicineum for the treatment of BCG-unresponsive NMIBC in September 2004 at 22 sites in Canada. We enrolled 64 patients with high-grade Ta or T1 tumors with or without CIS (17 of which had CIS) and who had previously received at least one treatment of BCG. The Phase 1 clinical trial was designed to assess safety and determine the maximum tolerated dose, and the recommended Phase 2 dose. The secondary objective was to explore the anti-tumor activity of Vicineum.

Eight dose levels were initially evaluated, ranging from 0.1 to 10.56 mg, and given once weekly for six consecutive weeks. Each dose was administered by instillation and held for two hours prior to voiding. Safety data from each dose cohort was evaluated after three weeks of treatment before proceeding to the next dose cohort. A maximum tolerated dose was not reached; therefore, additional escalations through 13.73 mg, 17.85 mg, 23.20 mg and 30.16 mg were undertaken. No dose-limiting toxicities were reported and no maximum tolerated dose was reached in these additional dose-escalations. Vicineum was generally well-tolerated at each of these escalated doses.

A CR was defined in this Phase 1 clinical trial as non-positive urine cytology and either normal cystoscopy or abnormal cystoscopy with negative biopsy. Of the 64 patients enrolled, only 61 were considered to be evaluable for efficacy as two patients were excluded from the analysis due to an absence of BCG treatment prior to this Phase 1 clinical trial, and there was one unrelated death for whom no final tumor assessment was obtained. Evidence of clinical efficacy, as defined by a CR, was achieved by 24 of the 61 randomized patients (39%). Only three of the 17 patients (18%) treated in the 0.1-<1 mg/dose range were CRs. In contrast, seven of the 14 patients (50%) treated in 1.0-<10 mg/dose range and 14 of the 30 patients (46.7%) treated in the ≥10 mg/dose range experienced CRs at the three-month assessment. Of the patients with CIS, five of the 17 patients (29%) achieved a CR, while non-recurrence was observed in seven of the 16 patients with T1 (43.8%) and 12 of the 28 patients with Ta (42.8%). This Phase 1 clinical trial was completed in April 2006.

*Phase 2 Clinical Trial.* Based on our Phase 1 clinical trial conducted in Canada, we submitted the IND for Vicineum for the treatment of BCG-unresponsive NMIBC to the FDA in August 2005, and we initiated an open-label Phase 2 clinical trial of Vicineum in March 2007 at 20 sites in Canada and the United States. We enrolled 46 patients with CIS (with or without Ta or T1) who had previously received at least one treatment of BCG. Of the 46 patients enrolled, 27 patients (58.7%) had received at least two treatments of BCG. The Phase 2 clinical trial was designed to determine the tolerability and explore the potential for clinical benefit from Vicineum. Clinical benefit was defined in this Phase 2 clinical trial as a CR or no evidence of disease at the three-month evaluation. A CR was defined in this Phase 2 clinical trial as no histological evidence of disease and negative urine cytology. Any cases with no histological evidence of disease on initial biopsy but atypical or suspicious urine cytology were also considered CRs only if they remained negative after being evaluated with repeat biopsy, directed and random. A patient was considered to have a durable CR if that patient obtained a CR and remained disease-free for a period of at least 12 months from initiation of treatment.

The dosing regimen for our Phase 2 clinical trial included an induction phase followed by a maintenance phase, consisting of three weekly treatments and then nine weeks of no treatment repeated every three months for at least one year. There were two treatment groups in this Phase 2 clinical trial. Treatment Arm A consisted of 23 patients, of which 22 were ultimately evaluable as one patient violated eligibility requirements early in this Phase 2 clinical trial. Twenty-two patients in the induction phase

*halt clinical trials, delay or prevent its regulatory approval, limit the commercial profile of its labeling, if approved, or result in significant negative consequences following any marketing approval.*

Undesirable side effects or serious adverse events caused by Vicineum for the treatment of non-muscle invasive CIS of the bladder in patients previously treated with adequate or less than adequate BCG could cause us or regulatory authorities to interrupt, delay or halt respective clinical trials and could result in a restrictive label or the delay or denial of regulatory approval by the FDA or other comparable non-US regulatory authorities.

There were no Grade 4 or Grade 5 serious adverse events that were considered by the clinical investigators to be related to Vicineum during the Phase 1 and Phase 2 clinical trials of Vicineum for the treatment of NMIBC. There was one Grade 5 serious adverse event, or death, which was determined by the clinical investigator to be unrelated to Vicineum. The most common reported treatment-related adverse events were an abnormally frequent passage of small amounts of urine, blood in the urine and painful urination, the majority of which were considered to be mild or moderate in severity. No patients discontinued treatment due to a Vicineum-related adverse event during the Phase 1 and Phase 2 clinical trials.

As of the May 29, 2019 data cutoff date, in patients across all cohorts (n=133) of our Phase 3 VISTA Trial of Vicineum for the treatment of BCG-unresponsive NMIBC, 88% experienced at least one adverse event, with 95% of adverse events being Grade 1 or 2. The most commonly reported treatment-related adverse events were dysuria (14%), hematuria (13%) and urinary tract infection (12%) - all of which are consistent with the profile of bladder cancer patients and the use of catheterization for treatment delivery. These adverse events were determined by the clinical investigators to be manageable and reversible, and only four patients (3%) discontinued treatment due to an adverse event. Serious adverse events, regardless of treatment attribution, were reported in 14% of patients. There were four treatment-related serious adverse events reported in three patients including acute kidney injury (Grade 3), pyrexia (Grade 2), cholestatic hepatitis (Grade 4) and renal failure (Grade 5 or death). There were no age-related increases in adverse events observed in the VISTA Trial.

In addition, side effects and serious adverse events or further safety or toxicity issues that we may experience in our clinical trials or in post-marketing experience, if approved, could lead to the FDA's or other comparable non-US regulatory authority's imposition of a REMS or other post-marketing obligations, which could hinder us from generating revenues or achieving profitability. Results of our clinical trials could reveal an unacceptably high severity and prevalence of side effects or serious adverse events. As a result, our clinical trials could be suspended or terminated, and the FDA or comparable non-US regulatory authorities could order us to cease further development or deny approval of Vicineum for the treatment of non-muscle invasive CIS of the bladder in patients previously treated with adequate or less than adequate BCG. The related drug-side effects or serious adverse events in our clinical trials could affect clinical trial patient recruitment or the ability of enrolled patients to complete the clinical trial or result in potential product liability claims.

Additionally, if Vicineum for the treatment of non-muscle invasive CIS of the bladder in patients previously treated with adequate or less than adequate BCG receives marketing approval, and we or others later identify undesirable side effects or serious adverse events caused by Vicineum, a number of potentially significant negative consequences could result, including:

•we may suspend or be forced to suspend marketing of Vicineum for the treatment of non-muscle invasive CIS of the bladder in patients previously treated with adequate or less than adequate BCG;

•we may be obliged to conduct a product recall or product withdrawal;

•regulatory authorities may suspend, vary, or withdraw their approvals of Vicineum for the treatment of non-muscle invasive CIS of the bladder in patients previously treated with adequate or less than adequate BCG;

•regulatory authorities may order the seizure or recall of Vicineum;

•regulatory authorities may require additional warnings on the label or a REMS or other post-marketing obligations that could diminish the usage or otherwise limit the commercial success of Vicineum for the treatment of non-muscle invasive CIS of the bladder in patients previously treated with adequate or less than adequate BCG;

•we may be required to conduct post-marketing studies;

•we could be sued and held liable for harm caused to patients;

•we could be required to pay fines and face other administrative, civil and criminal penalties; and

•our reputation may suffer.

Any of these events could prevent us from achieving or maintaining market acceptance of Vicineum for the treatment of non-muscle invasive CIS of the bladder in patients previously treated with adequate or less than adequate BCG, if approved.

*We will need to obtain regulatory authority approval of any proposed names for oportuzumab monatox for the treatment of non-muscle invasive CIS of the bladder in patients previously treated with adequate or less than adequate BCG, and any failure or delay associated with such naming approval may adversely impact our business.*

*†Recurrence-free rate is defined as the percentage of patients that are recurrence-free at the given assessment time point.*
*\*Response-evaluable population includes any mITT patient who completed the induction phase.*

**Duration of Response:** The median DoR for patients in Cohort 1 and Cohort 2 combined (n=93) is 287 days (95% CI, 154-NE), using the Kaplan-Meier method. Additional *ad hoc* analysis of pooled data for all patients with CIS (Cohorts 1 and 2, n=93) shows that among patients who achieved a complete response at 3 months, 52% remained disease-free for a total of 12 months or longer after starting treatment, using the Kaplan-Meier method. DoR is defined as the time from first occurrence of complete response to documentation of treatment failure or death.

We have conducted additional analyses for secondary endpoints. These additional data include the following:

•**Time to Cystectomy:** Across all 133 patients treated with Vicineum in the VISTA Trial, greater than 75% of all patients are estimated to remain cystectomy-free at 3 years, using the Kaplan-Meier method. Additional *ad hoc* analysis shows that approximately 88% of responders are estimated to remain cystectomy-free at 3 years. Time to cystectomy is defined as the time from the date of first dose of study treatment to surgical bladder removal. The first 2018 FDA guidance on treatment of BCG-unresponsive NMIBC patients states that the goal of therapy in such patients is to avoid cystectomy. Therefore, time to cystectomy is a key secondary endpoint in the VISTA Trial.

•**Time to Disease Recurrence:** High-grade papillary (Ta or T1) NMIBC is associated with high rates of progression and recurrence. The median time to disease recurrence for patients in Cohort 3 (n=40) is 402 days (95% CI, 170-NE), using the Kaplan-Meier method. Time to disease recurrence is defined as the time from the date of the first dose of study treatment to the first occurrence of treatment failure or death on or prior to treatment discontinuation.

•**Progression-Free Survival ("PFS"):** 90% of all 133 patients treated with Vicineum in the VISTA Trial are estimated to remain progression-free for 2 years or greater, using the Kaplan-Meier method. PFS is defined as the time from the date of first dose of study treatment to the first occurrence of disease progression (e.g., T2 or more advanced disease) or death on or prior to treatment discontinuation.

•**Event-Free Survival:** 29% of all 133 patients treated with Vicineum in the VISTA Trial are estimated to remain event-free at 12 months, using the Kaplan-Meier method. Event-free survival is defined as the time from the date of first dose of study treatment to the first occurrence of disease recurrence, progression or death on or prior to treatment discontinuation.

•**Overall Survival ("OS"):** 96% of all 133 patients treated with Vicineum in the VISTA Trial are estimated to have an overall survival of 2 years or greater, using the Kaplan-Meier method. OS is defined as the time from the date of first dose of study treatment to death from any cause.

Data is as of the May 29, 2019 data cut from the Phase III VISTA trial. The clinical data shown are based on the data submitted in the BLA on December 18, 2020. Final numbers are pending. On August 13, 2021, the FDA issued a CRL for the BLA that included requests for additional clinical and statistical data.

### Safety Results

As of the May 29, 2019 data cutoff date, in patients across all cohorts (n=133) of our Phase 3 VISTA Trial of Vicineum for the treatment of BCG-unresponsive NMIBC, 88% experienced at least one adverse event, with 95% of adverse events being Grade 1 or 2. The most commonly reported treatment-related adverse events were dysuria (14%), hematuria (13%) and urinary tract infection (12%) - all of which are consistent with the profile of bladder cancer patients and the use of catheterization for treatment delivery. These adverse events were determined by the clinical investigators to be manageable and reversible, and only four patients (3%) discontinued treatment due to an adverse event. Serious adverse events, regardless of treatment attribution, were reported in 14% of patients. There were four treatment-related serious adverse events reported in three patients including acute kidney injury (Grade 3), pyrexia (Grade 2), cholestatic hepatitis (Grade 4) and renal failure (Grade 5 or death). There were no age-related increases in adverse events observed in the VISTA Trial.

### *Manufacturing*

In October 2018, we entered into a Master Bioprocessing Services Agreement with Fujifilm (the "Fujifilm MSA") for the manufacturing process and technology transfer of Vicineum drug substance production.

In November 2019, we entered into a Commercial Manufacturing and Supply Agreement with Baxter for the manufacturing process and technology transfer of Vicineum drug product production.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**SESEN BIO, INC.**

(Registrant)

| | | | |
|---|---|---|---|
| Date: | February 28, 2022 | By: | /s/ Thomas R. Cannell, D.V.M. |
| | | Name: | Thomas R. Cannell, D.V.M. |
| | | Title: | President and Chief Executive Officer |
| | | | (Principal Executive Officer and Duly Authorized Officer) |

Pursuant to the requirements of the Securities and Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Capacity | Date |
|---|---|---|
| /s/ Thomas R. Cannell, D.V.M.<br>Thomas R. Cannell, D.V.M. | President, Chief Executive Officer and Director<br>(Principal Executive Officer) | February 28, 2022 |
| /s/ Monica Forbes<br>Monica Forbes | Chief Financial Officer<br>(Principal Financial Officer) | February 28, 2022 |
| /s/ Elly Ryu<br>Elly Ryu | Corporate Controller<br>(Principal Accounting Officer) | February 28, 2022 |
| /s/ Jay S. Duker, M.D.<br>Jay S. Duker, M.D. | Chair of the Board of Directors | February 28, 2022 |
| /s/ Carrie L. Bourdow<br>Carrie L. Bourdow | Director | February 28, 2022 |
| /s/ Jason A. Keyes<br>Jason A. Keyes | Director | February 28, 2022 |
| /s/ Peter K Honig, M.D.<br>Peter K Honig, M.D. | Director | February 28, 2022 |
| /s/ Michael A.S. Jewett, M.D.<br>Michael A.S. Jewett, M.D. | Director | February 28, 2022 |

93