**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| IN RE SESEN BIO, INC. SECURITIES LITIGATION |

Case No.: 1:21-cv-07025-AKH

**MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S**
**MOTION FOR AN AWARD OF ATTORNEYS' FEES AND**
**REIMBURSEMENT OF LITIGATION EXPENSES**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   ARGUMENT........................................................................................................ 4

      A.    The Common Fund Doctrine Applies To The Settlement ..................................... 4

      B.    The Court Should Award A Reasonable Percentage Of The Common Fund......... 5

      C.    The Requested Attorneys' Fees Are Reasonable................................................... 7

          1.    The Requested Attorneys' Fees Are Reasonable Under the Percentage-of-the-Fund Method.................................................................................. 7

          2.    The Lodestar "Cross-Check" Strongly Supports the Reasonableness of the Requested Fee ................................................................................. 9

      D.    Factors Considered By Courts In The Second Circuit Confirm The Requested Fee Is Fair And Reasonable ................................................................................ 11

          1.    Time And Labor Expended Support The Requested Fee ......................... 11

          2.    The Risks Of Litigation Support The Requested Fee .............................. 13

          3.    The Magnitude And Complexity Of The Action Support The Requested Fee.......................................................................................... 18

          4.    The Quality Of Representation Supports The Requested Fee .................. 20

          5.    The Requested Fee In Relation To The Settlement Amount .................... 23

          6.    Public Policy Considerations Support The Requested Fee...................... 23

      E.    Lead Counsel's Expenses Are Reasonable And Were Necessarily Incurred To Achieve The Benefit Obtained............................................................................. 24

      F.    Lead Plaintiffs Should Be Awarded Their Reasonable Costs And Expenses Under 15 U.S.C. § 78u-4(a)(4) ............................................................................. 25

III.  CONCLUSION.................................................................................................. 26

# TABLE OF AUTHORITIES

<u>CASES</u>

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ................................................................................. 2

*Athale v. Sinotech Energy Ltd.*,
2013 WL 11310686 (S.D.N.Y. Sept. 4, 2013)................................................. 5, 8, 11

*Bell v. Pension Comm. of ATH Holding Co., LLC*,
2019 WL 4193376 (S.D. Ind. Sept. 4, 2019) ......................................................... 4

*Bellifemine v. Sanofi-Aventis U.S. LLC*,
2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010).......................................................... 6

*Board of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
2012 WL 2064907 (S.D.N.Y. June 7, 2012) .......................................................... 7

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980)............................................................................................... 4

*Burns v. Falconstor Software, Inc.*,
2014 WL 12917621 (E.D.N.Y. Apr. 10, 2014) .................................................... 10

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
2015 WL 13639234 (S.D.N.Y. Oct. 19, 2015) ...................................................... 8

*City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*,
2020 WL 7413926 (S.D.N.Y. Dec. 17, 2020) ................................................. 15, 24

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974).................................................................................. 14

*City of Providence v. Aeropostale, Inc.*,
2014 WL 1883494 (S.D.N.Y. May 9, 2014) ................................................... 20, 23

*Davis v. J.P. Morgan Chase & Co.*,
827 F. Supp. 2d 172 (W.D.N.Y. 2011) .............................................................. 6, 10

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009).................................................................................... 21

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)................................................ 14, 15, 23, 24

*Goldberger v. Integrated Res., Inc.*,
209 F.3d 43 (2d Cir. 2000)........................................................................................... *passim*

*Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*,
212 F.R.D. 400 (E.D. Wis. 2002) .............................................................................. 14

*Gross v. GFI Group, Inc.*,
784 Fed. App'x. 27 (2d Cir. Sept. 13, 2019) ........................................................... 15

*Guevoura Fund Ltd. v. Sillerman*,
2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ......................................................... 11

*Hicks v. Morgan Stanley, & Co.*,
 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ..................................................... 4, 6

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,
2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006)......................................................... 22

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
127 F. Supp. 2d 418 (S.D.N.Y. 2001)......................................................................... 7

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)........................................................ 18, 19

*In re Bisys Sec. Litig.*,
2007 WL 2049726 (S.D.N.Y July 16, 2007) ........................................................... 10

*In re Bristol-Myers Squibb Sec. Litig.*,
361 F. Supp. 2d 229 (S.D.N.Y. 2005)...................................................................... 6, 7

*In re Colgate-Palmolive Co. ERISA Litig.*,
36 F. Supp. 3d 344 (S.D.N.Y. 2014)......................................................................... 11

*In re Comverse Tech., Inc. Sec. Litig.*,
2010 WL 2653354 (E.D.N.Y. June 24, 2010) ............................................. 10, 14, 23

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
80 F. Supp. 3d 838 (N.D. Ill. 2015) .............................................................. 13, 15, 16

*In re Deutsche Telekom AG Sec. Litig.*,
2005 WL 7984326 (S.D.N.Y. June 14, 2005) ......................................................... 11

*In re Elan Sec. Litig.*,
385 F. Supp. 2d 363 (S.D.N.Y. 2005)....................................................................... 11

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
2007 WL 2230177 (S.D.N.Y. July 27, 2007) ............................................................ 5

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015) .......................................................... 13

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
343 F. Supp. 3d 394 (S.D.N.Y. 2018) ................................................................. 8, 21

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
279 F.R.D. 151 (S.D.N.Y. Nov. 2, 2011) .............................................................. 14

*In re Gilat Satellite Networks, Ltd.*,
2007 WL 2743675 (E.D.N.Y. Sept. 18, 2007) ...................................................... 18

*In re Global Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ............................................................... 10, 14, 24

*In re Hi-Crush Partners L.P. Sec. Litig.*,
2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ......................................................... 9

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
194 F.R.D. 166 (E.D. Pa. 2000) ........................................................................... 19

*In re Indep. Energy Holdings PLC Sec. Litig.*,
302 F. Supp. 2d 180 (S.D.N.Y. 2003) ................................................................... 24

*In re Interpublic Sec. Litig.*,
2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004) ....................................................... 11

*In re JDS Uniphase Corp. Sec. Litig.*,
2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) ...................................................... 21

*In re Lloyd's Am. Trust Fund Litig.*,
2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ...................................................... 7

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
2009 WL 5178546 (S.D.N.Y. 2009) ..................................................................... 25

*In re Monster Worldwide, Inc. Sec. Litig.*,
2008 WL 9019514 (S.D.N.Y. Nov. 25, 2008) ....................................................... 7

*In re Qudian Inc. Sec. Litig.*,
2021 WL 2328437 (S.D.N.Y. June 8, 2021) ......................................................... 25

*In re Rite Aid Corp. Sec. Litig.*,
 396 F.3d 294 (3d Cir. 2005)............................................................................... 6

*In re Sadia S.A. Sec. Litig.*,
 2011 WL 6825235 (S.D.N.Y. Dec. 28, 2011) ................................................... 8

*In re Schering-Plough Corp. Enhance Sec. Litig.*,
 2013 WL 5505744 (D.N.J. Oct. 1, 2013).......................................................... 17

*In re Signet Jewelers Limited Sec. Litig.*,
 2020 WL 4196468 (S.D.N.Y. July 21, 2020) ............................................. 3, 11, 26

*In re Sumitomo Copper Litig.*,
 74 F. Supp. 2d 393 (S.D.N.Y. 1999)................................................................. 17

*In re Telik, Inc. Sec. Litig.*,
 576 F. Supp. 2d 570 (S.D.N.Y. Sept. 10, 2008) ............................................... 11

*In re Veeco Instruments Inc. Sec. Litig.*,
 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007)............................................... *passim*

*In re WorldCom, Inc. Sec. Litig.*,
 388 F. Supp. 2d 319 (S.D.N.Y. 2005)................................................................. 6

*In re Xcel Energy, Inc., Sec., Deriv. & "ERISA" Litig.*,
 364 F. Supp. 2d 980 (D. Minn. 2005)............................................................. 2, 18

*Johnson v. Brennan*,
 2011 WL 4357376 (S.D.N.Y. Sept. 16, 2011)..................................................... 6

*La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*,
 2009 WL 4730185 (D.N.J. Dec. 4, 2009) .......................................................... 19

*Lea v. Tal Educ. Grp.*,
 2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021) ......................................... 7, 10, 18, 26

*Leach v. NBC Universal Media, LLC*,
 2017 WL 10435878 (S.D.N.Y. Aug. 24, 2017)..................................................... 8

*LeBlanc-Sternberg v. Fletcher*,
 143 F.3d 748 (2d Cir. 1998)............................................................................... 9

*Maley v. Del Global Techs. Corp.*,
 186 F. Supp. 2d 358 (S.D.N.Y. 2002)............................................................ *passim*

*Meredith Corp. v. SESAC, LLC*,
  87 F. Supp. 3d 650 (S.D.N.Y. 2015).................................................................................. 17

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970)............................................................................................................ 4

*Missouri v. Jenkins*,
  491 U.S. 274 (1989)............................................................................................................ 9

*Moloney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*,
  2009 WL 5851465 (S.D.N.Y. Mar. 31, 2009) .................................................................... 7

*Montero S.A.A. Sec. Litig.*,
  2021 WL 4173684 (E.D.N.Y. Aug. 13, 2021)..................................................................... 9

*Monzon v. 103W77 Partners, LLC*,
  2015 WL 993038 (S.D.N.Y. 2015)..................................................................................... 5

*Savoie v. Merchants Bank*,
  166 F.3d 456 (2d Cir. 1999).............................................................................................. 10

*Schwartz v. TXU Corp.*,
  2005 WL 3148350 (N.D. Tex. Nov. 8, 2005)................................................................... 17

*Shapiro v. JPMorgan Chase & Co.*,
  2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) .................................................................. 13

*Silverman v. Motorola Sols., Inc.*,
  739 F.3d 956 (7th Cir. 2013) .............................................................................................. 3

*Taft v. Ackermans*,
  2007 WL 414493 (S.D.N.Y. Jan. 31, 2007) ..................................................................... 20

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
  2004 WL 1087261 (S.D.N.Y. May 14, 2004) ................................................................... 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).......................................................................................................... 23

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005)................................................................................... 5, 6, 10, 24

*Wilson v. LSB Industries, Inc.*,
  2019 WL 3542844 (S.D.N.Y. June 28, 2019) ................................................................... 22

*Zeltser v. Merrill Lynch & Co., Inc.*,
   2014 WL 4816134 (S.D.N.Y. Sept. 23, 2014).......................................................................... 8

STATUTES

15 U.S.C. § 78u-4 ................................................................................................................. 2

15 U.S.C. § 78u-4(a)(4) ................................................................................................... 1, 25

15 U.S.C. § 78u-4(a)(6) ....................................................................................................... 5

Court-appointed Lead Counsel Glancy Prongay & Murray LLP ("GPM" or "Lead Counsel"), on behalf of all Plaintiffs' Counsel, respectfully submits this memorandum of law in support of their request for attorneys' fees of 18.5% the Settlement Fund[1] (or $3,885,000, plus interest at the same rate as the Settlement Fund).[2]  Lead Counsel also seek reimbursement of $64,031.13 in out-of-pocket expenses advanced by counsel, as well as $10,000 to Lead Plaintiffs ($2,500 for each Lead Plaintiff), as authorized by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(a)(4).

## I.    INTRODUCTION[3]

The proposed Settlement, which provides for a non-reversionary cash payment of $21 million in exchange for the resolution of the Action, exceeds available directors and officers liability insurance.  This is an extremely favorable result for the Settlement Class, particularly when juxtaposed against the significant hurdles that Lead Plaintiffs would have needed to overcome in order to prevail in this complex securities fraud litigation.  In undertaking this

---

[1] Unless otherwise noted, capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated August 3, 2022 (ECF No. 88-1), or in the concurrently filed Declaration of Garth Spencer in Support of: (I) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Spencer Declaration" or "Spencer Decl."). Citations to "¶__" or "Ex. __" in this memorandum refer to paragraphs in, or exhibits to, the Spencer Declaration.  Unless otherwise indicated, all emphasis is added, and all internal quotation marks and citations are omitted.

[2] The Notice informed the Settlement Class that Lead Counsel would apply for an attorneys' fee award of up to 25% of the Settlement Fund, which would have been a requested fee of $5,250,000. Lead Counsel seeks the lesser amount of $3,885,000 in recognition of the lodestar crosscheck and the stage at which this Action settled.

[3] The Spencer Declaration is an integral part of this submission and, for the sake of brevity, the Court is respectfully referred to it for a discussion of, *inter alia*, the factual and procedural history of the Action; the claims asserted; the mediation and negotiations leading to the Settlement; the risks and uncertainties of continued litigation; a summary of the services Plaintiffs' Counsel provided for the Settlement Class's benefit; and additional information on the factors that support the fee and expense application, including the lodestar cross-check.

1

litigation, Lead Counsel faced numerous challenges to establishing liability, loss causation and damages. The risk of losing was very real, and it was greatly enhanced by the fact that they would be litigating against a corporate defendant represented by highly skilled defense counsel, under the heightened pleading standard and automatic stay of discovery imposed by the PSLRA. *See* 15 U.S.C. § 78u-4; *see also Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 235 (5th Cir. 2009) (O'Connor, J., by designation) ("To be successful, a securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action."). Indeed, "[o]f the securities class action cases filed and resolved between 1 January 2012 and 31 December 2021, a motion to dismiss was filed in 96%. Among those, a decision was reached in 73% of cases." *See* Ex. 6 (Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review* (NERA Jan. 25, 2022 at p. 14) ("NERA Report"). Of the cases with a decision on a motion to dismiss, approximately 56% were granted with prejudice, 7% were granted without prejudice, 17% were partially granted/partially denied, and only 19% were denied. *See Id*.

Moreover, "securities claims brought against small, clinical-stage biotech companies were actually *more* likely to be dismissed at an early stage than other types of securities class actions[.]" Ex. 7 (Greene, Doug, *et al.*, *Analysis of Biotech Securities Class Action Motion to Dismiss Results, 2005-2022*, Guest Post in Kevin M. LaCroix's The D&O Diary (July 19, 2022)) (emphasis in the original) (finding that between 2005-2017, 68.6% of motions resulted in complete dismissal; and between July 11, 2017 and March 21, 2022, 68.2% resulted in complete dismissal) ("D&O Diary"). There was, therefore, a very strong possibility that the case would yield little or no recovery after many years of costly litigation. *See In re Xcel Energy, Inc., Sec., Deriv. & "ERISA" Litig.*, 364 F. Supp. 2d 980, 994 (D. Minn. 2005) ("Precedent is replete with situations in which attorneys

2

representing a class have devoted substantial resources in terms of time and advanced costs yet have lost the case despite their advocacy."); *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (observing that "Defendants prevail outright in many securities suits.").

Despite these risks, Lead Counsel worked over 4,102.3 hours on behalf of the Settlement Class, all on a fully contingent basis with no guarantee of ever being paid.  As compensation for Plaintiffs' Counsel's significant efforts and achievements on behalf of the Settlement Class, Lead Counsel respectfully requests a fee award in the amount of 18.5% of the Settlement Fund.  The requested fee is consistent with attorney fee awards in comparable class action settlements, whether considered as a percentage of the Settlement or in relation to Lead Counsel's lodestar.  In fact, the requested fee represents a multiplier of 1.87 on Lead Counsel's lodestar, which is well within the range of multipliers typically awarded in class actions with substantial contingency risks such as this one. *See In re Signet Jewelers Limited Sec. Litig.*, 2020 WL 4196468, at \*16 (S.D.N.Y. July 21, 2020) ("In complex litigation, lodestar multipliers between 2 and 5 are commonly awarded, and fee awards resulting in multipliers as high as 6 have also been approved.").

Lead Counsel also seek reimbursement of $64,031.13 in out-of-pocket litigation expenses incurred by Lead Counsel in prosecuting this Action. *See* ¶¶95-103.  The expenses are reasonable in amount and were necessarily incurred in the successful prosecution of the Action.  Accordingly, they should be approved.

Finally, Court-appointed Lead Plaintiffs Ryan Bibb, Rodney Samaan, Lionel Dreshaj, and Benjamin Dreshaj (collectively, "Lead Plaintiffs"), respectfully request PSLRA awards in the aggregate amount of $10,000 ($2,500 each) to compensate them for the time and effort they expended on behalf of the Settlement Class.  Exs. 1-4.  Each Lead Plaintiff, *inter alia*, reviewed filings, conferred with Plaintiffs' Counsel about litigation and settlement strategies, and authorized

Lead Counsel to settle the case.  But for their "commitment to pursuing these claims, the successful recovery for the [Settlement] Class would not have been possible." *Bell v. Pension Comm. of ATH Holding Co., LLC*, 2019 WL 4193376, at *6 (S.D. Ind. Sept. 4, 2019).

For the reasons set forth herein, and in the Spencer Declaration, Lead Counsel respectfully request the Court award Plaintiffs' Counsel 18.5% of the Settlement Fund, approve reimbursement of $64,031.13 in litigation expenses, and grant PSLRA awards of $2,500 to each Lead Plaintiff.

## II. ARGUMENT

### A. The Common Fund Doctrine Applies To The Settlement

The Supreme Court and the Second Circuit have long recognized that attorneys whose efforts create a "common fund" are entitled to a reasonable attorneys' fee from that fund.  *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).  "The rationale for the doctrine is an equitable one: it prevents unjust enrichment of those benefitting from a lawsuit without contributing to its cost." *Id.* at 47; *see also In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *2 (S.D.N.Y. Nov. 7, 2007). Awarding reasonable attorneys' fees from a common fund also serves an important policy goal: it encourages "skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons," and thus discourages "future misconduct of a similar nature." *Id.*; *see also Hicks v. Morgan Stanley & Co.*, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005).

For the common fund doctrine to apply, "the applicant's efforts must confer a 'substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread costs proportionately among them,' an award of attorneys' fees must operate to shift the costs of litigation to that group." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (quoting *Mills v. Elec.*

*Auto-Lite Co.*, 396 U.S. 375, 393-94 (1970)).  All of these elements are present here.  Plaintiffs'

Counsel's efforts conferred a substantial benefit—$21 million in cash—on an ascertainable class.

In addition, a fee award from the common fund will equitably shift the costs of litigation to the

group benefitting from the Settlement, *i.e.*, the Settlement Class.  Accordingly, the Court should

award attorneys' fees from the Settlement Fund.  *See Maley*, 186 F. Supp. 2d 369.

**B.**     **The Court Should Award A Reasonable Percentage Of The Common Fund**

In the Second Circuit, "both the lodestar and the percentage of the fund methods are

available to district judges in calculating attorneys' fees." *Goldberger*, 209 F.3d at 50.  However,

"[t]he trend in the Second Circuit is to use the percentage of the fund method in common fund

cases like this one, as it directly aligns the interests of the class and its counsel, mimics the

compensation system actually used by individual clients to compensate their attorneys, provides a

powerful incentive for the efficient prosecution and early resolution of litigation, and preserves

judicial resources." *Monzon v. 103W77 Partners, LLC*, 2015 WL 993038, at \*2 (S.D.N.Y. 2015);

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("The trend in this

Circuit is toward the percentage method, which directly aligns the interests of the class and its

counsel and provides a powerful incentive for the efficient prosecution and early resolution of

litigation.").[4]  The percentage-of-the-fund method is also supported by the PSLRA, which states

that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class

shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest

actually paid to the class."  15 U.S.C. § 78u-4(a)(6).[5]  The lodestar method, by contrast, "create[s]

---

[4] *See also Athale v. Sinotech Energy Ltd.*, 2013 WL 11310686, at \*7 (S.D.N.Y. Sept. 4, 2013) ("the trend in this Circuit has been toward the use of a percentage of recovery as the preferred method of calculating the award for class counsel in common fund cases, particularly in complex securities class actions.").

[5] *See also In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at \*16 (S.D.N.Y.

an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits." *Wal-Mart*, 396 F.3d at 121.

The percentage method does not, however, render the lodestar irrelevant. Rather, part of the reasonableness inquiry is a comparison of the lodestar to the fee awarded pursuant to the percentage of the fund method "[a]s a 'cross-check.'" *Wal-Mart*, 396 F.3d at 123 (quoting *Goldberger*, 209 F.3d at 50). "[W]here [the lodestar method is] used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50. "Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case," *id.*, or "[t]he district courts … may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 184 (W.D.N.Y. 2011); *Johnson v. Brennan*, 2011 WL 4357376, at *14-15 (S.D.N.Y. Sept. 16, 2011).

In sum, the weight of authority suggests that the Court should use the percentage-of-recovery method, with a lodestar cross-check, in determining a reasonable attorneys' fee. *See In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d 229, 233 (S.D.N.Y. 2005) ("Typically, courts utilize the percentage method and then 'cross-check' the adequacy of the resulting fee by applying the lodestar method."); *Bellifemine v. Sanofi-Aventis U.S. LLC*, 2010 WL 3119374, at *6 (S.D.N.Y. Aug. 6, 2010) ("applying a lodestar 'cross-check'"); *Hicks*, 2005 WL 2757792, at *10.

---

July 27, 2007) ("[T]he PSLRA implicitly supports the use of the percentage of the fund method."); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005) ("apply[ing] the percentage method" due, at least in part, to "the PSLRA's express contemplation that the percentage method will be used to calculate attorneys' fees in securities fraud class actions").

C.      **The Requested Attorneys' Fees Are Reasonable**

1.      **The Requested Attorneys' Fees Are Reasonable Under the Percentage-of-the-Fund Method**

Lead Counsel's 18.5% fee request is well within the range of percentage fees awarded in comparable, complex class actions within the Second Circuit.  *See In re GreenSky Sec. Litig.*, No. 18-cv-11071 (AKH), ECF No. 211 at ¶13 (S.D.N.Y. Oct. 22, 2021) ("the fee awarded, constituting approximately 22% of the [$27,500,00] Settlement Fund, is within an acceptable range of fees under the percentage of the fund method") (Ex. 12); *Maley*, 186 F. Supp. 2d at 370 (finding 33⅓% fee request "falls comfortably within the range of fees typically awarded in securities class actions"); *In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *26 (S.D.N.Y. Nov. 26, 2002) (collecting cases and stating "[i]n this district alone, there are scores of common fund cases where fees alone (*i.e.,* where expenses are awarded in addition to the fee percentage) were awarded in the range of 33-1/3% of the settlement fund."); *In re Monster Worldwide, Inc. Sec. Litig.*, 2008 WL 9019514, at *1-2 (S.D.N.Y. Nov. 25, 2008) (awarding 25% of $47.5 million settlement); *In re Salomon Analyst Metromedia Litig.*, No. 02-CV-7966, ECF No. 93 at 1 (S.D.N.Y. Feb. 27, 2009) (awarding 27% of $35 million settlement) (Ex. 13); *In re Celestica Inc. Sec. Litig.*, No. 07-cv-00312, ECF No. 267 at 2 (S.D.N.Y. July 28, 2015) (awarding 30% of $30 million settlement) (Ex. 14).[6]  It is also far below the 27.5% median attorneys' fee awarded in securities class actions

---

[6] *See also Moloney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*, 2009 WL 5851465, at *5 (S.D.N.Y. Mar. 31, 2009) (collecting cases and noting that "Class Counsel's request for 33% of the Settlement Fund is typical in class action settlements in the Second Circuit."); *Lea v. Tal Educ. Grp.*, 2021 WL 5578665, at *11 (S.D.N.Y. Nov. 30, 2021) (awarding 33⅓% settlement fund and stating: "[t]he percentage of the fund request[ed] – one-third – is a percent that has been approved as reasonable in this Circuit."); *Landmen Partners, Inc. v. The Blackstone Group, L.P. et al.*, No. 08-cv-03601, ECF No. 191 at ¶14 (S.D.N.Y. Dec. 18, 2013) (awarding 33⅓% of $85 million settlement) (Ex. 15); *Board of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2012 WL 2064907, at *3 (S.D.N.Y. June 7, 2012) (awarding 25% of $37,500,000 settlement); *In re OSG Sec. Litig.*, No. 12-cv-07948, ECF No. 261 at 1-2 (S.D.N.Y. Dec. 2, 2015) (awarding 30% of $31.6 million settlement) (Ex. 16); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F.

with settlements of a similar magnitude. *See* Ex. 6 (NERA Report) at p. 27, Fig. 25 (between 2012 to 2021, the median attorneys' fee award for settlements between $10-$25 million was 27.5%).

That this case was settled before the Court decided Defendants' pending motion to dismiss does not alter the analysis. "Class Counsel should not be penalized by a reduction of their fee request, but rather rewarded for the extent and expediency of the recovery for the Settlement Class[] that they have achieved." *Leach v. NBC Universal Media, LLC*, 2017 WL 10435878 at ¶40 (S.D.N.Y. Aug. 24, 2017). Indeed, recognizing the importance of efficient and effective advocacy, courts have repeatedly awarded similar fees where a settlement was reached during the pendency of a motion to dismiss or shortly after, and where no or limited discovery had been obtained as a result of the PSLRA discovery stay. *See Athale v. Sinotech Energy Ltd.*, 2013 WL 11310686, at *8-9 (S.D.N.Y. Sept. 4, 2013) (awarding 20% of $20 million, amounting to a multiplier of 5.65, in case settling before the court ruling on a motion to dismiss, and noting "litigants generally should not be encouraged to overbill in an effort to garner a lower lodestar multiplier."); *Zeltser v. Merrill Lynch & Co., Inc.*, 2014 WL 4816134, at *10 (S.D.N.Y. Sept. 23, 2014) (awarding a 33% fee, equating to a 5.1 multiplier, where settlement was reached after the amended complaint was filed and noting that Plaintiff's Counsel should not be "penalize[d] ... for achieving an early settlement, particularly where ... the settlement amount is substantial.").[7]

---

Supp. 2d 418, 433 (S.D.N.Y. 2001) (awarding 25% of $21 million settlement); *In re Sadia S.A. Sec. Litig.,* 2011 WL 6825235, at *3 (S.D.N.Y. Dec. 28, 2011) (awarding 30% of $27 million settlement); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 2015 WL 13639234 (S.D.N.Y. Oct. 19, 2015) (awarding 30% of $33 million settlement); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394 (S.D.N.Y. 2018) (awarding 25% of $35 million settlement), *aff'd*, 674 F. App'x 37 (2d Cir. 2016).

[7] *See also In re Am. Express Fin. Advisors Sec. Litig.*, No. 04 Civ. 1773 (DAB), ECF No. 170 at ¶16 (S.D.N.Y. July 18, 2007) (awarding 27% of $100 million, representing a 2.8 multiplier, where settlement was reached while motion to dismiss was pending) (Ex. 17); *In re L.G. Philips LCD Co. Sec. Litig.*, No. 1:07-cv-00909-RJS, ECF No. 82 at ¶3 (S.D.N.Y. Mar. 17, 2011) (awarding 30% of $18 million, representing a multiplier of 3.17, where settlement reached while motion to

The requested 18.5% fee is, therefore, consistent with awards in other similarly complex cases. *See In re Graña y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at \*18 (E.D.N.Y. Aug. 13, 2021) (awarding 25% of $14,650,000, representing a multiplier of 3.56 in case settled prior to significant discovery, and stating that the multiplier is "below what has been deemed reasonable for the common fund settlement in securities class action cases in this circuit."), *report and recommendation adopted by*, 2021 WL 4173170, at \*2-3 (E.D.N.Y. Sept. 14, 2021); *Cornwell v. Credit Suisse Grp.*, No. 08-cv-03758 (VM), ECF No. 117 at 4 (S.D.N.Y. July 18, 2011) (finding reasonable an award of 27.5% of $70 million settlement fund, representing a lodestar multiplier of 4.7, "[g]iven the public policy and judicial economy interests that support the expeditious settlement of cases") (Ex. 22).

### 2.    The Lodestar "Cross-Check" Strongly Supports the Reasonableness of the Requested Fee

A lodestar "cross-check" confirms the reasonableness of the requested fee award. *See Goldberger*, 209 F.3d at 50. The "lodestar" is calculated by multiplying the number of hours expended on the litigation by each particular attorney or paralegal by their current reasonable and customary hourly rate, and totaling the amounts for all time-keepers.[8] Additionally, "[u]nder the

---

dismiss was pending) (Ex. 18); *In re Penn West Petroleum Ltd. Sec. Litig.*, No. 14-cv-06046-JGK, ECF No. 144 at 2 (S.D.N.Y. June 28, 2016) (awarding 20% of $19,759,282 prior to a motion to dismiss decision) (Ex. 19); *In re Ubiquiti Networks, Inc. Sec. Litig.*, No. 18-cv-01620 (VM), ECF No. 49 at 6 (S.D.N.Y. Mar. 27, 2020) (awarding 33.3% of $15 million settlement, representing a multiplier of 3.1, where settlement was reached prior to filing a motion to dismiss) (Ex. 20); *Maley*, 186 F. Supp. 2d at 370 (awarding one-third of $11.5 million settlement, representing a 4.65 multiplier, where motions to dismiss were pending); *In re TeleTech Litig.*, No. 1:08-cv-00913-LTS, ECF No. 82 at 1 (S.D.N.Y. June 11, 2010) (awarding 30% of $11 million, representing a 3.78 multiplier, where settlement reached before motion to dismiss was filed) (Ex. 21).

[8] "[T]he use of current rates to calculate the lodestar figure has been endorsed repeatedly by the Supreme Court, the Second Circuit and district courts within the Second Circuit as a means of accounting for the delay in payment inherent in class actions and for inflation." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at \*15 (S.D.N.Y. Dec. 19, 2014); *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998)

lodestar method of fee computation, a multiplier is typically applied to the lodestar." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004). "The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *Id.* (citing *Goldberger*, 209 F.3d at 47); *Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir. 1999). Thus, "[w]here, as here, counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar." *In re Comverse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *5 (E.D.N.Y. June 24, 2010).

Here, Lead Counsel (including attorneys, paralegals, and professional support staff) collectively devoted a total of 4,102.30 hours to the prosecution of this Action, resulting in a lodestar of $2,074,470. ¶80.[9] Based on a 18.5% fee (equal to $3,885,000), Lead Counsel's lodestar yields a multiplier of 1.87. This multiplier is at the lower end of the range of multipliers commonly awarded in securities class actions and other complex litigation. *See Wal-Mart*, 396 F.3d at 123 (upholding multiplier of 3.5 as reasonable on appeal); *Maley*, 186 F. Supp. 2d at 369 (awarding fee equal to a 4.65 multiplier, which was "well within the range awarded by courts in this Circuit and courts throughout the country"); *Burns v. Falconstor Software, Inc.*, 2014 WL 12917621, at *10 (E.D.N.Y. Apr. 10, 2014) (finding fee award of 33.3% "reasonable" based on cross-check multiplier of 4.75); *In re Bisys Sec. Litig.*, 2007 WL 2049726, at *3 (S.D.N.Y July 16, 2007) (awarding 30% fee, equating to a 2.99 multiplier and finding that the multiplier "falls well within the parameters set in this district and elsewhere"); *Davis*, 827 F. Supp. 2d at 185 (awarding fee representing a multiplier

---

("[C]urrent rates, rather than historical rates, should be applied in order to compensate for the delay in payment.").

[9] Lead Counsel's rates range from $725 to $1,050 for partners, and $625 to $650 for non-partners (¶79), and "are comparable to peer plaintiffs and defense-side law firms litigating matters of similar magnitude." *TAL Educ. Grp.*, 2021 WL 5578665, at *12 (approving GPM's rates of $600 to $995 for partners, and $500 to $750 for associates); *see also* Ex. 11 (chart of rates charged by peer plaintiff and defense counsel in complex litigation).

of 5.3, which was "not atypical" in similar cases); *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 376

(S.D.N.Y. 2005) (awarding multiplier of 3.47 in light of an early settlement).[10]

"In sum, Lead Counsel's requested fee award is well within the range of what courts in this

Circuit regularly award in class actions such as this one, whether calculated as a percentage of the

fund or in relation to Plaintiff's Counsel's lodestar." *In re Signet Jewelers Limited Sec. Litig.*, 2020

WL 4196468, at *17 (S.D.N.Y. July 21, 2020).  And, as discussed below, each factor established by

the Second Circuit in *Goldberger* supports a finding that the requested fee is reasonable.

> **D.     Factors Considered By Courts In The Second Circuit Confirm The Requested Fee Is Fair And Reasonable**

The Second Circuit has set forth the following criteria that courts should consider when

reviewing a request for attorneys' fees in a common fund case:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50.  Consideration of these factors, together with the analyses above,

demonstrates that the requested fee is reasonable.

> **1.     Time And Labor Expended Support The Requested Fee**

The time and effort expended by Plaintiffs' Counsel in prosecuting the Action and

achieving the Settlement supports the requested fee.  Among other things, Plaintiffs' Counsel:

---

[10] *See also Sinotech*, 2013 WL 11310686, at *8 (stating that courts routinely award lodestar multipliers of "between four and five"); *Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, at *18 (S.D.N.Y. Dec. 18, 2019) ("multipliers of between three and four times…have been routinely awarded in this Circuit.");  *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 590 (S.D.N.Y. Sept. 10, 2008) ("In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court."); *In re Interpublic Sec. Litig.*, 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 26, 2004) ("In recent years multipliers of between 3 and 4.5 have been common in federal securities cases."); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 353 (S.D.N.Y. 2014) (awarding fee representing a multiplier of 5.2, which was "large, but not unreasonable."); *In re Deutsche Telekom AG Sec. Litig.*, 2005 WL 7984326 at *4 (S.D.N.Y. June 14, 2005) (awarding fee representing a 3.96 multiplier).

- drafted the initial complaint in the Action and moved for consolidation and appointment of Lead Plaintiffs and Lead Counsel;

- opposed Lead Plaintiff movant Maurice Harris' motion for reconsideration of the Court's Order appointing Lead Plaintiffs and Lead Counsel (ECF No. 58);

- conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) Sesen Bio's filings with the U.S. Securities and Exchange Commission ("SEC"), (ii) public reports, blog posts, research reports prepared by securities and financial analysts, and news articles concerning Sesen Bio, (iii) press releases published by and regarding Sesen Bio, and (iv) Sesen Bio's investor call transcripts and other publicly available material related to Sesen Bio; (b) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, interviews of former Company employees; and (c) working with experts in the fields of loss causation, damages, and Food and Drug Administration ("FDA") and European Medicines Agency ("EMA") regulations;

- researched and drafted the opposition to Defendants' motion to transfer venue to the United States District Court of Massachusetts;

- utilized the foregoing investigation and additional research to draft and file the comprehensive 77-page Amended Class Action Complaint for Violations of the Federal Securities Laws, which asserted claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act;

- researched and drafted the opposition to Defendants' motion to dismiss;

- negotiated and entered a confidentiality agreement pursuant to which Defendants would produce documents in advance of an agreed upon mediation, and reviewed and analyzed the 39,200 files, equating to 151,403 pages, produced by Defendants;

- engaged in a mediation process overseen by a highly experienced third-party mediator, Jed Melnick, Esq., of JAMS, which involved, *inter alia*: (a) an exchange of written submissions concerning the facts of the case, liability and damages; (b) a full-day formal mediation session; (c) extensive consultation with Lead Plaintiffs' expert on damages and loss causation; (d) a second telephonic mediation with Mr. Melnick; and (e) two weeks of follow up negotiations;

- negotiated a detailed confidential settlement term sheet with Defendants' Counsel, which was executed on July 19, 2022;

- interviewed Sesen Bio's CEO, Defendant Cannell, to further assess the strengths and weaknesses of Plaintiffs' claims;

- drafted and then negotiated the terms of the Stipulation (including the exhibits thereto) and Supplemental Agreement with Defendants' Counsel;

12

- worked with a damages expert to craft a plan of allocation that treats Lead Plaintiffs and all other members of the proposed Settlement Class fairly;

- drafted the preliminary approval motion and supporting papers;

- oversaw the implementation of the notice process; and

- drafted the motion for final approval and supporting papers.  ¶¶17-33.[11]

Moreover, the legal work related to the Settlement will not end with the Court's approval of the proposed Settlement.  Additional hours and resources will be expended assisting Settlement Class Members with their Claim Forms, responding to Settlement Class Members' inquiries, shepherding the claims process to conclusion, and filing a distribution motion.  No additional compensation will be sought for this work.  *See In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 2015 WL 6971424, at \*10 (S.D.N.Y. Nov. 9, 2015) ("Considering that the work in this matter is not yet concluded for Plaintiffs' counsel who will necessarily need to oversee the claims process, respond to inquiries, and assist Class Members in submitting their Proof of Claims, the time and labor expended by counsel in this matter support a conclusion that a 33% fee award in this matter is reasonable.").  Accordingly, this factor supports the requested fee.

### 2.    The Risks Of Litigation Support The Requested Fee

"[T]he risk of success [is] perhaps the foremost factor to be considered in determining" a reasonable award of attorneys' fees.  *Goldberger*, 209 F.3d at 54; *see also Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at \*21 (S.D.N.Y. Mar. 24, 2014) ("The Second Circuit long ago recognized that courts should consider the risks associated with lawyers undertaking a case on a contingent fee basis."); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 80 F. Supp. 3d 838, 847-48 (N.D. Ill. 2015) ("When determining the reasonableness of a fee request, courts put a

---

[11] *See also* Ex. 8 (chart categorizing Lead Counsel's hours by the following tasks: (1) Preparation of Complaints and Factual Investigation; (2) Motion Practice; (3) Discovery; and (4) Mediation and Settlement).

fair amount of emphasis on the severity of the risk (read: financial risk) that class counsel assumed in undertaking the lawsuit."). This is because "[n]o one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974). In applying this factor, "'litigation risk must be measured as of when the case is filed,' rather than with the hindsight benefit of subsequent events." *Global Crossing*, 225 F.R.D. at 467 (quoting *Goldberger*, 209 F.3d at 55). The many severe risks that Plaintiffs' Counsel faced in prosecuting this suit more than justify the requested 18.5% fee. *See, e.g.*, ¶¶34-47.

Numerous courts have recognized that "class actions confront even more substantial risks than other forms of litigation[,]" *Comverse*, 2010 WL 2653354, at *5, and that "[s]ecurities class actions such as this are notably difficult and notoriously uncertain." *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *27 (S.D.N.Y. Nov. 8, 2010).[12] This case was no exception. From the outset, Plaintiffs' Counsel understood that they were embarking on a complex, expensive, and potentially lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, "plaintiffs' counsel were obligated to assure that sufficient attorney and para-professional resources were dedicated to the prosecution of the Action; counsel also faced the responsibility of advancing

---

[12] *See also Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004) ("Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation."); *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 409 (E.D. Wis. 2002) ("Shareholder class actions are difficult and unpredictable, and skepticism about optimistic forecasts of recovery is warranted.").

litigation and overhead expenses on this case … ."  *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 164 (S.D.N.Y. Nov. 2, 2011).  Indeed, "[u]nlike counsel for Defendants, who are paid substantial hourly rates and reimbursed for their expenses on a regular basis, [Plaintiffs'] Counsel have not been compensated for any time or expenses since this case began [approximately a year and a half ago]."  *Flag Telecom*, 2010 WL 4537550, at *27.  Lead Counsel's commitment was substantial (*i.e.*, $2,080,770.00 in lodestar and $64,031.13 in out-of-pocket hard costs),[13] and had they not obtained a recovery, it could have all been lost.  *See Gross v. GFI Group, Inc.*, 784 Fed. App'x. 27, 28 (2d Cir. Sept. 13, 2019) (affirming grant of summary judgment against plaintiffs in securities fraud class action where GPM served as one of Lead Plaintiff's counsel on the alternative ground that Defendant's "statement did not, as a matter of law, amount to a material misrepresentation or omission actionable under section 10(b)," despite the trial court twice finding the statement actionable); *In re: Korean Ramen Antitrust Litig.*, No. 3:13-cv-04115 (N.D. Cal.) (GPM lost a six-week antitrust jury trial after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs).  To put it bluntly, complex litigation is not risk free, and this case was not a slam dunk.[14]

"One proxy for assessing risk is whether the litigation followed on the heels of some prior criminal or civil proceeding involving the same parties or subject matter."  *Dairy Farmers*, 80 F.

---

[13] *See* ¶80 (lodestar), ¶96 (expenses).

[14] For a discussion of the litigation, and thus contingency fee, risks inherent in this case, the Court is respectfully referred to the concurrently filed Final Approval Memorandum and Spencer Declaration.  *See* Final Approval Memorandum § III.A.3.; Spencer Decl. ¶¶34-48.  While Lead Counsel believe those risks are important in assessing a reasonable attorneys' fee, for the sake of brevity, this section focuses on what made this Action riskier than other securities class actions. *See City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*, 2020 WL 7413926, at *3 (S.D.N.Y. Dec. 17, 2020) ("[G]reater risks undertaken by counsel who accept a case on a contingent fee basis support a higher settlement percentage.").

Supp. 3d at 848. "This inquiry provides insight into whether class counsel benefitted from the work of others, which acts a red flag for judges assessing fee petitions." *Id.* In the instant case, no civil or criminal charges have been filed by the SEC or Department of Justice with respect to the conduct at issue in this case—even as of today. And, while the "STAT article" (*see* ¶37) did provide some guidance to Lead Plaintiffs, it also raised a host of issues with respect to ***pleading*** a securities fraud case—most notably with respect to alleging scienter and an actionable misstatement or omission with the specificity required by the PSLRA—as Defendants aggressively argued in their motion to dismiss papers. *See* ECF No. 73; ECF No. 77. Among other things, Defendants argued that: (a) the STAT article did not identify any current or former Sesen Bio employees by name, job title, dates of employment or in any other way sufficient to support the allegations in the article—much less the allegations in the Complaint (ECF 73 at 20, 39-40; ECF No. 77 at 7-8); (b) the allegations in the STAT article and Complaint concerning protocol violations and investigator misconduct were too vague to support a claim of securities fraud (ECF 73 at 5, n.3; ECF No. 77 at 6-7); (c) "Plaintiffs have come forward with zero 'confidential witnesses' or 'confidential informants' asserting that Defendants knew or suspected that … the allegations in the STAT article had any factual basis" (ECF 73 at 5); (d) Sesen Bio did not have a duty to disclose the protocol deviations or alleged site misconduct reported in the STAT article (*id.*); (e) Sesen Bio repeatedly disclosed the serious adverse events referenced in the STAT article before and during the class period (*id.*); and (f) the STAT article could not "form the basis of a securities fraud claim because it lacks sufficient indicia of reliability." ECF No. 77 at 8.[15]

While Lead Plaintiffs believe they had strong arguments in opposition to the motion to

---

[15] Similarly, while the EMA's withdrawal assessment report regarding Vicineum provided useful information for Plaintiffs, Defendants forcefully argued that it did not allow Plaintiffs to state a claim for securities fraud. *See* ECF 73 at 17, 36.

dismiss, Defendants' arguments were not frivolous. Lead Plaintiffs could not, therefore, simply rely on the allegations of the STAT article and call it a day. Rather, they had to conduct their own independent investigation, consult with experts, and then draft an amended complaint that would not only comply with the rigorous pleading standards of the PSLRA, but also allow them to credibly contest a motion to dismiss drafted by one of the country's foremost law firms. Put simply, an online article is far different from a government indictment, and "Plaintiffs' counsel (and their teams and experts) were truly the authors of the favorable outcome for the class." *Meredith Corp. v. SESAC*, *LLC*, 87 F. Supp. 3d 650, 670 (S.D.N.Y. 2015); *see also Maley*, 186 F. Supp. 2d at 371 (awarding one-third of settlement fund and noting that "[i]n this Action, Plaintiffs' Class Counsel did not 'piggy back' on any prior governmental action related to Del Global."); *In re Sumitomo Copper Litig.*, 74 F.Supp.2d 393, 395 (S.D.N.Y. 1999) (awarding 2.5 multiplier, which equated to 27.5% of $116 million settlement fund, and noting that "[t]here was no governmental assist to ease the task with which Petitioners was confronted.").

Another indicium of risk is the fact that this was not a restatement case. When companies restate their financials, they are admitting a material misstatement of their financial reporting. A case predicated on a restatement is, therefore, less risky because the misstatement and materiality elements of a securities fraud claim are already met. *See In re Schering-Plough Corp. Enhance Sec. Litig.*, 2013 WL 5505744 at *30 (D.N.J. Oct. 1, 2013) (granting fee request where the case was the antithesis of cases where liability is virtually certain due to a financial restatement); *Schwartz v. TXU Corp.*, 2005 WL 3148350, at *29 (N.D. Tex. Nov. 8, 2005) ("From the outset, this post-PSLRA action was an especially difficult and highly uncertain securities case, which did not involve restatement of TXU's previously issued financial statements or any other acknowledgments of wrongdoing.").

17

The case's riskiness was also heightened by the lack of insider trading and the subject matter of case.  As Defendants pointed out in their motion to dismiss papers, "no insider (including any director or officer) sold a single share of stock during the [c]lass [p]eriod or otherwise personally profited from the alleged fraud."  ECF No. 73 at 5; ECF No. 77 at 3 ("No insider sold a single share of stock"); *see also In re Gilat Satellite Networks, Ltd.*, 2007 WL 2743675, at *11 (E.D.N.Y. Sept. 18, 2007) ("Establishing scienter is a difficult burden to meet and proving it will be especially challenging in this case where, apparently, neither the individual defendants nor any other Gilat executive profited from their Gilat investments.").[16]  And, as noted above, securities claims brought against small, clinical-stage biotech companies are ***more*** likely to be dismissed at an early stage than other types of securities class actions.  *D&O Diary*, Ex. 7 at p. 2.

In short, this case lacked several strong factors that often support liability, large settlement valuations, and provide a roadmap for proving fraud, such as a corporate restatement, a companion SEC or DOJ action, or significant insider trading.  The contingency fee risk was high and, consequently, this factor militates in favor of the requested fee.  *See Xcel Energy*, 364 F. Supp. 2d at 995 (noting that attorney fee request was supported by fact that the "case did not benefit from meaningful governmental investigations" and "did not involve accounting fraud, a restatement of financials, or any allegations whatsoever of insider trading.").

### 3. The Magnitude And Complexity Of The Action Support The Requested Fee

Courts have repeatedly recognized the "notorious complexity" of securities class action litigation. *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 2006 WL 903236, at *8 (S.D.N.Y.

---

[16] While Sesen Bio itself sold stock during the Settlement Class Period, Defendants cited cases finding plaintiffs could not plead scienter based on such company stock sales. *See* ECF 73 at 38-39.

Apr. 6, 2006); *TAL Educ. Grp.*, 2021 WL 5578665, at *9 ("Class action suits have a well-deserved reputation as being most complex, and securities class actions are notably difficult and notoriously uncertain to litigate."); *La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, 2009 WL 4730185, at *8 (D.N.J. Dec. 4, 2009) ("securities class actions are inherently complex"). Moreover, "securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA," and other changes in the law. *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000); *see also AOL Time Warner*, 2006 WL 903236, at *9 ("[T]he legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages.").

Here, in addition to facing the heightened pleading standard and automatic discovery stay of the PSLRA—which can be problematic in the best of times as demonstrated by the high dismissal rate of securities class actions referenced *supra*—Lead Plaintiffs also had to deal with the extremely complicated rules and regulations governing the subject matter of the Action. The focal point of the litigation was Sesen Bio's quest for regulatory approval from the FDA and EMA for its lead product candidate, Vicineum, as a treatment for non-muscle invasive bladder cancer. Thus, to effectively prosecute the Action, Plaintiffs' Counsel needed to understand, among other things: clinical trial data relating to Vicineum; the FDA regulatory process for approval of a Biologics License Application; and the EMA regulatory process for approval of a marketing authorization application. The frameworks governing new drug testing and the pharmaceutical approval process in the U.S. and Europe is, to put it mildly, exceedingly complex, and Lead Plaintiffs had to retain an expert in the field of FDA and EMA regulations to understand the relevant standards and protocols. Indeed, it was only by researching the esoteric world of the pharmaceutical approval process, developing a working knowledge of the relevant procedures, and

19

conducting a thorough independent investigation of Sesen Bio and Individual Defendants—again, without the benefit of discovery—that Lead Counsel was able to put together a case strong enough to convince Defendants to engage in mediation and, ultimately, settle the case.  Simply put, this was an incredibly complex matter—even by the standards of securities class actions.

The magnitude of this Action was similarly unquestionable.  This was hard-fought, expensive litigation, with hundreds of millions of dollars of damages at stake, and it required considerable skill and resources to litigate.  Consequently, the magnitude and complexity of the litigation support the requested fee.  *See City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *16 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015) ("[T]he complex and multifaceted subject matter involved in a securities class action such as this supports the fee request.").

### 4.   The Quality Of Representation Supports The Requested Fee

"To determine the 'quality of the representation,' courts review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *Taft v. Ackermans*, 2007 WL 414493, at *10 (S.D.N.Y. Jan. 31, 2007); *see also Veeco*, 2007 WL 4115808, at *7.  Both of these factors point to the same conclusion, a 18.5% fee award is reasonable under circumstances.

Here, Lead Plaintiffs' damages expert estimates that if Lead Plaintiffs had fully prevailed on all their claims at summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Plaintiffs' damages theory—*i.e.*, *Plaintiffs' best-case scenario*—*total maximum aggregate damages* would be approximately $342 million.  Thus, the $21 million Settlement Amount equates to approximately 6.14% of total *maximum* damages *potentially* available in the Action.  This recovery is well above the median recovery of 1.8% in securities class actions settled in 2021, as well as the median recovery of 2.3% for similar sized securities class actions (with estimated damages of $200-$399

20

million) from 2012-2021.  *See* Ex. 6 (NERA Report) at p. 23 (Fig. 21) and p. 24 (Fig. 22).

This was, however, Lead Plaintiffs' optimum outcome, and had Defendants prevailed on any of their liability or damages arguments, recoverable damages would have been substantially reduced, if not altogether eliminated.  *See Facebook,* 343 F. Supp. 3d at 414 ("Because Plaintiffs face serious challenges to establishing liability, consideration of Plaintiffs' best possible recovery must be accompanied by the risk of non-recovery.").  For instance, Defendants would have no doubt asserted that the August 18, 2021 alleged corrective disclosure *i.e.*, the STAT article—could not support loss causation because it did not reveal any previously undisclosed "facts" to the market.  Indeed, Defendants had previewed this argument in their motion to dismiss papers.  *See* ECF No. 73 at 5 ("Sesen Bio repeatedly disclosed the serious adverse events referenced in the STAT article before and during the Class Period"); ECF No. 77 at 25 ("Plaintiffs have not alleged any contradiction between the STAT article allegations and Sesen Bio's disclosures and ignore that Sesen Bio did, in fact, disclose the liver related issues and the SAEs that occurred during the VISTA Trial.").  If Defendants prevailed on this and other potential loss causation arguments,[17] damages would have been significantly reduced, and had they prevailed on their liability arguments, damages would have been zero.  *See In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) ("to establish loss causation, *Dura* requires plaintiffs to disaggregate those losses caused by 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events,' from disclosures of the truth

---

[17] For example, Defendants likely would have argued at summary judgment and trial that the alleged August 13 and August 16, 2021 corrective disclosures did not reveal any concealed material facts, but rather simply represented an unforeseeable change in the FDA's assessment of Vicineum.  *See* ECF 73 at 3 ("Given the positive signals from the FDA, and in particular the FDA's agreement on Vicineum's label, approval appeared to be imminent.  The FDA, however, surprised Sesen Bio on August 13, 2021 when it issued a complete response letter").

21

behind the alleged misstatements."); *see also In re JDS Uniphase Corp. Sec. Litig.*, 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) (jury verdict for defendants following lengthy trial). Accordingly, the result speaks volumes about the quality of the representation.

Lead Counsel also respectfully submits that the quality of its efforts in the litigation to date, together with its substantial experience in securities class actions and its commitment to this litigation, provided it with the leverage necessary to negotiate the Settlement. ¶91; *see also* Ex. 10 (GPM firm resume); *Wilson v. LSB Industries, Inc.*, 2019 WL 3542844, at *2 (S.D.N.Y. June 28, 2019) ("Lead Counsel [GPM] has conducted the litigation and achieved the Settlement with skill, perseverance and diligent advocacy."). Indeed, "[n]ot only did Plaintiffs' Counsel's skill and expertise contribute to the favorable settlement for the class, it contributed to the overall efficiency of the case." *Veeco*, 2007 WL 4115808, at *7.

Finally, courts have recognized that the quality of the opposition faced by Lead Counsel should be taken into consideration in assessing the quality of the counsel's performance. ¶92; *see, e.g.*, *Veeco*, 2007 WL 4115808, at *7 (fee award supported by fact that defendants were represented by "one of the country's largest law firms"); *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the settlements were obtained from defendants represented by formidable opposing counsel from some of the best defense firms in the country also evidences the high quality of lead counsels' work."), *aff'd*, 272 Fed. Appx. 9 (2d Cir. 2008). Here, Defendants were represented by Hogan Lovells US LLP, a prestigious and well-respected law firm with a substantial securities class action litigation practice, whose lawyers tenaciously represented the interests of their clients throughout this Action. ¶92. Notwithstanding this formidable opposition, Lead Counsel's thorough investigation, ability to present a strong case, and demonstrated willingness to vigorously prosecute the Action, ultimately

22

resulted in the favorable Settlement.  Consequently, this factor militates in favor of the requested fee. *See Veeco*, 2007 WL 4115808, at *7 ("That Plaintiffs' Counsel was able to obtain a substantial settlement from these Defendants confirms the quality of Plaintiffs' Counsel's representation … and is a factor in determining the reasonableness of the fee request.").

### 5.    The Requested Fee In Relation To The Settlement Amount

Courts have interpreted this factor as requiring the review of the fee requested in terms of the percentage it represents of the total recovery.  "When determining whether a fee request is reasonable in relation to a settlement amount, the court compares the fee application to fees awarded in similar securities class-action settlements of comparable value." *Comverse*, 2010 WL 2653354, at *3.  As discussed in detail in Section II.C.1, *supra*, the requested 18.5% fee is consistent with percentage fees that courts in the Second Circuit have awarded in comparable complex cases.  Accordingly, the requested fee is reasonable in relation to the Settlement.

### 6.    Public Policy Considerations Support The Requested Fee

"[The Supreme] Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the [SEC]." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  If the "important public policy [of enforcing the securities laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook." *Flag Telecom*, 2010 WL 4537550, at *29.  "[A]s a practical matter, lawsuits such as this one can only be maintained if competent counsel can be retained to prosecute them.  This will occur if courts award reasonable and adequate compensation for such services where successful results are achieved." *City of Providence*, 2014 WL 1883494, at *18.

Here, Plaintiffs' Counsel invested substantial amounts of time and money vigorously

pursuing allegedly serious wrongdoing by a public enterprise, and they did so on a fully contingent basis. Had Plaintiffs' Counsel not done so, the Settlement Class would have received no compensation whatsoever. Accordingly, public policy considerations favor Lead Counsel's attorneys' fee request. *See City of Birmingham*, 2020 WL 7413926, at *2 ("Protecting investors from fraudulent or misleading investments serves the public interest, and Lead Counsel's fees should reflect the important goal of 'serv[ing] as an inducement for lawyers to make similar efforts in the future.'") (quoting *Wal-Mart*, 396 F.3d at 96) (alteration in the original).

**E.      Lead Counsel's Expenses Are Reasonable And Were Necessarily Incurred To Achieve The Benefit Obtained**

Lead Counsel also request reimbursement of $64,031.13 in expenses incurred while prosecuting the Action. *See Flag Telecom*, 2010 WL 4537550, at *30 ("It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class"); *In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003) ("Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were 'incidental and necessary to the representation' of those clients.").

Here, a significant portion of the expenses were incurred for professional services rendered by Lead Plaintiffs' experts, the investigator, and the mediator, and the remaining expenses are attributable to legal and factual research, the document review platform, case-related travel, filing fees, and other incidental expenses incurred in the course of the litigation. ¶¶95-102; Ex. 9 (chart categorizing expenses). These expenses were critical to Lead Plaintiffs' success in achieving the proposed Settlement, are reasonable in amount, and are customary and necessary expenses for a complex securities action. As such, they should be reimbursed. *See Flag Telecom*, 2010 WL 4537550, at *30; *Global Crossing*, 225 F.R.D. at 468 ("The expenses incurred – which include

24

investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review – are the type for which 'the paying, arms' length market' reimburses attorneys.  For this reason, they are properly chargeable to the Settlement fund.").

**F.      Lead Plaintiffs Should Be Awarded Their Reasonable Costs And Expenses Under 15 U.S.C. § 78u-4(a)(4)**

In connection with their request for reimbursement of Litigation Expenses, Lead Counsel also respectfully requests PSLRA awards of $2,500 for each of the Lead Plaintiffs to compensate them for the time and effort they expended on behalf of the Settlement Class.  ¶104.  The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class."  15 U.S.C. § 78u-4(a)(4).

Here, Lead Plaintiffs took an active role in the litigation by, among other things: (i) regularly communicating with their counsel regarding the posture and progress of the case, as well as strategy; (ii) producing documents to their attorneys; (iii) reviewing all significant pleadings and memoranda; (iv) consulting with their attorneys regarding the settlement negotiations; and (v) evaluating and approving the proposed Settlement.  *See* Ex. 1, ¶¶4-5; Ex. 2, ¶¶4-5; Ex. 3, ¶¶4-5; Ex. 4, ¶¶4-5.  These are "precisely the types of activities that support awarding reimbursement of expenses to class representatives."  *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *21 (S.D.N.Y. 2009).

Consequently, Lead Counsel respectfully requests that the Court grant Lead Plaintiffs' request for reimbursement of their "reasonable costs and expenses incurred in managing this litigation and representing the Class."  *Id.* at *21 (approving $215,000 total award to two lead plaintiffs); *In re Qudian Inc. Sec. Litig.*, 2021 WL 2328437, at *2 (S.D.N.Y. June 8, 2021) (awarding lead plaintiff $25,000, and class representative $12,500, for "reasonable costs and

expenses directly related to [their] representation of the Class").[18]

## III.    CONCLUSION

For the foregoing reasons, Lead Counsel respectfully requests the Court grant the motion.

DATED: December 19, 2022                          **GLANCY PRONGAY & MURRAY LLP**


By: *Matthew M. Houston*
Matthew M. Houston (MH-2218)
745 Fifth Avenue, 5th Floor
New York, New York 10151
Telephone: (212) 935-7400
Email: mhouston@glancylaw.com

Garth Spencer (GS-7623)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Email: gspencer@glancylaw.com

*Attorneys for Lead Plaintiffs and the Settlement Class*

---

[18] *See also In re Signet Jewelers Limited Sec. Litig.*, 2020 WL 4196468, at \*24 (S.D.N.Y. July 21, 2020) (collecting cases and awarding $25,410 to lead plaintiff); *Lea*, 2021 WL 5578665, at \*13 (awarding two lead plaintiffs $7,500 each); *Veeco*, 2007 WL 4115808, at \*12 (awarding lead plaintiff $15,900 of $5.5 million settlement for time spent supervising litigation, and characterizing such awards as "routine" in this Circuit); *In re Salomon*, No 02-CV-7966, ECF No. 93 at 2 (awarding three lead plaintiffs $5,000 each) (Ex. 13).

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the foregoing document was electronically filed with the Clerk of

Court via the CM/ECF system, which will send Notice of such filing to all counsel of record.


Dated: December 19, 2022                 */s/ Matthew M. Houston*
                                          Matthew M. Houston

27