**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE SESEN BIO, INC. SECURITIES LITIGATION | Case No. 1:21-cv-07025-AKH |

**DECLARATION OF GARTH SPENCER IN SUPPORT OF: (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................... 2

II.     PROSECUTION OF THE ACTION ...................................................................... 6

        A.      Background ................................................................................................ 6

        B.      Commencement Of The Action And Appointment Of Lead Plaintiffs And
                Lead Counsel ............................................................................................ 7

        C.      Defendants' Motion To Transfer .............................................................. 7

        D.      The Comprehensive Pre-Filing Investigation And The Preparation Of The
                Complaint ................................................................................................... 8

        E.      Defendants' Motion To Dismiss The Complaint And Plaintiffs' Response ........... 9

        F.      Mediation Efforts, Settlement Negotiations, And The Settlement's
                Preliminary Approval ............................................................................... 10

III.    THE RISKS OF CONTINUED LITIGATION ..................................................... 12

        A.      Risks To Overcoming Defendants' Motion To Dismiss ......................... 12

        B.      Risks Faced In Obtaining And Maintaining Class Action Status ........... 13

        C.      Risks To Proving Liability ...................................................................... 14

        D.      Risks To Proving Loss Causation And Damages .................................... 15

        E.      Other Risks, Including Trial, Appeals, And Ability To Collect A Judgment ....... 16

        F.      The Settlement Is Reasonable In Light Of Potential Recovery In The
                Action ....................................................................................................... 18

IV.     PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL
        ORDER REQUIRING ISSUANCE OF THE NOTICE ...................................... 18

V.      ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ............... 20

VI.     FINAL CERTIFICATION OF THE SETTLEMENT CLASS ............................. 25

VII.    LEAD    COUNSEL'S    REQUEST    FOR    ATTORNEYS'    FEES    AND
        REIMBURSEMENT OF LITIGATION EXPENSES ........................................... 27

A.    The Fee Application..................................................................................... 28

    1.    The Excellent Outcome Achieved Is The Result Of The Significant Time And Labor That Plaintiffs' Counsel Devoted To The Action ......... 28

    2.    The Magnitude And Complexity Of The Action ..................................... 30

    3.    The Significant Risks Borne By Plaintiffs' Counsel ............................... 31

    4.    The Quality Of Representation, Including The Result Obtained, The Experience And Expertise Of Lead Counsel, And The Standing And Caliber Of Defendants' Counsel .............................................................. 32

    5.    The Requested Fee In Relation To The Settlement ................................. 32

    6.    The Reaction Of The Settlement Class Supports Lead Counsel's Fee Request................................................................................................... 33

    7.    Lead Plaintiffs Support Lead Counsel's Fee Request............................. 33

B.    Reimbursement Of The Requested Litigation Expenses Is Fair And Reasonable ................................................................................................... 33

VIII.    CONCLUSION.................................................................................................... 36

**TABLE OF EXHIBITS TO DECLARATION**

| EXHIBIT | TITLE |
|---|---|
| 1 | Declaration of Ryan Bibb in Support of: (1) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 2 | Declaration of Rodney Samaan in Support of: (1) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 3 | Declaration of Lionel Dreshaj in Support of: (1) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 4 | Declaration of Benjamin Dreshaj in Support of: (1) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 5 | Declaration of Eric Schachter Regarding: (A) Mailing of Notice and Claim Form; (B) Publication of Summary Notice; and (C) Report on Requests for Exclusion Received to Date |
| 6 | Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review* (NERA Jan. 25, 2022) |
| 7 | Doug Greene, *et al.*, *Analysis of Biotech Securities Class Action Motion to Dismiss Results, 2005-2022*, Guest Post In Kevin M. LaCroix's The D&O Diary (July 19, 2022) |
| 8 | Glancy Prongay & Murray LLP Lodestar Chart By Individual And By Category Of Work |
| 9 | Glancy Prongay & Murray LLP Expense Chart |
| 10 | Glancy Prongay & Murray LLP Firm Resume |
| 11 | Table of Law Firm Billing Rates |

| | |
|---|---|
| 12 | *In re GreenSky Sec. Litig.*, No. 18-cv-11071 (AKH), ECF No. 211 (S.D.N.Y. Oct. 22, 2021) |
| 13 | *In re Salomon Analyst Metromedia Litig.*, No. 02-CV-7966, ECF No. 93 (S.D.N.Y. Feb. 27, 2009) |
| 14 | *In re Celestica Inc. Sec. Litig.*, No. 07-cv-00312, ECF No. 267 (S.D.N.Y. July 28, 2015) |
| 15 | *Landmen Partners, Inc. v. The Blackstone Group, L.P. et al.*, No. 08-cv-03601, ECF No. 191 (S.D.N.Y. Dec. 18, 2013) |
| 16 | *In re OSG Sec. Litig.*, No. 12-cv-07948, ECF No. 261 (S.D.N.Y. Dec. 2, 2015) |
| 17 | *In re Am. Express Fin. Advisors Sec. Litig.*, No. 04 Civ. 1773 (DAB), ECF No. 170 (S.D.N.Y. July 18, 2007) |
| 18 | *In re L.G. Philips LCD Co. Sec. Litig.*, No. 1:07-cv-00909-RJS, ECF No. 82 (S.D.N.Y. Mar. 17, 2011) |
| 19 | *In re Penn West Petroleum Ltd. Sec. Litig.*, No. 14-cv-06046-JGK, ECF No. 144 (S.D.N.Y. June 28, 2016) |
| 20 | *In re Ubiquiti Networks, Inc. Sec. Litig.*, No. 18-cv-01620 (VM), ECF No. 49 (S.D.N.Y. March 27, 2020) |
| 21 | *In re TeleTech Litig.*, No. 1:08-cv-00913-LTS, ECF No. 82 (S.D.N.Y. June 11, 2010) |
| 22 | *Cornwell v. Credit Suisse Grp.*, No. 08-cv-03758 (VM), ECF No. 117 (S.D.N.Y. July 18, 2011) |

iv

I, Garth Spencer, declare the following pursuant to 28 U.S.C. §1746:

1.      I am an attorney duly licensed to practice law in this Court and before all of the courts of the State of New York. I am a partner in the law firm of Glancy Prongay & Murray LLP ("GPM"), Lead Counsel for Lead Plaintiffs Ryan Bibb, Rodney Samaan, Lionel Dreshaj, and Benjamin Dreshaj ("Lead Plaintiffs" or "Plaintiffs") in the above-entitled action (the "Action").[1]

2.      I respectfully submit this declaration, together with the attached exhibits, in support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and the concurrently filed memorandum in support thereof ("Final Approval Memorandum"). As set forth in the Final Approval Memorandum, Plaintiffs seek final approval of the $21,000,000 Settlement for the benefit of the Settlement Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members.

3.      I also respectfully submit this declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and the concurrently filed memorandum in support thereof ("Fee Memorandum").[2] As set forth in the Fee Memorandum, Lead Counsel seeks an award of attorneys' fees in the amount of 18.5% of the Settlement Fund (which, by definition, includes interest accrued thereon), and reimbursement of Litigation Expenses in the total amount of $74,031.13, which includes Plaintiffs' Counsel's total out-of-pocket litigation costs in the amount of $64,031.13, and a total of $10,000 to Plaintiffs ($2,500 each), pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Stipulation and Agreement of Settlement dated August 3, 2022 (the "Stipulation"). ECF No. 88-1.

[2] Lead Counsel's motion for attorneys' fees and reimbursement of Litigation Expenses is made on behalf of Lead Counsel and additional counsel, The Law Offices Of Frank R. Cruz (collectively, "Plaintiffs' Counsel").

1

their costs, including lost wages, incurred in connection with their representation of the Settlement Class.

4.    The Court preliminarily approved the proposed Settlement by Order dated October 3, 2022 (the "Preliminary Approval Order"), and thereby directed notice of the Settlement to be disseminated to the Settlement Class. *See* ECF No. 96. Pursuant to the Preliminary Approval Order, Eric Schachter of A.B. Data, Ltd. ("A.B. Data"), the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by mail and by publication.

5.    As of December 14, 2022, a total of 51,742 Notice Packets have been mailed to potential Settlement Class Members and their nominees, and thus far, there has not been a single request for exclusion or objection. *See* Ex. 5 ("Schachter Decl.") ¶¶9, 15-16.

## I.    INTRODUCTION

6.    This is a consolidated securities class action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and Section 20(a) of the Exchange Act. Plaintiffs asserted claims against Defendant Sesen Bio, Inc. ("Sesen Bio" or the "Company") and Defendants Thomas R. Cannell (Sesen Bio's CEO) and Monica Forbes (Sesen Bio's CFO) (collectively, "Individual Defendants," and together with the Sesen Bio, "Defendants").

7.    On December 6, 2021, Plaintiffs filed their Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint"), asserting violations of the Exchange Act. ECF No. 65. The Complaint alleged that during the Settlement Class Period, Sesen Bio was a late-stage clinical company seeking regulatory approvals for its lead product candidate, Vicineum, as a treatment for non-muscle invasive bladder cancer ("NMIBC"). *Id.* The Complaint

alleged Defendants made materially false and misleading statements and/or failed to disclose material facts concerning the clinical trials for Vicineum, and communications with regulators about Vicineum. *Id.* The Complaint further alleged that the prices of Sesen Bio's securities were artificially inflated as a result of Defendants' allegedly false and misleading statements, and declined when the truth was revealed. *Id.*

8.      The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $21,000,000 (the "Settlement Amount") for the benefit of the Settlement Class.   As detailed herein, Plaintiffs and Lead Counsel submit that the proposed Settlement represents an excellent result for the Settlement Class considering, *inter alia*: (a) the posture of the Action; (b) the significant risks remaining in the Action; and (c) the fact that the Settlement Amount is greater than the available insurance.

9.      Additionally, the $21,000,000 cash Settlement Amount is well within the range of reasonableness under the circumstances to warrant final approval of the Settlement.  Plaintiffs' damages expert estimates that if Plaintiffs had *fully prevailed* on their Exchange Act claims at both summary judgment and after a jury trial, if the Court certified the same class as the Settlement Class, and if the Court and jury accepted Plaintiffs' damages theory—*i.e.*, Plaintiffs' ***best case scenario***—the total ***maximum*** damages would be approximately $342 million.   Thus, the $21,000,000 Settlement Amount represents approximately 6.14% of the total *maximum* damages ***potentially*** available in this Action.

10.      A recovery above the 1.8% median settlement for securities litigation matters is well-within the range of reasonableness. *See, e.g.*, Ex. 6 (Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review* (NERA Jan. 25, 2022) ("NERA Report") at p. 24, Fig. 22 (median recovery in securities class actions in 2021 was

approximately 1.8% of estimated damages). Consequently, the amount recovered by Plaintiffs, when balanced against the risks of continued litigation, weighs strongly in favor of final approval.

11.    The Settlement provides a substantial, certain, and immediate recovery, while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover less than the Settlement Amount (or nothing) after years of additional litigation and delay.

12.    The Settlement was reached after contested litigation. Plaintiffs' Counsel's efforts involved, among other things: (a) conducting an extensive investigation into Sesen Bio's allegedly wrongful acts; (b) working with an investigator to locate and interview relevant former employees and third parties; (c) consulting with experts in the fields of loss causation, damages, and Food and Drug Administration ("FDA") and European Medicines Agency ("EMA") regulations; (d) drafting the comprehensive 77-page consolidated amended complaint; (e) engaging in substantial briefing opposing Defendants' motion to dismiss; (f) conducting significant informal discovery, which included a review and analysis of 39,200 files (equating to 151,403 pages) produced by Sesen Bio, and an interview with Sesen Bio's CEO, Defendant Cannell; and (g) participating in a lengthy mediation process under the auspices of a well-respected mediator of complex cases—Jed Melnick, Esq. of JAMS.

13.    In preparation for the mediation, Plaintiffs' Counsel reviewed and analyzed Defendants' substantial pre-mediation document production, drafted a detailed mediation statement and thoroughly reviewed and analyzed Defendants' mediation statement. Following the exchange of detailed mediation statements addressing both liability and damages, Lead Counsel prepared for and engaged in a full-day mediation session overseen by Mr. Melnick, which ended without an agreement to settle. However, based on the significant submissions addressing both the

4

factual and legal basis for the Parties' respective positions and the full-day session, Mr. Melnick conducted further negotiations over the course of two weeks. These negotiations culminated in the Parties accepting Mr. Melnick's recommendation to settle the Action for $21,000,000. The proposed Settlement is, therefore, the result of arm's length negotiations between and among well-informed, highly experienced counsel, with the aid and oversight of an experienced neutral mediator.

14.     Based on the foregoing efforts, Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of its members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Plaintiffs and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

15.     In addition, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Plaintiffs' damages consultant. The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts and the type of security at issue.

16.     Finally, Lead Counsel, on behalf of Plaintiffs' Counsel, seeks approval of the request for attorneys' fees and reimbursement of Litigation Expenses as set forth in the Fee Memorandum. As discussed in detail in the accompanying Fee Memorandum, the requested 18.5% fee is within the range of awards granted by courts in this Circuit in comparable securities class actions. Additionally, the fairness and reasonableness of the request is confirmed by

lodestar/multiplier cross-check, and warranted in light of the extent and quality of the work performed and the substantial result achieved. Likewise, the requested out-of-pocket litigation costs of $64,031.13 and the requested reimbursements of costs totaling $10,000 ($2,500 to each of the four Plaintiffs) pursuant to the PSLRA are also fair and reasonable. Accordingly, for the reasons set forth in the Fee Memorandum and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for attorneys' fees and reimbursement of Litigation Expenses be approved.

## II.   PROSECUTION OF THE ACTION

### A.   Background

17.     Plaintiffs allege that Defendants made materially false and misleading statements during the period of December 21, 2020 through August 17, 2021, inclusive (the "Settlement Class Period") concerning Sesen Bio's lead product candidate, Vicineum, the clinical trials for Vicineum, and communications with regulators concerning Vicineum. Specifically, the Complaint alleges Defendants made materially false and misleading statements and/or failed to disclose that: (a) Sesen Bio's clinical trials showed Vicineum leaked out from the bladder into the body, interacting with non-cancerous cells and leading to harmful side effects; (b) the VISTA clinical trial for Vicineum had more than 2,000 trial protocol violations, including 215 classified as "major"; (c) three of Sesen Bio's clinical investigators were found guilty of "serious noncompliance," including "back-dating data"; (d) Sesen Bio submitted the tainted data in connection with applications for regulatory approval to market Vicineum; and (e) the EMA raised serious concerns about Vicineum and the VISTA trial to Sesen Bio. ECF No. 65.

18.     As a result of Defendants' materially false and misleading statements, Plaintiffs allege the price of Sesen Bio's publicly-traded common stock was artificially inflated and declined

6

when the truth was revealed. On August 13, 2021 and August 16, 2021, Sesen Bio announced that the FDA had rejected its application to market Vicineum, and that the FDA would require Sesen Bio to conduct an additional clinical trial prior to approval. *Id.* On August 18, 2021 the healthcare industry news publication, STAT, published an article alleging safety risks and clinical trial misconduct relating to Vicineum. *Id.* Sesen Bio's stock price declined substantially following these disclosures. *Id.*

### B.   Commencement Of The Action And Appointment Of Lead Plaintiffs And Lead Counsel

19.     On August 19, 2021, Plaintiffs' Counsel, representing Plaintiff Ryan Bibb, initiated this action by filing a putative class action complaint in the United States District Court for the Southern District of New York (the "Court") asserting claims under Sections 10(b) and 20(a) of the Exchange Act, 14 U.S.C. §§ 78j(b), 78t(a), and under Rule 10b-5, 17 C.F.R. 240.10b-5. The case was styled as *Bibb v. Sesen Bio, Inc.*, *et al.*, 1:21-cv-07025-AKH. Two other putative class action complaints were subsequently filed in the Court, styled as *Cizek v. Sesen Bio, Inc., et al.*, 1:21-cv-07309-AKH, and *Markman v. Sesen Bio, Inc., et al.*, 1:21-cv-08308-AKH.

20.     By Order dated October 29, 2021, the Court ordered that the cases be consolidated and recaptioned as *In re Sesen Bio, Inc. Securities Litigation*, Master File No. 1:21-cv-07025-AKH; appointed Ryan Bibb, Rodney Samaan, Lionel Dreshaj, and Benjamin Dreshaj as Lead Plaintiffs for the consolidated action; and approved Lead Plaintiffs' selection of GPM as Lead Counsel for the putative class. ECF No. 48.

### C.   Defendants' Motion To Transfer

21.     On November 24, 2021, Defendants filed and served a motion to transfer venue to the United States District Court of Massachusetts. ECF Nos. 60-63. On December 6, 2021, Lead

7

Plaintiffs opposed Defendants motion to transfer venue, and on December 13, 2021, Defendants filed and served their reply brief. ECF Nos. 64-65.

> **D.** **The Comprehensive Pre-Filing Investigation And The Preparation Of The Complaint**

22. Following Lead Counsel's appointment, counsel conducted a comprehensive investigation into Sesen Bio's allegedly wrongful acts, which included, among other things: (a) reviewing and analyzing (i) Sesen Bio's filings with the U.S. Securities and Exchange Commission ("SEC"), (ii) public reports, blog posts, research reports prepared by securities and financial analysts, and news articles concerning Sesen Bio, (iii) Sesen Bio's investor call transcripts, and (iv) press releases published by and regarding Sesen Bio and other publicly available material concerning Sesen Bio; and (b) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, interviews of former Company employees. Lead Counsel also consulted with experts on the subjects of loss causation, damages, and FDA and EMA regulations.

23. On December 6, 2021, Lead Plaintiffs filed and served the Amended Class Action Complaint for Violations of the Federal Securities Laws, asserting claims against all Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act.  Among other things, the Complaint alleged Defendants published materially false and misleading statements about the safety, trial results, and prospects for rapid approval of Vicineum, Sesen Bio's lead product candidate, by the FDA and the EMA. According to the Complaint, the alleged misrepresentations proximately caused class member losses as it became clear that Vicineum would not gain regulatory approval in the near future.

8

**E.**     **Defendants' Motion To Dismiss The Complaint And Plaintiffs' Response**

24.     On March 7, 2022, Defendants moved to dismiss the Complaint. ECF No. 73. Therein, Defendants argued, among other things, that the alleged misstatements were: (a) protected by the Exchange Act's safe harbor for forward looking statements; (b) inactionable statements of opinion under *Omnicare*; and/or (c) mere corporate optimism and puffery. Defendants further argued that they had no duty to disclose interim regulatory feedback from governmental agencies or the allegations made in the STAT article. Regarding scienter, Defendants argued that they had no motive to commit fraud as the Individual Defendants did not sell any stock during the class period, and that the more plausible inference—based in their communications with the FDA—was the FDA was going to approve Vicineum. As Defendants explained, Sesen Bio continued to receive positive signs from the FDA – "the FDA granted an Application Orientation Meeting, the FDA accepted the BLA for Vicineum and granted Priority Review, and the FDA informed Sesen Bio that the FDA was no longer planning to hold an AdCom [FDA Advisory Committee] meeting on Vicineum." *See id.* at 43. Defendants also argued that their lack of scienter and belief that the product would be approved was supported by the fact that Sesen Bio had begun making major investments into its planned commercial launch of the product, including the hiring of a substantial number of staff. Defendants argued it simply would not make sense to spend Sesen Bio's limited resources pointlessly.

25.     Lead Plaintiffs filed their opposition to Defendants' motion on April 6, 2022.  ECF No. 75. Plaintiffs argued, *inter alia*, that: (a) Defendants' statements selectively disclosing positive information about Vicineum's clinical trials, safety profile, and discussions with regulators, were misleading for omitting material negative information on these topics; (b) Defendants' statements were actionably misleading because they were not protected by the PSLRA safe harbor, were not protected opinions, and were not mere puffery; and (c) the Complaint creates a strong inference of

9

Defendants' scienter based on their conscious disregard of known adverse information, and Sesen

Bio's substantial sales of its artificially inflated stock. *Id.*

26.    On May 6, 2022, Defendants filed their reply brief, responding to Plaintiffs'

opposition arguments and elaborating on arguments in Defendants' opening brief. ECF No. 77.

**F.    Mediation Efforts, Settlement Negotiations, And The Settlement's Preliminary Approval**

27.    After Defendants' motion to dismiss was fully briefed, on June 3, 2022, the Parties

sent a letter requesting the Court delay ruling on the motion until after the Parties participated in a

mediation before Jed Melnick, Esq. of JAMS. ECF No. 81. That same day, June 3, 2022, the Court

granted the Parties' request and ordered the Parties to inform the Court of the outcome of the

mediation no later than July 14, 2022. ECF No. 82.

28.    In advance of the mediation session, and to facilitate the mediation, pursuant to

Rule 408 of the Federal Rules of Civil Procedure and subject to the terms and conditions of a

confidentiality agreement, Sesen Bio provided Lead Counsel with Company documents, including

CEO Defendant Cannell's non-privileged emails from the class period, CFO Defendant Forbes's

non-privileged emails from the class period, and meeting materials (agenda, decks, minutes and

resolutions) from Sesen Bio's board of director and board committee meetings held during the

class period. The production consisted of 39,200 files, equating to 151,403 pages.

29.     Lead Counsel dedicated substantial efforts to reviewing and analyzing Defendants'

document production, and to preparing a persuasive, evidence-based mediation statement setting

forth the facts relevant to the underlying alleged misrepresentations, and analyzing applicable facts

and law. The Parties exchanged, and provided to Mr. Melnick, detailed mediation statements and

exhibits, which addressed the strengths and weaknesses of the arguments advanced by the Parties

on the pending motion to dismiss, as well as the substantive factual issues that would determine the outcome of the case if the matter were to proceed to summary judgment or trial.

30.    On June 30, 2022, the Parties participated in an in-person, all-day mediation before Mr. Melnick. During the mediation session, the Parties engaged in full and frank discussions concerning the merits of this Action, including, for example, the facts alleged to support Plaintiffs' claims. This negotiation process enabled the Parties to meaningfully assess the relative strengths and weaknesses of their respective claims and defenses. The matter was not resolved that day, but the Parties held a second telephonic mediation before Mr. Melnick on July 6, 2022, and continued to negotiate with the assistance of Mr. Melnick over the course of the next two weeks.[3]

31.    The mediation process culminated in Mr. Melnick making a mediator's recommendation to resolve the action for $21,000,000, which was accepted by all of the Parties. The agreement was memorialized in a term sheet (the "Term Sheet") that was executed on July 19, 2022. The Term Sheet set forth, among other things, the Parties' agreement to settle and release all claims asserted against Defendants in the Action in return for a cash payment by or on behalf of Defendants of $21,000,000 for the benefit of the Settlement Class, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers. One other such condition was that Plaintiffs could conduct a four-hour interview of the Company's CEO, Defendant Cannell, to further assess the strengths and weaknesses of the Parties' claims and defenses that would be advanced if the case proceeded to summary judgment and trial. That interview took place on July 25, 2022.

---

[3] By its Order dated July 14, 2022, the Court agreed to continue holding the motion to dismiss in abeyance to allow the Parties to continue their settlement negotiations with the assistance of Mr. Melnick. ECF No. 84.

32.     On July 27, 2022, the Parties informed the Court that they had reached an agreement in principle to settle. ECF No. 85. Following additional negotiations, the Parties exchanged multiple drafts of—and ultimately executed—the Stipulation. ECF No. 88-1. On August 16, 2022, Plaintiffs submitted their Unopposed Motion for: (I) Preliminary Approval of Class Action Settlement; (II) Certification of the Settlement Class; and (III) Approval of Notice To The Settlement Class. ECF Nos. 86-88. On September 28, 2022 the Court held a hearing on the motion, which involved a detailed discussion of the proposed settlement and the strengths and weaknesses of Plaintiffs' claims.

33.     On October 3, 2022, the Court issued its Order Preliminarily Approving Settlement and Providing for Notice ("Preliminary Approval Order"). ECF No. 96.

## III.     THE RISKS OF CONTINUED LITIGATION

34.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $21,000,000. As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals.

### A.     Risks To Overcoming Defendants' Motion To Dismiss

35.     As discussed *supra* in Section II.E, Defendants raised a number of arguments in their motion to dismiss, any one of which could have resulted in the dismissal of Plaintiffs' claims. While Plaintiffs believe they have strong arguments in opposition to the motion to dismiss, there is no guarantee that the Court would have denied the motion. Indeed, a high proportion of motions to dismiss filed in securities class actions are granted. Ex. 6, NERA Report, at p. 14, Fig. 14 (over 2012-2021, 56% of motions to dismiss filed in securities class actions were granted; an additional

12

7% granted without prejudice; an additional 17% partially granted; and only 19% denied). The risks to overcoming a motion to dismiss are substantial in a securities fraud class action such as this one, in part because of the heightened pleading requirements of the PSLRA and Rule 9(b), and the PSLRA's bar on discovery during the pendency of a motion to dismiss.

36.     Moreover, "securities claims brought against small, clinical-stage biotech companies [like Sesen Bio] were actually *more* likely to be dismissed at an early stage than other types of securities class actions[.]"  Ex. 7 (Greene, Doug, *et al.*, *Analysis of Biotech Securities Class Action Motion to Dismiss Results, 2005-2022*, Guest Post In Kevin M. LaCroix's The D&O Diary (July 19, 2022)) (finding that between 2005-2017, 68.6% of motions resulted in complete dismissal; and between July 11, 2017 and March 21, 2022, 68.2% resulted in complete dismissal). Therefore, despite their belief in the merits of this case, Lead Counsel recognized that Defendants' motion to dismiss presented substantial risk.

### B.     Risks Faced In Obtaining And Maintaining Class Action Status

37.     Defendants likely would have argued against class certification. While Lead Counsel are confident that all of the Rule 23 requirements would have been met, and the Court would have certified the proposed class, Plaintiffs bear the burden of proof on class certification, and Defendants would have undoubtedly raised arguments challenging the propriety of class certification, and perhaps argued for a shorter class period.  For instance, Defendants argued that Sesen Bio repeatedly disclosed the serious adverse events referenced in the STAT article before and during the class period; thus, Defendants may have claimed that there could not have been any price impact resulting from the disclosure of any previously concealed information (as opposed to the disclosure of new, previously unknown information). *See* ECF No. 73 at 5.  Moreover, even if Plaintiffs successfully obtained class certification, Defendants could have sought permission from

13

the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery. Class certification was, by no means, a forgone conclusion.

38.     Additionally, a relatively recent ruling by the Supreme Court has potentially made obtaining class certification for Plaintiffs more difficult and may provide additional challenges should the litigation against Defendants proceed. In *Goldman Sachs Grp. v. AR Teacher Ret.*, 141 S.Ct. 1951 (June 21, 2021), the Supreme Court held, in part, that when defendants are seeking to rebut the presumption of reliance established under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), as modified by *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014), courts may consider the generic nature of an alleged misrepresentation as evidence of lack of price impact. Accordingly, courts are now permitted to assess materiality of an alleged misstatement and consider "all evidence relevant to price impact" at the class certification stage.

**C.     Risks To Proving Liability**

39.     In addition to the hurdles of defeating Defendants' motion to dismiss and certifying a class, Plaintiffs and Lead Counsel faced numerous additional risks at summary judgment and trial, including establishing Defendants' liability. Defendants forcefully argued in their motion to dismiss—and undoubtedly would have continued to argue at summary judgment and/or trial—that Plaintiffs could not establish the elements of their Exchange Act claims.

40.     For instance, Defendants strenuously argued, and would likely continue to argue, among other things, that: (a) they had fully and accurately disclosed Vicineum's clinical trial data and potential side effects; (b) the statements at issue were not materially false and misleading but were true statements of opinions, subject to the heightened pleading standards of *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015); (c) certain challenged

14

statements were forward-looking and thus protected under the PSLRA safe-harbor; and (c) they had no motive to commit fraud and in fact believed the FDA would approve Vicineum. In support of their arguments, Defendants claimed that the FDA provided positive feedback to Sesen Bio throughout the class period by, among other things, granting Fast Track status and Priority Review, informing Sesen Bio that an FDA Advisory Committee meeting and confirmatory trial was not required, not issuing any "Warning Letters" or Discipline Review Letters, and agreeing on Vicineum's label's final wording. Defendants also argued that their lack of scienter and belief that the product would be approved was supported by the fact that Sesen Bio had begun making major investments into its planned commercial launch of the product, including the hiring of a substantial number of staff. It simply made no sense to spend Sesen Bio's limited resources pointlessly. The more plausible inference, according to Defendants, was that the Defendants truly believed the FDA was going to approve Vicineum.

41.     While Plaintiffs and Lead Counsel strongly disagreed with Defendants' arguments, they were not frivolous, and had the litigation continued there was no guarantee that documents and deposition testimony obtained during fact discovery would support Plaintiffs' narrative of the case. Additionally, if Plaintiffs advanced past summary judgment and proceeded to trial, substantial uncertainty remained as to how a trier of fact would view each side's narrative of the events at issue.

**D.     Risks To Proving Loss Causation And Damages**

42.     Assuming Plaintiffs overcame the above risks and established Defendants' liability, Plaintiffs would have confronted considerable challenges in establishing loss causation and class-wide damages. While Plaintiffs would have argued that the declines in the price of Sesen Bio common stock were attributable to corrections of the alleged misstatements and omissions,

15

Defendants likely would have contested whether those declines were caused by any misstatements or omissions, as opposed to a mere unforeseeable change in the FDA's assessment of Vicineum. Moreover, in order to prove their claims, Plaintiffs would have to proffer expert testimony demonstrating, among other things: (a) what the "true value" of Sesen Bio common stock would have been had there been no alleged material misstatements or omissions; (b) the amount by which the value of Sesen Bio common stock was inflated by the alleged material misstatements and omissions; and (c) the amount of artificial inflation removed by the alleged corrective disclosures. Such expert testimony is expensive, time consuming, and subject to rebuttal.

43.     Indeed, Defendants almost certainly would have presented their own damages expert(s), who would have no doubt presented conflicting conclusions and theories for Sesen Bio price declines on the alleged disclosure dates, and who would likely have presented alternative calculations to reduce or eliminate Plaintiffs' claimed damages. Defendants likely would have challenged Plaintiffs' expert(s) at the class certification stage, summary judgment, with *Daubert* motions, and at trial and appeal. This "battle of the experts" creates an additional litigation risk because the reaction of a trier of fact to such expert testimony is highly unpredictable, creating uncertainty regarding how much weight a judge or jury will accord the analysis of competing experts.

### E.     Other Risks, Including Trial, Appeals, And Ability To Collect A Judgment

44.     Plaintiffs would have had to prevail at several stages of litigation, each of which would have presented significant risks in complex class actions such as this one. Lead Counsel know from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured. In fact, GPM lost a six-week antitrust jury trial in the Northern District of California after five years of litigation, which included many depositions, the

16

expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs. *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.).

45.    Lead Counsel also litigated a securities class action in the Southern District of New York for approximately five years and, after surviving a motion to dismiss, successfully obtaining class certification and undertaking significant discovery efforts, which included depositions throughout the U.S. and in the U.K. and substantial document review, summary judgment was entered for defendants, and the judgment was affirmed on alternative grounds on appeal to the Second Circuit. *Gross v. GFI Grp., Inc.*, 784 F. App'x 27, 29 (2d Cir. 2019). In short, complex litigation is uncertain, and success in cases like this one is never guaranteed.

46.    Even if Plaintiffs succeeded in proving all elements of their case at trial and obtained a jury verdict, Defendants would almost certainly have appealed. An appeal not only would have renewed the risks faced by Plaintiffs—as Defendants would have reasserted their arguments summarized above—but also would have resulted in significant additional delay and further depletion of Defendants' already wasting insurance policies and diminishing assets. Given these significant litigation risks, Plaintiffs and Lead Counsel believe the Settlement represents an excellent result for the Settlement Class.

47.    Moreover, *if* Plaintiffs successfully won a post-trial appeal, there is no guarantee that they would succeed in collecting a judgment. The $21,000,000 Settlement Amount exceeds Defendants' insurance available to contribute to this Action, meaning that any possibly larger recovery on a final judgment could only come from ***additional*** contributions of Defendants' own assets and, absent settlement, the amount of available insurance will continue to erode. Since the end of the Settlement Class Period, Sesen Bio has paused clinical development of Vicineum, has

experienced substantial operating losses, has sought to re-orient its business via a merger with another clinical stage biopharmaceutical company, and has seen its common stock trade below $1.00 for over a year. Given these difficulties, there is substantial uncertainty about whether Defendants would be able to fund a potentially larger judgment several years in the future after protracted litigation and appeals.

**F.      The Settlement Is Reasonable In Light Of Potential Recovery In The Action**

48.      In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages. If Plaintiffs had fully prevailed in each of their claims at both summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Plaintiffs' damages theory, including proof of loss causation as to the common stock price drop dates alleged in this case—*i.e.*, Plaintiffs' best-case scenario—estimated total ***maximum*** damages are approximately $342 million. Under this scenario, the Settlement represents a recovery of 6.14% of the Settlement Class's maximum estimated damages. This recovery is well above the median recovery of 1.8% in securities class actions settled in 2021, as well as the median recovery of 2.3% for similar sized securities class actions (with estimated damages of $200-$399 million) from 2012-2021.  *See* Ex. 6 (NERA Report at p. 23, Fig. 21 and at p. 24, Fig. 22).

49.      However, if Defendants prevailed on any of the arguments discussed above, damages could have been significantly lower, or eliminated entirely.

**IV.    PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE**

50.      The Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and the Proof of

Claim and Release Form (the "Claim Form" and, collectively with the Notice, the "Notice Packet") be disseminated to the Settlement Class. The Preliminary Approval Order also set a deadline of January 2, 2023 (21 calendar days prior to the final fairness hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the application for attorneys' fees and Litigation Expenses or to request exclusion from the Settlement Class, and set a final fairness hearing date of January 23, 2023 (the "Settlement Hearing").

51.     In accordance with the Preliminary Approval Order, A.B. Data, under the direction and supervision of its Senior Vice President, Eric Schachter, the Court-appointed Claims Administrator: (a) mailed copies of the Notice Packet via first-class mail to all potential Settlement Class Members who could be identified with reasonable effort; and (b) notified brokerage firms and other nominees who regularly act as nominees for beneficial purchasers of securities to either (i) mail the Notice Packet to potential Settlement Class Members, or (ii) provide A.B. Data with mailing information that would enable A.B. Data to notify potential Settlement Class Members. Ex. 5 ("Schachter Decl.") ¶¶2-9.  As of December 14, 2022, a total of 51,742 potential Settlement Class Members and nominees have been mailed Notice Packets. *Id*. at ¶9.[4]

52.     In addition to ensuring the dissemination of the Notice Packet, A.B. Data caused the Summary Notice to be published once in *Investor's Business Daily* and transmitted once over the *PR Newswire* on November 14, 2022.  Schachter Decl. ¶10, Exs. 5-B and 5-C.  A.B. Data also posted downloadable versions of the Stipulation, Preliminary Approval Order, Notice, Claim

---

[4] A.B. Data re-mailed 424 Notice Packets to persons whose original mailings were returned by the U.S. Postal Service and for whom updated addresses were either provided to the Claims Administrator by the Postal Service or ascertained through a third-party information provider. *See id.* at ¶9.

Form, and Complaint on the settlement website (*id.* at ¶12), and established a toll-free number to respond to Settlement Class Member inquiries. *Id.* ¶11.

53. As set forth above, the Notice informed potential Settlement Class Members that the deadline to file objections to the Settlement, the proposed Plan of Allocation and/or the Fee and Expense Application, or to request exclusion from the Settlement Class, is January 2, 2023. As of December 14, 2022, the Claims Administrator has not received a single request for exclusion. The Claims Administrator will file a supplemental affidavit after the January 2, 2023 deadline addressing whether any requests for exclusion have been received. In addition, to date, no objections to the Settlement, the Plan of Allocation, and/or the application for attorneys' fees and Litigation Expenses have been entered on this Court's docket or have otherwise been received by Lead Counsel. Lead Counsel will file reply papers by January 16, 2023 that will address any objections that may be received.

## V. ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

54. Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $21,000,000 Settlement Amount, plus any and all interest earned thereon, less: (a) any Taxes; (b) any Notice and Administration Costs; (c) any Litigation Expenses awarded by the Court; and (d) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information either online or postmarked no later than February 28, 2023. The Net Settlement Fund will be distributed among Authorized Claimants according to the proposed Plan of Allocation, subject to Court approval. *See* Ex. 5-A (Notice) at ¶48; ECF No. 88-1 (Stipulation) at ¶21. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

55. The proposed Plan of Allocation is detailed in the Notice. *See* Ex. 5-A (Notice) at ¶¶48-57). The Notice was sent to Settlement Class Members, and a downloadable version is posted online at www.SesenBioSecuritiesSettlement.com. If approved, the Plan of Allocation will govern how the Net Settlement Fund will be distributed among Authorized Claimants. The Plan of Allocation's objective is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a result of the alleged wrongdoing as opposed to losses caused by market or industry-wide factors or Company-specific factors unrelated to the alleged wrongdoing, and takes into consideration when each Authorized Claimant purchased and/or sold Sesen Bio common stock or options. *See id*. As stated in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *Id.* at ¶48.

56. The Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act, and reflects an assessment of the damages that Plaintiffs contend could have been recovered under the theories of liability and damages asserted in the Action. More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation that the price of Sesen Bio common stock was artificially inflated during the period from December 21, 2020 through and including August 17, 2021 due to Defendants' alleged materially false and misleading statements and omissions. The Plan of Allocation is based on the premise that the decrease in the price of Sesen Bio's common stock following the alleged corrective disclosures that took place (a) during the trading on August 13, 2021, (b) before the market opened on August

16, 2021 and (c) before the market opened on August 18, 2021 (the "Corrective Disclosures") may be used to measure the alleged artificial inflation in the price of Sesen Bio common stock prior to the Corrective Disclosures. *See id.* at ¶¶50-51. For a Settlement Class Member to have a Recognized Loss under the Plan of Allocation, with respect to Sesen Bio Common Stock and Sesen Bio Call Options, the stock or call options must have been purchased or acquired during the Settlement Class Period and held through at least one of the Corrective Disclosure; and, with respect to Sesen Bio Put Options, those options must have been sold (written) during the Settlement Class Period and not closed prior to at least one Corrective Disclosure. *Id.* at ¶50.

57.    For purchases of Sesen Bio common stock during the Settlement Class Period, Recognized Losses are generally calculated based on the purchase price, the sale price (or, if not sold, the "90-Day Lookback Value," *see* 15 U.S.C. § 78u-4(e)(1)), and the amount of artificial inflation in the price of Sesen Bio's common stock on the relevant dates. *See* ¶¶50-54.

58.    Sesen Bio Call and Put Option trading accounted for less than 2.0% of total dollar trading volume for Sesen Bio Securities during the Settlement Class Period. As such, claims for Sesen Bio Call and Put Option transactions are allotted 2.0% of the Net Fund Settlement Fund pursuant to the Plan of Allocation.

59.    For Sesen Bio Call Options purchased during the Settlement Class Period and held through a corrective disclosure, Recognized Losses are generally calculated based on the purchase price, and: (a) if sold prior to the end of the Settlement Class Period, the sale price; (b) if exercised prior to the end of the Settlement Class Period, the closing price of Sesen Bio common stock on the exercise date and the option's strike price; and (c) if still held at the end of the Settlement Class

22

Period, the closing price of Sesen Bio common stock on August 18, 2021 and the option's strike price. *See* ¶55.[5]

60.     For example, someone who purchased an "out of the money" Sesen Bio Call Option during the Settlement Class Period hoping to be able to exercise the option after an increase in the price of Sesen Bio's common stock, but who still held that option after the end of the Settlement Class Period and the decline in the price of Sesen Bio's common stock (causing the option to remain non-economic to exercise), may, in certain circumstances, have a Recognized Loss equal to the option's purchase price (*i.e.*, this hypothetical call option purchaser's out of pocket loss).

61.     For Sesen Bio Put Options sold (*i.e.*, written) during the Settlement Class Period and still open through a corrective disclosure, Recognized Losses are generally calculated based on the sale price, and: (a) if subsequently purchased prior to the end of the Settlement Class Period, the purchase price; (b) if exercised (*i.e.*, assigned) prior to the end of the Settlement Class Period, the option's strike price and the closing price of Sesen Bio common stock on the exercise date; and (c) if still open at the end of the Settlement Class Period, the closing price of Sesen Bio common stock on August 18, 2021 and the option's strike price. *See* ¶56.

62.     For example, consider someone who sold an "out of the money" Sesen Bio Put Option during the Settlement Class Period for $2 of premium, hoping the price of Sesen Bio's common stock would increase (causing the option to remain non-economic for the purchaser to exercise). If the decline in Sesen Bio's common stock price after the first corrective disclosure caused the price of the option to increase to $3, and the seller then purchased the same option to close out her position, the seller may, in certain circumstances, have a Recognized Loss equal to

---

[5] If a Sesen Bio Call Option acquired during the Settlement Class Period and held through a corrective disclosure expired unexercised before the end of the Settlement Class Period, the Recognized Loss is equal to the purchase price. ¶55.

the $1 difference between her sale price and subsequent purchase price for the option (*i.e.*, this hypothetical put option seller's out of pocket loss).

63.    Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *Id.* at ¶¶50, 68.

64.    An individual Claimant's recovery under the Plan of Allocation will depend on several factors, including the number of valid claims filed by other Claimants and the type and quantity of Sesen Bio securities the Claimant purchased, acquired, or sold during the Settlement Class Period and when that Claimant bought, acquired, or sold the securities. If a Claimant has an overall market gain with respect to his, her, or its overall transactions in Sesen Bio common stock and options during the Settlement Class Period, or if the Claimant purchased Sesen Bio securities during the Settlement Class Period, but did not hold any of those securities through an alleged corrective disclosure, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud. *Id.* at ¶¶50, 67.

65.    If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant. *Id.* at ¶70. Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose prorated payments are $10.00 or greater. In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost-prohibitive.[6]

---

[6] If any funds remain after an initial distribution to Authorized Claimants, as a result of uncashed or returned checks or other reasons, subsequent distributions will be conducted as long as they are cost effective. Ex. 5-A (Notice) at ¶71. At such time as it is determined that the re-distribution of

24

66.     In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in Sesen Bio Securities that were attributable to the conduct alleged in the Complaint. Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

67.     As noted above, as of December 14, 2022, a total of 51,742 copies of the Notice Packet had been disseminated to potential Settlement Class Members and their nominees, which provides the Plan of Allocation therein, and advises Settlement Class Members of their right to object to the proposed Plan of Allocation. *See* Schachter Decl. at ¶9; Ex. 5-A (Notice). To date, no objections to the proposed Plan of Allocation have been received by Lead Counsel or filed on the Court's docket.

## VI.     FINAL CERTIFICATION OF THE SETTLEMENT CLASS

68.     In the Preliminary Approval Order, the Court certified the Settlement Class, "solely for purposes of effectuating the proposed Settlement," found that "each element required for certification of the Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure has been met," appointed Lead Plaintiffs as Class Representatives for the Settlement Class, and appointed Lead Counsel as Class Counsel for the Settlement Class. ECF No. 96 at ¶¶1-3. Lead Counsel respectfully submits that those holdings are amply supported by the record in this case, and should be affirmed for purposes of final approval of the Settlement.

69.     The Settlement Class satisfies the numerosity requirement of Fed. R. Civ. P. 23(a)(1). The Settlement Class is comprised of purchasers of Sesen Bio common stock and/or

---

funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance shall be contributed to non-sectarian, not-for-profit organization(s), to be recommended by Lead Counsel and approved by the Court.

Sesen Bio Call Options, and/or those who wrote Sesen Bio Put Options. During the Settlement Class Period, Sesen Bio actively traded on the NASDAQ with millions of shares traded in that period. Accordingly, there are likely to be hundreds, if not thousands of Settlement Class Members.

70. The Settlement Class satisfies the commonality requirement of Fed. R. Civ. P. 23(a)(2). Numerous questions of law and fact regarding Plaintiffs' Exchange Act claims will be common to the Settlement Class, including, for example, whether Defendants' representations to the investing public during the Settlement Class Period were materially misleading. These questions are susceptible to common answers because their resolution does not differ based on the plaintiff's identity.

71. The Settlement Class satisfies the typicality requirement of Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims, and those of the Settlement Class, are based on the Defendants' alleged misrepresentations and omissions. Thus, any Settlement Class Member's claim arising from these misrepresentations and omissions will necessarily rely on the same course of events.

72. The Settlement Class satisfies the adequacy requirement of Fed. R. Civ. P. 23(a)(4). Plaintiffs and Settlement Class Members purchased Sesen Bio common stock and/or Call Options, and/or wrote Put Options during the Settlement Class Period, and they were all injured by Defendants' allegedly materially false statements and omissions. Plaintiffs sought to recover as much as possible in damages for the Settlement Class in light of their significant losses. If Plaintiffs were to prove their claims at trial, they would also prove the Settlement Class's claims. Plaintiffs demonstrated their commitment to this litigation by retaining qualified counsel. *See* Ex. 10 (Lead Counsel firm resume).

73.     The Settlement Class satisfies the predominance requirement of Fed. R. Civ. P. 23(b)(3). Common questions of law and fact, such as whether the Defendants violated the federal securities laws based on a common course of conduct directed at the entire Settlement Class, predominate over any individualized questions that may exist, such as the ministerial computation of claims for individual Settlement Class members.

74.     The Settlement Class satisfies the superiority requirement of Fed. R. Civ. P. 23(b)(3). Lead Counsel is not aware of any evidence that putative Settlement Class members desire to bring separate individual actions. It is desirable to concentrate the claims in this Court as it is already familiar with the factual and legal issues in the case.

75.     Lead Counsel satisfy the requirements to be Class Counsel for the Settlement Class under Fed. R. Civ. P. 23(g). As set forth above, Lead Counsel devoted substantial time, effort, and resources to identifying, investigating, litigating and settling the claims in this matter. Moreover, Lead Counsel are experienced in handling class action litigation and are highly familiar with securities class action litigation. *See* Ex. 10 (Lead Counsel firm resume).

## VII.   LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

76.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying for a fee award of 18.5% of the Settlement Fund (or $$3,885,000, plus interest earned at the same rate as the Settlement Fund). Lead Counsel also request reimbursement of Litigation Expenses in the amount of $74,031.13, which includes $64,031.13 in out-of-pocket expenses incurred by Plaintiffs' Counsel in connection with the prosecution of the Action from the Settlement Fund, and a total of $10,000 to Plaintiffs ($2,500 each) for their reasonable costs (including lost wages) directly incurred in connection with their representation of the Settlement Class. The total Litigation Expenses amount of $74,031.13 is well below the maximum expense

27

amount of $175,000 set forth in the Notice. The legal authorities supporting a 18.5% fee award are set forth in the accompanying Fee Memorandum. The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

### A.    The Fee Application

#### 1.    The Excellent Outcome Achieved Is The Result Of The Significant Time And Labor That Plaintiffs' Counsel Devoted To The Action

77.    Attached as Exhibit 8 hereto are: (i) a summary indicating the amount of time spent by attorneys and professional support staff of my firm who, from inception of the Action through and including December 16, 2022, billed twenty or more hours to the Action, and the lodestar calculation for those individuals based on Lead Counsel's current billing rates; and (ii) a summary of the hours expended organized by category of work. For personnel who are no longer employed by GPM, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment. The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by GPM.

78.    GPM attorneys involved in this Action reviewed these daily time records in connection with the preparation of this declaration.  The purpose of this review was to confirm both the accuracy of the records as well as the necessity for, and reasonableness of, the time committed to the litigation.  As a result of this review, Lead Counsel made reductions to certain of the firm's time entries such that the time included in Exhibit 8 reflects that exercise of billing judgment.  Based on this review and the adjustments made, I believe that the time of GPM attorneys and staff reflected in Exhibit 8 was reasonable and necessary for the effective and efficient prosecution and resolution of the Action.  No time expended on the application for fees and reimbursement of expenses has been included.

28

79. The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted in other securities or shareholder litigation in this District. Additionally, the rates billed by Lead Counsel's attorneys (ranging from $625 to $650 per hour for non-partners and $725 to $1,050 per hour for partners) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude. *See* Ex. 11 attached hereto (table of peer law firm billing rates).

80. The total number of hours reflected in Exhibit 8 is 4,102.30 hours. The total lodestar reflected in Exhibit 8 is $2,074,470.00, consisting of $2,020,052.50 for attorneys' time and $54,417.50 for professional support staff time.[7] The requested fee amount of 18.5% of the Settlement Fund equals $3,885,000 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a multiplier of 1.87 on Lead Counsel's lodestar.

81. Moreover, Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval. Among other things, Lead Counsel will continue working with the Claims Administrator to resolve issues with Settlement Class Member claims, will respond to shareholder inquiries, will draft and file a motion for distribution, and will oversee the distribution process. No additional compensation will be sought for this work. Thus, the multiplier will be small by the time the case concludes.

82. As detailed above, throughout this case, Lead Counsel devoted substantial time to the prosecution of the Action. Lead Counsel maintained control of, and monitored the work performed by, lawyers and other personnel on this case. I personally devoted substantial time to this case and was involved in drafting and reviewing and editing pleadings and other court filings

---

[7] Lead Counsel will be compensating The Law Offices Of Frank R. Cruz for its contribution to the initiation, prosecution, and resolution of the Action, including communicating with Lead Plaintiffs throughout the pendency of this litigation.

(including substantial work drafting the Complaint and Plaintiffs' opposition to Defendants' motion to dismiss), and communicating with other GPM lawyers about the case on a regular basis. Other experienced attorneys were involved with drafting, reviewing and/or editing pleadings, court filings, various informal discovery-related materials, and the mediation submissions, communicating with Plaintiffs, participating in the mediation process, negotiating the terms of the Stipulation, and other matters. More junior attorneys and paralegals worked on matters appropriate to their skill and experience level. Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

### 2.    The Magnitude And Complexity Of The Action

83.    As detailed in the Fee Memorandum, securities class action cases are known for their notorious complexity. This case was no different. As detailed above, this Action presented complex issues, including the need for Plaintiffs' Counsel to understand, among other things: clinical trial data relating to Vicineum; the FDA regulatory process for approval of a Biologics License Application; and the European Medicines Agency ("EMA") regulatory process for approval of a marketing authorization application.

84.    For example, Plaintiffs consulted with an investigator to locate and interview relevant former Sesen Bio employees. Plaintiffs also consulted with an expert in the field of FDA and EMA regulations.

85.    This Action also involved complex damages issues, as discussed by the Parties during mediation. As such, Plaintiffs also consulted with their experts regarding loss causation and damages.

30

86.    The total *maximum* possible damages of $342 million, as calculated by Plaintiffs' damages expert, clearly shows the high-stakes of this litigation.

87.    While the Parties' relations have been courteous and professional, the litigation has been hard-fought, with both sides zealously advocating their positions. The mediation process in this Action was similarly hard-fought. Both Parties negotiated while arguing their positions for two weeks before Mr. Melnick made, and the Parties accepted, the mediator's proposal.

### 3.    The Significant Risks Borne By Plaintiffs' Counsel

88.    This prosecution was undertaken by Plaintiffs' Counsel on an entirely contingent-fee basis. From the outset, this Action was a difficult and highly uncertain securities case. There was no guarantee that Plaintiffs' Counsel would ever be compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and that the considerable litigation costs required by a case like this one were covered. Thus, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel received no compensation during the course of the Action and incurred $64,031.13 in out-of-pocket litigation-related expenses in prosecuting the Action.

89.    Additionally, Plaintiffs and their counsel developed and then alleged the Exchange Act claims without information gained through subpoena power, hindered by the PSLRA's automatic discovery stay.

90.    Moreover, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured. As discussed above, Lead Counsel know from experience that the commencement of a class action does not guarantee a settlement. On the

contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

### 4. The Quality Of Representation, Including The Result Obtained, The Experience And Expertise Of Lead Counsel, And The Standing And Caliber Of Defendants' Counsel

91. As demonstrated by the firm resume, attached hereto as Exhibit 10, GPM's attorneys are highly experienced and skilled in securities class action litigation, and focus their practices on that field. I believe Lead Counsel's experience and extensive knowledge of the practice area added valuable leverage in the settlement negotiations.

92. Additionally, the quality of the work performed by Plaintiffs' Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Hogan Lovells US LLP, a well-known international law firm that vigorously represented the interests of its clients throughout this Action. In the face of this experienced and formidable opposition, Lead Counsel were able to develop a case that was sufficiently strong to nonetheless persuade Defendants to settle the case on terms that were highly favorable to the Settlement Class.

### 5. The Requested Fee In Relation To The Settlement

I believe that the amount of the fee requested (18.5%) in relation to the Settlement Amount ($21 million) is fair and reasonable. *See* Fee Memorandum § II.C.1. It is also significantly below the amount set forth in the Notice, which informed the Settlement Class that Lead Counsel would apply for an attorneys' fee award of up to 25% of the Settlement Fund. A request of 25% would equate to a fee of $5,250,000. Lead Counsel, however, seeks the lesser amount of $3,885,000 in recognition of the lodestar crosscheck and the stage at which this Action settled.

32

**6.  The Reaction Of The Settlement Class Supports Lead Counsel's Fee Request**

93.  As noted above, as of December 14, 2022, a total of 51,742 Notice Packets were mailed to Settlement Class Members and their nominees.  Schachter Decl. ¶9.  To date, no objections to the 25% maximum potential attorneys' fee request set forth in the Notice have been received by Lead Counsel or entered on this Court's docket.

**7.  Lead Plaintiffs Support Lead Counsel's Fee Request**

94.  As set forth in the declarations submitted by Lead Plaintiffs Ryan Bibb, Rodney Samaan, Lionel Dreshaj, and Benjamin Dreshaj, Plaintiffs have concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action.  *See* Ex. 1 ("Bibb Decl.") ¶¶9-11; Ex. 2 ("Samaan Decl.") ¶¶9-11; Ex. 3 ("L. Dreshaj Decl.") ¶¶9-11; Ex. 4 ("B. Dreshaj Decl.") ¶¶9-11.  Plaintiffs have been closely involved in this case, and their endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

**B.  Reimbursement Of The Requested Litigation Expenses Is Fair And Reasonable**

95.  Lead Counsel seeks a total of $74,031.13 in Litigation Expenses to be paid from the Settlement Fund.  This amount includes: $64,031.13 in out-of-pocket expenses reasonably and necessarily incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action; as well as a total of $10,000 ($2,500 each) to Mr. Bibb, Mr. Samaan, and Messrs. Dreshaj, pursuant to 15 U.S.C. § 78u-4(a)(4) for their reasonable costs (including lost wages) directly incurred in connection with their representation of the Settlement Class.  *See* Bibb Decl., ¶¶12-13; Samaan Decl., ¶¶12-13; L. Dreshaj Decl., ¶¶12-13; B. Dreshaj Decl., ¶¶12-13.

33

96.    Lead Counsel is seeking reimbursement of a total of $64,031.13 in out-of-pocket costs and expenses.  The following is a combined breakdown by category of all expenses incurred by Lead Counsel:

| CATEGORY OF EXPENSE | AMOUNT |
|---|---:|
| COURIER AND SPECIAL POSTAGE | 41.63 |
| COURT FILING FEES | 402.00 |
| DOCUMENT MANAGEMENT | 3,514.12 |
| EXPERTS | 25,118.00 |
| INVESTIGATIONS | 8,406.50 |
| MEDIATION | 16,462.32 |
| ONLINE RESEARCH | 4,149.55 |
| PSLRA PRESS RELEASE | 110.00 |
| TELEPHONE | 18.04 |
| TRAVEL AIRFARE | 2,695.87 |
| TRAVEL AUTO | 960.84 |
| TRAVEL HOTEL | 1,997.35 |
| TRAVEL MEALS | 154.91 |
| GRAND TOTAL | 64,031.13 |

97.    The Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $175,000. The $74,031.13 requested by Lead Counsel and Plaintiffs, falls well below that amount. To date, no objections have been raised as to the maximum amount of expenses set forth in the Notice.

98.    From the beginning of the case, Lead Counsel were aware that they might not recover their out-of-pocket expenses.  Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the contemporaneous lost use of funds advanced to prosecute this Action.  Accordingly, Lead Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

99.     The largest component of expenses, $25,118.00, or approximately 39.2% of the total expenses, was expended on the retention of experts in: (a) loss causation and damages; and (b) FDA and EMA regulations.

100.     Additionally, Lead Counsel paid $16,462.32 in mediation fees owed to Mr. Melnick for the services Mr. Melnick provided during the settlement negotiation period, which is approximately 25.7% of the total expenses incurred.

101.     Another large component of expenses, $8,406.50, or approximately 13.1% of the total expenses, was expended on the retention of an investigator who located and interviewed relevant former employees and third parties.

102.     The other litigation expenses for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These litigation expenses included, among other things, court fees, cost of publishing the press release required by the PSLRA, document management, travel-related expenses, postage and delivery expenses, and the cost of on-line legal research.

103.     The litigation expenses incurred in the Action are reflected on the books and records of GPM.  These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred. The expenses reflected herein are the expenses actually incurred by GPM.

104.     Finally, as stated above, Plaintiffs seek reimbursement, pursuant to 15 U.S.C. § 78u-4(a)(4), of their reasonable costs (including lost wages) directly incurred in connection with their representation of the Settlement Class, in the amount of $2,500 each.  *See* Ex. 1 (Bibb Decl.), ¶¶12-13; Ex. 2 (Samaan Decl.), ¶¶12-13; Ex. 3 (L. Dreshaj Decl.), ¶¶12-13; Ex. 4 (B. Dreshaj Decl.), ¶¶12-13.  Plaintiffs worked closely with Lead Counsel throughout the pendency of this

Action in connection with their service as Lead Plaintiffs.  For example, Plaintiffs: (a) regularly communicated with counsel regarding the posture and progress of the case, as well as strategy; (b) reviewed pleadings and briefs filed in the Action; (c) reviewed Court Orders; (d) produced documents to counsel; (e) prepared for the mediation sessions by, among other things, discussing with counsel the mediation statements and mediation strategy; (f) received updates from counsel regarding settlement negotiations; (g) evaluated the Settlement Amount, conferred with counsel, and ultimately approved the Settlement; and (h) communicated with counsel regarding the process of finalizing the Settlement.  *See* Ex. 1 (Bibb Decl.), ¶5; Ex. 2 (Samaan Decl.), ¶5; Ex. 3 (L. Dreshaj Decl.), ¶5; Ex. 4 (B. Dreshaj Decl.), ¶5.

105.    To date, no objections to the Litigation Expenses have been filed on the Court's docket or received by Lead Counsel.  In my opinion, the Litigation Expenses incurred by Lead Counsel and Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement.

## VIII.  CONCLUSION

106.    In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Memorandum, I respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and the proposed Plan of Allocation should be approved as fair and reasonable.  I further submit that the requested fee in the amount of 18.5% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of $74,031.13 in Litigation Expenses, including PSLRA reimbursement for costs in the amounts of $2,500 each for the four Lead Plaintiffs, should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed this 19th day of December, 2022, at Wilmington, North Carolina.

*s/ GARTH SPENCER*
GARTH SPENCER

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was electronically filed with the Clerk of

Court via the CM/ECF system, which will send Notice of such filing to all counsel of record.


Dated: December 19, 2022                    */s/ Matthew M. Houston*
                                            Matthew M. Houston